# United States Court of Appeals

### *for the*

# Fourth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

– v. –

RICHARD TODD HAAS,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# JOINT APPENDIX
# VOLUME ONE

BRIAN R. HOOD
HEATHER H. MANSFIELD
OFFICE OF THE U.S. ATTORNEY
919 E. Main Street, Suite 1900
Richmond, VA 23219
(804) 819-5400
brian.hood@usdoj.gov
heather.h.mansfield@usdoj.gov

AIDAN T. GRANO
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3708
aidan.grano@usdoj.gov

*Counsel for Appellee*

WILLIAM J. DINKIN
STONE, CARDWELL &
DINKIN, PLLC
101 Shockoe Slip, Suite K
Richmond, VA 23219
(804) 359-0000
bill.dinkin@gmail.com

*Counsel for Appellant*



# TABLE OF CONTENTS

## VOLUME ONE

District Court Docket Sheet ........................................................................... 1

Indictment
    Filed November 1, 2016 ............................................................. 19

Defendant's Motion to Suppress
    Filed January 3, 2017 ................................................................. 23

    Search Warrant and Affidavit ..................................................... 32

Response of the United States to Defendant's Motion to Suppress
    Filed January 6, 2017 ................................................................. 82

Defendant's Reply to the Government's Response to Motion to Suppress
    Filed January 16, 2017 ............................................................... 96

    Exhibit 2 – Transcript of call between Haas and CW1 8/14/16 ................. 106

    Exhibit 3 – Transcript of call between Haas and CW1 8/16/16 ................. 109

Transcript of Motion to Suppress Hearing before the Hon. Robert E. Payne
    Heard February 8, 2017 ............................................................. 113

    **Melvin Gonzalez**
    Direct ...................................................................................... 121
    Cross ....................................................................................... 167
    Redirect ................................................................................... 170

Defendant's Supplemental Briefing on Motion to Suppress
    Filed March 10, 2017 ................................................................ 257

    Exhibit A – Application for Search Warrant ............................. 273

    Exhibit B – Search Warrant ....................................................... 310

## VOLUME TWO

Exhibit C – Search Warrant Return ............................................................. 360

Exhibit D – Transcript of call between Haas and CW1 8/14/16 ................ 367

Exhibit E – Transcript of call between Haas and CW1 8/16/16 ................ 370

Exhibit F – Stipulations ............................................................................. 374

Exhibit G1 – Text messages ...................................................................... 376

Exhibit G2 – Text messages ...................................................................... 399

Supplemental Response of the United States
        Filed March 27, 2017 ....................................................................... 421

Defendant's Reply to United States' Response to Supplemental Briefing on Motion
to Suppress
        Filed April 3, 2017 ........................................................................... 439

Memorandum Opinion
        Filed May 2, 2017 ............................................................................. 445

Order Denying Defendant's Motion to Suppress
        Entered May 2, 2017 ......................................................................... 474

Superseding Indictment
        Filed December 19, 2017 ................................................................... 475

Defendant's Motion to Suppress and Motion for a Franks Hearing
        Filed July 23, 2018 ........................................................................... 479

Response in Opposition to Defendant's Motion to Suppress and Motion for a
Franks Hearing
        Filed August 6, 2018 ......................................................................... 487

Transcript of Motion to Suppress Hearing before the Hon. Robert E. Payne
        Heard August 16, 2018 ..................................................................... 505

Memorandum Opinion Denying Motion to Suppress and Franks Request
    Filed August 23, 2018 ................................................................... 586

Order Denying Motion to Suppress and Franks Request
    Entered August 23, 2018 ............................................................. 604

Transcript of Jury Trial (Day One) before the Hon. Robert E. Payne
    Heard September 24, 2018 ........................................................... 605

    **Shannon Brill**
    Direct by Ms. Mansfield .......................................................... 608
    Cross by Mr. Everhart .............................................................. 611

    **Sarah Hanson**
    Direct by Mr. Hood .................................................................. 612
    Cross by Mr. Everhart .............................................................. 668
    Redirect by Mr. Hood .............................................................. 710

    **Kevin P. Hiner**
    Direct by Ms. Mansfield .......................................................... 714

**VOLUME THREE**

Transcript of Jury Trial (Day Two) before the Hon. Robert E. Payne
    Heard September 25, 2019 ......................................................... 727

    **Melvin Gonzalez**
    Direct by Ms. Mansfield .......................................................... 731
    Cross by Mr. Everhart .............................................................. 748
    Redirect by Ms. Mansfield ....................................................... 758

    **Karen Shafer**
    Direct by Mr. Hood .................................................................. 759
    Cross by Mr. Everhart .............................................................. 822
    Redirect by Mr. Hood .............................................................. 832

Defendant's Position with Respect to Sentencing Factors and Arguments for
Downward Variance
    Filed January 7, 2019 ................................................................. 839

United States' Position with Respect to Sentencing Factors and Motion for Upward Departure, or, in the Alternative, Upward Variance
     Filed January 8, 2019................................................................................. 848

United States' Position with Respect to Sentencing Factors and Motion for Upward Departure, or, in the Alternative, Upward Variance
     Filed January 8, 2019................................................................................. 874

United States' Position with Respect to Defendant's Addendum on Position with Respect to Sentencing Factors
     Filed January 16, 2019............................................................................. 900

Transcript of Sentencing Hearing before the Hon. Robert E. Payne
     Heard January 17, 2019 ........................................................................... 908

Order on Sentencing Motions
     Entered January 18, 2019 ...................................................................... 1064

Judgment
     Entered January 24, 2019 ...................................................................... 1066

Notice of Appeal
     Filed January 31, 2019.......................................................................... 1072

## VOLUME FOUR (SEALED)

Presentence Investigation Report
     Prepared December 5, 2018.................................................................... 1074

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CRIMINAL DOCKET FOR CASE #: 3:16-cr-00139-REP-1

Case title: USA v. Haas

Date Filed: 11/01/2016
Date Terminated: 01/24/2019

---

Assigned to: District Judge Robert E. Payne

Appeals court case number: 19-4077 USCA

**Defendant (1)**

**Richard Todd Haas**
*TERMINATED: 01/24/2019*

represented by **William Jeffrey Dinkin**
Stone Dinkin & Amirshahi PLC
101 Shockoe Slip
Suite K
Richmond, VA 23219
804-359-0000
Fax: 804-257-5555
Email: bill.dinkin@shockoelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Carolyn V. Grady**
Office of the Federal Public Defender
(Richmond)
701 East Broad Street
Suite 3600
Richmond, VA 23219
804-565-0855
Fax: 804-648-5033
Email: Carolyn_Grady@fd.org
*TERMINATED: 08/31/2017*
*Designation: Public Defender*

**Charles Arthur Gavin**
Cawthorne Deskevich & Gavin PC
1409 Eastridge Road
Richmond, VA 23229
804-288-7999
Fax: 804-327-5795
Email: c.gavin@cawthorn.net
*TERMINATED: 05/11/2018*
*Designation: CJA Appointment*

**Jeffrey Lee Everhart**
Rice & Everhart
4100 E. Parham Road

1

Suite C
Henrico, VA 23228
804-672-1087
Fax: 804-672-0545
Email: everhartlaw@comcast.net
*TERMINATED: 01/24/2019*
*Designation: Retained*

**Robert James Wagner**
Office of the Federal Public Defender
(Richmond)
701 East Broad Street
Suite 3600
Richmond, VA 23219
(804) 343-0800
Email: robert_wagner@fd.org
*TERMINATED: 08/31/2017*
*Designation: Public Defender*

**Valencia Danyale Roberts**
Office of the Federal Public Defender
(Richmond)
701 East Broad Street
Suite 3600
Richmond, VA 23219
804-565-0885
Fax: 804-648-5033
Email: valencia_roberts@fd.org
*TERMINATED: 08/31/2017*
*Designation: Public Defender*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1591(a)(1) AND IN ACCORDANCE WITH 18:2253: SEX TRAFFICKING OF A CHILD; FORFEITURE NOTICE (1) | DISMISSED ON MOTION OF GOVERNMENT |
| 18:1591(a)(1), 1591(b)(1) & 1594 AND IN ACCORDANCE WITH 18:1594(e)(1) & 2253: ATTEMPTED SEX TRAFFICKING OF CHILDREN; FORFEITURE NOTICE (1s) | LIFE IMPRISONMENT, LIFE SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT |
| 18:2252A(a)(2)(A) AND IN ACCORDANCE WITH 18:2253: RECEIPT OF CHILD PORNOGRAPHY; FORFEITURE NOTICE (2) | DISMISSED ON MOTION OF GOVERNMENT |
| 18:2252A(a)(2)(A) & (b) AND IN ACCORDANCE WITH 18:1594(e)(1) & (2253): RECEIPT OF CHILD PORNOGRAPHY; FORFEITURE NOTICE (2s) | 240 MONTHS IMPRISONMENT, LIFE SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT |

18:2252A(a)(5)(B) AND IN
ACCORDANCE WITH 18:2253:
POSSESSION OF CHILD
PORNOGRAPHY; FORFEITURE
NOTICE
(3-5)

DISMISSED ON MOTION OF
GOVERNMENT

18:2252A(a)(5)(B) AND IN
ACCORDANCE WITH 18:1594(e)(1) &
2253: POSSESSION OF CHILD
PORNOGRAPHY; FORFEITURE
NOTICE
(3s)

120 MONTHS IMPRISONMENT, LIFE
SUPERVISED RELEASE, $100 SPECIAL
ASSESSMENT

18:2252A(a)(5)(B) AND IN
ACCORDANCE WITH 18:1594(e)(1) &
2253: POSSESSION OF CHILD
PORNOGRAPHY; FORFEITURE
NOTICE
(4s)

120 MONTHS IMPRISONMENT, LIFE
SUPERVISED RELEASE, $100 SPECIAL
ASSESSMENT

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Plaintiff**

| **USA** | represented by | **Brian R. Hood** |
| --- | --- | --- |
| | | Office of the U.S. Attorney |
| | | SunTrust Building |
| | | 919 East Main Street |
| | | Suite 1900 |
| | | Richmond, VA 23219 |
| | | (804) 819-5400 |
| | | Email: brian.hood@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: US Attorney* |
| | | |
| | | **Heather Hart Mansfield** |
| | | United States Attorney's Office (Richmond) |
| | | SunTrust Building |
| | | 919 East Main Street |

3

Suite 1900
Richmond, VA 23219
(804) 819-5400
Fax: (804) 771-2316
Email: Heather.H.Mansfield@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**David V. Harbach , II**
United States Attorney Office (Richmond-NA)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
NA
(804) 819-5443
Email: david.harbach@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Samuel Eugene Fishel , IV**
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
Email: sfishel@oag.state.va.us
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Thomas Kennerly Johnstone , IV**
Office of the Attorney General (Richmond)
202 North 9th Street
Richmond, VA 23219
804-786-2071
Fax: 804-786-1726
Email: tjohnstone@oag.state.va.us
*TERMINATED: 12/19/2017*
*Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/01/2016 | 1 | INDICTMENT as to Richard Todd Haas Counts 1, 2, and 3-5. (sbea, ) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/01/2016) |
| 11/01/2016 | 2 | Minute Entry as to Richard Todd Haas: Before U.S. Magistrate Judge David J. Novak. Court Reporter: Deanna Arend, Zahn Court Reporting. Appearances: Samuel E. Fishel, IV, AUSA. Indictment, a true bill returned before a Magistrate Judge at Richmond. Govt's motion for the issuance of an arrest warrant, to be lodged as a detainer, heard and so-ordered. (sbea, ) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/01/2016) |
| 11/01/2016 | 4 | Arrest Warrant Issued as to Richard Todd Haas. Clerk placed Warrant in U.S. Marshals box. (sbea, ) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/01/2016) |
| 11/04/2016 | 5 | ARREST Warrant Returned Executed on 11/4/2016 as to Richard Todd Haas. (cgar). |

4

Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/04/2016)

| 11/04/2016 | | Oral ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Richard Todd Haas. Valencia Danyale Roberts for Richard Thomas Haas appointed by Magistrate Judge David J. Novak on 11/4/2016. (cgar) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/04/2016) |
|---|---|---|
| 11/04/2016 | 6 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Initial Appearance as to Richard Todd Haas held on 11/4/2016. Matter came on for initial appearance. Deft advised of charges penalties and rights. Deft requested c/a counsel. Financial affidavit executed. Elizabeth W. Hanes, AFPD present. FPD provisionally appointed. Counsel to be prepared to address Deft's finances in detail on 11/9/2016 at 11:45 a.m. Govt's motion to detain deft GRANTED. Financial review and detention hearing set for 11/9/16 at 11:45 a.m. Deft remanded to custody. (Tape #FTR.)(cgar) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/04/2016) |
| 11/04/2016 | 7 | CJA 23 Financial Affidavit by Richard Todd Haas. (cgar) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/04/2016) |
| 11/04/2016 | | Set Hearings as to Richard Todd Haas: Attorney Appointment Hearing and Detention Hearings set for 11/9/2016 at 11:45 AM in Richmond Courtroom 5400 before Magistrate Judge David J. Novak. (cgar) Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/04/2016) |
| 11/04/2016 | 8 | Temporary Detention Order as to Richard Todd Haas. Signed by Magistrate Judge David J. Novak on 11/4/2016. (cgar). Modified docket text on 11/9/2016. (sbea, ) (Entered: 11/07/2016) |
| 11/09/2016 | 9 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Attorney Appointment and Detention Hearings as to Richard Todd Haas held on 11/9/2016. Matter came on for attorney appointment and detention hearings. Court has reviewed additional financial information and confirms appointment of counsel. Matter continued as to detention. Deft and Govt adduced evidence. Argument heard from Defense Counsel. Findings stated from bench. Deft ordered held pending trial. Deft remanded to custody. (Tape #FTR.)(cgar, ) (Entered: 11/09/2016) |
| 11/09/2016 | 10 | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Arraignment as to Richard Todd Haas (1) Count 1,2,3-5 held on 11/9/2016. Matter came on for arraignment. Deft WFA. Deft arraigned and entered plea of not guilty. Jury trial set for January 11, 2017 at 9:30 a.m. March 21, 2016 at 9:30 a.m. Motions deadline set. Deft remanded to custody.(Tape #FTR.)(cgar) (Entered: 11/09/2016) |
| 11/09/2016 | | Set Hearing as to Richard Todd Haas: Jury Trial set for 1/11/2017 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (cgar) (Entered: 11/09/2016) |
| 11/09/2016 | 11 | Detention Order Pending Trial as to Richard Todd Haas. Signed by Magistrate Judge David J. Novak on 11/9/2016. (cgar) (Entered: 11/10/2016) |
| 12/16/2016 | 12 | Joint MOTION to Continue *Jury Trial* by Richard Todd Haas. (Attachments: # 1 Proposed Order)(Roberts, Valencia) (Entered: 12/16/2016) |
| 12/20/2016 | 13 | ORDER that the JOINT 12 MOTION TO CONTINUE JURY TRIAL is granted. It is further ORDERED that the jury trial scheduled for 9:30 a.m. January 11, 2017 is continued generally until further Order of the Court. It is ORDERED that a telephone status conference is scheduled for 2:30 p.m. January 5, 2017 for the purpose of setting a new trial date. Counsel for the defendant shall be responsible for arranging the telephone |

5

| | | |
|---|---|---|
| | | conference. Signed by Magistrate Judge David J. Novak on 12/20/2016. (jsmi, ) (Entered: 12/20/2016) |
| 12/20/2016 | | Jury Trial on January 11, 2017 continued as to Richard Todd Haas -- telephone conference scheduled for January 5, 2017 at 2:30 p.m. (khan, ) (Entered: 12/20/2016) |
| 01/03/2017 | 14 | MOTION to Suppress *Evidence* by Richard Todd Haas. (Attachments: # 1 Exhibit) (Wagner, Robert) (Entered: 01/03/2017) |
| 01/03/2017 | 15 | NOTICE OF ATTORNEY APPEARANCE: Carolyn V. Grady appearing for Richard Todd Haas (Grady, Carolyn) (Entered: 01/03/2017) |
| 01/05/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 1/5/2017 (khan, ) (Entered: 02/06/2017) |
| 01/06/2017 | 16 | ORDER that the trial in this matter, which was continued generally on December 20, 2016, shall begin on April 3, 2017, at 9:30 a.m. and carryover to April 4, 2017. See Order for details. Signed by District Judge Robert E. Payne on 1/5/2017. (jsmi, ) (Entered: 01/06/2017) |
| 01/06/2017 | 17 | ORDER that the Government shall file its response to DEFENDANT'S 14 MOTION TO SUPPRESS EVIDENCE by January 9, 2017; Defendant shall reply by January 16, 2017. Furthermore, it is hereby ORDERED that the hearing on DEFENDANT'S 14 MOTION TO SUPPRESS EVIDENCE is scheduled for February 8, 2017 at 10 A.M. Signed by District Judge Robert E. Payne on 1/5/2017. (jsmi, ) (Entered: 01/06/2017) |
| 01/06/2017 | | Set Motion case as to Richard Todd Haas 14 MOTION to Suppress *Evidence*. Motion Hearing set for 2/8/2017 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 01/06/2017) |
| 01/06/2017 | | Set/Reset Hearings as to Richard Todd Haas: Jury Trial set for 4/3/2017 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 01/06/2017) |
| 01/06/2017 | 18 | RESPONSE to Motion by USA as to Richard Todd Haas re 14 MOTION to Suppress *Evidence* (Attachments: # 1 Exhibit A)(Fishel, Samuel). Clerk modified attachment name on 1/9/2017. (sbea, ) (Entered: 01/06/2017) |
| 01/16/2017 | 19 | Reply by Richard Todd Haas *to Government Response* (Attachments: # 1 Exhibit, # 2 Exhibit)(Wagner, Robert) (Entered: 01/16/2017) |
| 01/17/2017 | 20 | MOTION for Leave to File *Supplement to Response* by USA as to Richard Todd Haas. (Attachments: # 1 Exhibit Gov Exhibit B)(Fishel, Samuel) (Entered: 01/17/2017) |
| 01/20/2017 | 21 | ORDER as to Richard Todd Haas that it is hereby ORDERED that the 20 motion is granted and the United States is permitted to supplement its Response to Defendant's Motion to Suppress Evidence (ECF No. 18 ). It is so ORDERED. Signed by District Judge Robert E. Payne on 1/20/2017. (sbea, ) (Entered: 01/20/2017) |
| 01/30/2017 | 22 | NOTICE OF ATTORNEY APPEARANCE Heather Hart Mansfield appearing for USA. (Mansfield, Heather) (Entered: 01/30/2017) |
| 02/08/2017 | 25 | Minute Entry for proceedings held before District Judge Robert E. Payne:Motion Hearing as to Richard Todd Haas held on 2/8/2017 re 14 MOTION to Suppress *Evidence* filed by Richard Todd Haas. Dft adduced evidence. Arguments heard. Further briefing is required by the Court. Jury Trial continued generally will be reset after these issues are resolved. Court retained exhibits to be returned to defense counsel once the court is finished. Dft remanded to custody. (Court Reporter Diane Daffron, OCR.)(khan, ) (Entered: 02/10/2017) |

6

| | | |
|---|---|---|
| 02/08/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 2/8/2017 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 03/03/2017) |
| 02/09/2017 | 23 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the trial in this matter, scheduled for April 3, 2017, shall be continued generally until further Order of the Court, said continuance being in the interest of justice and the interest of justice thereby to be served outweighs the interest of the defendant and the public and a speedy trial within the time prescribed by 18 U.S. C. § 3161. It is so ORDERED Signed by District Judge Robert E. Payne on 2/9/2017. (sbea, ) (Entered: 02/09/2017) |
| 02/10/2017 | 24 | ORDER as to Richard Todd Haas; 1) the Defendant shall file Supplemental Briefing on his Motion to Suppress by March 10, 2017; 2) The Government shall file its response by March 27, 2017; and 3) The Defendant may reply by April 3, 2017. See Order for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 2/9/2017. (sbea, ) (Entered: 02/10/2017) |
| 02/10/2017 | | Jury Trial continued generally as to Richard Todd Haas: (khan, ) (Entered: 02/10/2017) |
| 02/20/2017 | 26 | TRANSCRIPT of Proceedings held on February 8, 2017, before Judge Robert E. Payne. Court reporter Diane Daffron, Telephone number 804-916-2893. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/22/2017. Redacted Transcript Deadline set for 4/24/2017. Release of Transcript Restriction set for 5/22/2017.**(daffron, diane) (Entered: 02/20/2017) |
| 03/10/2017 | 27 | Memorandum in Support by Richard Todd Haas re 14 MOTION to Suppress *Evidence Supplemental* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G1, # 8 Exhibit G2)(Roberts, Valencia) (Entered: 03/10/2017) |
| 03/27/2017 | 28 | Supplemental Memorandum by USA as to Richard Todd Haas re 14 MOTION to Suppress *Evidence* (Mansfield, Heather) (Entered: 03/27/2017) |
| 04/03/2017 | 29 | REPLY TO RESPONSE to by Richard Todd Haas re 28 Supplemental Memorandum (Grady, Carolyn) (Entered: 04/03/2017) |
| 05/02/2017 | 30 | MEMORANDUM OPINION as to Richard Todd Haas. See Opinion for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 5/2/2017. (sbea, ) (Entered: 05/02/2017) |
| 05/02/2017 | 31 | ORDER as to Richard Todd Haas. It is hereby ORDERED that DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 14 ) is denied. It is further ORDERED that Defendant's request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) is also denied. It is so ORDERED. Signed by District Judge Robert E. Payne on 5/2/2017. (sbea, ) (Entered: 05/02/2017) |
| 05/03/2017 | 32 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the trial in this matter is scheduled for June 12, 2017 until June 14, 2017. The Court finds that granting the oral motion serves the ends of justice and that the ends of justice served therein outweigh the best interest of the public and the Defendant in a trial within the time prescribed by 18 |

7

| | | |
|---|---|---|
| | | U.S.C. § 3161. It is so ORDERED. Signed by District Judge Robert E. Payne on 5/3/2017. (sbea, ) (Entered: 05/03/2017) |
| 05/03/2017 | | Set/Reset Hearings as to Richard Todd Haas: Jury Trial set for 6/12/2017 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 05/03/2017) |
| 05/03/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 5/3/2017 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 06/06/2017) |
| 06/01/2017 | 33 | MOTION to Seal *Writ of Habeas Corpus Ad Testificandum* by USA as to Richard Todd Haas. (Attachments: # 1 Proposed Order)(Mansfield, Heather) (Entered: 06/01/2017) |
| 06/01/2017 | 34 | Memorandum in Support by USA as to Richard Todd Haas re 33 MOTION to Seal *Writ of Habeas Corpus Ad Testificandum (Non-Confidential)* (Mansfield, Heather) (Entered: 06/01/2017) |
| 06/01/2017 | 36 | Sealed Petition and Order for Writ of Habeas Corpus Ad Testificandum as to Richard Todd Haas. Signed by Magistrate Judge Roderick C. Young on 6/1/2017. (sbea, ) (Entered: 06/01/2017) |
| 06/01/2017 | 37 | Sealed Writ of Habeas Corpus Ad Testificandum issued in the case as to Richard Todd Haas. (sbea, ) (Entered: 06/01/2017) |
| 06/01/2017 | 35 | ORDER as to Richard Todd Haas that: 1) The Government's 33 Motion to Seal the Petition and Order for Writ of Habeas Corpus ad Testificandum is GRANTED; 2) The Petition and Order for Writ of Habeas Corpus ad Testificandum SHALL remain under seal until the first day of trial in this matter. The United States will file a motion to unseal before the items are set to be unsealed automatically if circumstances warrant earlier unsealing.; and, 3) A copy of the Petition and Order for Writ of Habeas Corpus ad Testificandum SHALL BE provided to the United States Marshals Service so that the prisoner may be produced (please see Order for details). SO ORDERED and Signed by Magistrate Judge Roderick C. Young on 6/1/2017. (sbea, ) (Entered: 06/01/2017) |
| 06/02/2017 | 39 | SECOND MOTION to Continue *Jury Trial* by Richard Todd Haas. (Grady, Carolyn). Modified docket text on 6/2/2017 (sbea, ). (Entered: 06/02/2017) |
| 06/05/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 6/5/2017 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 07/10/2017) |
| 06/06/2017 | | Set/Reset Hearings as to Richard Todd Haas: Jury Trial set for 10/2/2017 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 06/06/2017) |
| 06/06/2017 | 40 | ORDER as to Richard Todd Haas that the trial in this matter is continued from June 12, 2017 until October 2, 2017 at 9:30 a.m., and shall carryover until October 4, 2017. It is so ORDERED. Signed by District Judge Robert E. Payne on 6/5/2017. (sbea, ) (Entered: 06/06/2017) |
| 06/13/2017 | 41 | AGREED DISCOVERY ORDER. See Order for details and deadlines. Signed by District Judge Robert E. Payne on 6/13/2017. (jsmi, ) (Entered: 06/13/2017) |
| 08/10/2017 | 42 | MOTION to Appoint New Counsel by Richard Todd Haas. (Motion is not signed). (Attachments: # 1 Envelope)(tjoh, ) (Entered: 08/11/2017) |
| 08/15/2017 | 43 | ORDER as to Richard Todd Haas, that counsel of record for the Defendant and Mr. Paul Gill shall file a response to Defendant's MOTION FOR NEW COUNSEL (ECF No. 42 ) |

8

| | | |
|---|---|---|
| | | by August 21, 2017, the Defendant may respond by August 28, 2017 and the Government shall respond by September 4, 2017. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/14/2017. (sbea, ) (Entered: 08/15/2017) |
| 08/16/2017 | 44 | RESPONSE by Richard Todd Haas re 43 Order, (Grady, Carolyn) (Entered: 08/16/2017) |
| 08/16/2017 | 45 | MOTION to Withdraw as Attorney by Carolyn Grady and Valencia Roberts. by Richard Todd Haas. (Grady, Carolyn) (Entered: 08/16/2017) |
| 08/16/2017 | 46 | MOTION to Appoint Counsel by Richard Todd Haas. (Grady, Carolyn) (Entered: 08/16/2017) |
| 08/22/2017 | | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Richard Todd Haas 45 MOTION to Withdraw as Attorney by Carolyn Grady and Valencia Roberts., 46 MOTION to Appoint Counsel . Motion Hearing set for 8/23/2017 at 03:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 08/22/2017) |
| 08/22/2017 | 47 | ORDER as to Richard Todd Haas. It is hereby ORDERED that oral argument on the MOTION FOR NEW COUNSEL (ECF No. 42 ) and DEFENSE COUNSEL'S MOTION TO WITHDRAW AS COUNSEL, AND RESPONSE TO COURT ORDER (ECF No. 45 ) shall be heard at 3:30 p.m. August 23, 2017. The defendant is required to be in attendance. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/22/2017. (sbea, ) (Entered: 08/22/2017) |
| 08/23/2017 | 48 | RESPONSE by Richard Todd Haas re: 43 Order. (sbea, ) (Entered: 08/23/2017) |
| 08/23/2017 | 49 | Minute Entry for proceedings held before District Judge Robert E. Payne:Motion Hearing as to Richard Todd Haas held on 8/23/2017 re 46 MOTION to Appoint Counsel filed by Richard Todd Haas, 45 MOTION to Withdraw as Attorney by Carolyn Grady and Valencia Roberts. filed by Richard Todd Haas. Portion of hearing UNDER SEAL. Dft and lawyer to talk. Matter continued to 8/30/17 at 1:30 p.m. Dft remanded to custody. (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 08/24/2017) |
| 08/23/2017 | | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Richard Todd Haas 45 MOTION to Withdraw as Attorney by Carolyn Grady and Valencia Roberts., 46 MOTION to Appoint Counsel , 42 MOTION to Appoint Counsel. Motion Hearing set for 8/30/2017 at 01:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 08/24/2017) |
| 08/30/2017 | 50 | Minute Entry for proceedings held before District Judge Robert E. Payne: Motion Hearing (Status) as to Richard Todd Haas held on 8/30/2017. Statements made by counsel. Motion to withdraw as counsel, Granted. Deft's motion to appoint new counsel, Denied. Charles Gavin, Esquire appointed to represent deft. Jury trial to be rescheduled. Deft. remanded to custody. (Court Reporter P. Petersen,OCR.)(lcha ) (Entered: 08/30/2017) |
| 08/31/2017 | 51 | ORDER as to Richard Todd Haas that DEFENSE COUNSEL'S MOTION TO WITHDRAW AS COUNSEL AND RESPONSE TO COURT ORDER (DOC. 43 ) (ECF Nos. 45 , and 46 ) is granted. Furthermore, it is hereby ORDERED that CHARLES A. GAVIN shall be appointed as new defense counsel in this matter. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/30/2017. (sbea, ) (Entered: 08/31/2017) |
| 08/31/2017 | 52 | ORDER as to Richard Todd Haas that Defendant's MOTION FOR NEW COUNSEL (ECF No. 42 ) is denied as moot. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/30/2017. (sbea, ) (Entered: 08/31/2017) |
| 08/31/2017 | 53 | MOTION to Continue *Trial* by Richard Todd Haas. (Gavin, Charles) (Entered: 08/31/2017) |

9

| 09/14/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 9/14/2017 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 10/11/2017) |
|---|---|---|
| 09/15/2017 | 54 | ORDER as to Richard Todd Haas that the **trial in this matter is continued from October 2, 2017 until January 3, 2018 at 9:30 a.m., and shall carry over until January 4, 2018.** It is so ORDERED. Signed by District Judge Robert E. Payne on 9/14/2017. (sbea, ) (Entered: 09/15/2017) |
| 09/18/2017 | | Set/Reset Hearings as to Richard Todd Haas: Jury Trial set for 1/3/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 09/18/2017) |
| 12/07/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference as to Richard Todd Haas held on 12/7/2017 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 01/02/2018) |
| 12/13/2017 | 73 | MOTION to Continue by Richard Todd Haas. (Gavin, Charles) (Entered: 12/13/2017) |
| 12/13/2017 | 74 | Ex Parte Subpoena Returned as to Richard Todd Haas re: 63 MOTION for Ex Parte Subpoena Duces Tecum. (sbea, ) Modified on 12/14/2017 (sbea, ). (Entered: 12/13/2017) |
| 12/18/2017 | 75 | MOTION to Withdraw as Attorney by Thomas Kennerly Johnstone, IV. by USA as to Richard Todd Haas. (Fishel, Samuel) (Entered: 12/18/2017) |
| 12/19/2017 | 76 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the MOTION FOR WITHDRAWAL (ECF No. 75 ) is granted. It is further ORDERED that the Clerk shall remove Thomas Kennerly Johnstone, IV, Esquire as counsel of record for the United States. It is so ORDERED Signed by District Judge Robert E. Payne on 12/18/2017. (sbea, ) (Entered: 12/19/2017) |
| 12/19/2017 | 77 | ORDER as to Richard Todd Haas that the MOTION TO CONTINUE (ECF No. 73 ) is continued. It is further ORDERED that the **jury trial scheduled for 9:30 a.m. January 3, 2018 is continued generally until further Order of the Court.** It is so ORDERED. Signed by District Judge Robert E. Payne on 12/18/2017. (sbea, ) (Entered: 12/19/2017) |
| 12/19/2017 | | Jury Trial scheduled to begin January 3, 2018 is continued generally under further order of the Court as to Richard Todd Haas: (khan, ) (Entered: 12/19/2017) |
| 12/19/2017 | 78 | SUPERSEDING INDICTMENT as to Richard Todd Haas Counts: 1s, 2s, and 3s-4s. (sbea, ) (Entered: 12/20/2017) |
| 12/19/2017 | | Set Hearing as to Richard Todd Haas: Arraignment set for January 4, 2018 at 2:00 p.m. in Richmond Courtroom 7400 before District Judge Robert E. Payne. (sbea, ) (Entered: 12/20/2017) |
| 12/20/2017 | | Set/Reset Hearings as to Richard Todd Haas: Arraignment on Superseding Indictment set for 1/4/2018 at 02:00 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 12/20/2017) |
| 01/02/2018 | 80 | NOTICE OF ATTORNEY APPEARANCE Brian R. Hood appearing for USA. (Hood, Brian) (Entered: 01/02/2018) |
| 01/09/2018 | | Set/Reset Hearings as to Richard Todd Haas: RE-Arraignment on Superseding Indictment set for 1/17/2018 at 01:30 PM in Richmond Courtroom 7000 before District Judge Robert E. Payne. (khan, ) (Entered: 01/09/2018) |
| 01/10/2018 | 81 | Notice of Intent and Motion to Introduce Other Acts Evidence Pursuant to Fed. R. Evid. 414 and 404(b) by USA as to Richard Todd Haas. (Hood, Brian). Modified docket text on |

| | | |
|---|---|---|
| | | 3/5/2018 (sbea, ). (Entered: 01/10/2018) |
| 01/18/2018 | | Set/Reset Hearings as to Richard Todd Haas: Arraignment on Superseding Indictment set for 1/18/2018 at 01:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 01/18/2018) |
| 01/18/2018 | 83 | Minute Entry for proceedings held before District Judge Robert E. Payne:Arraignment on Superseding Indictment as to Richard Todd Haas (1) Count 1s,2s,3s-4s held on 1/18/2018. Dft entered a plea of not guilty and requested a trial by jury. Jury Trial scheduled 4/23/18 (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 01/23/2018) |
| 01/19/2018 | 82 | ORDER as to Richard Todd Haas. It is hereby ORDERED that **the trial in this matter shall begin on April 23, 2018 at 9:30 a.m., and shall conclude by April 26, 2018.** Furthermore, having considered Defendant's oral motion to extend the deadline for his response to the UNITED STATES' NOTICE OF INTENT AND MOTION TO INTRODUCE OTHER ACTS EVIDENCE PURSUANT TO FED. R. EVID. 414 AND 404(b) (ECF No. 81 ), it is hereby ORDERED the motion is granted. Defendant shall respond to the motion by February 2, 2018, and the United States shall reply by February 7, 2018. It is further ORDERED that the United States shall provide Defendant with the forensic evidence that it intends to introduce at trial by January 19, 2018. It is so ORDERED. Signed by District Judge Robert E. Payne on 1/19/2018. (sbea, ) (Entered: 01/19/2018) |
| 01/22/2018 | | Reset Hearing as to Richard Todd Haas: Jury Trial set for 4/23/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/22/2018) |
| 02/01/2018 | 84 | MOTION for Extension of Time to File Response/Reply as to 82 Order on Motion 404(B) Evidence,,, by Richard Todd Haas. (Gavin, Charles) (Entered: 02/01/2018) |
| 02/01/2018 | 85 | MOTION to Withdraw as Attorney by Charles A. Gavin. by Richard Todd Haas. (Attachments: # 1 Letter Exhibit A)(Gavin, Charles) (Entered: 02/01/2018) |
| 02/02/2018 | 86 | Minute Entry for proceedings held before District Judge Robert E. Payne: Motion Hearing as to Richard Todd Haas held on 2/2/2018 re: 85 Motion to Withdraw as Attorney. Appearances: Brian Hood, AUSA & Heather Mansfield, AUSA; Deft. w/ counsel, Charles Gavin, Esquire. Defendant to submit under seal list of reasons wanting new counsel by 2/9/18. Defense counsel to submit reply under seal by noon on 2/14/18. Matter continued to 2/15/18 at 1:00 p.m. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 02/02/2018) |
| 02/02/2018 | | Set Hearing re: 85 Motion to Withdraw as Attorney set for 2/15/2018 at 01:00 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 02/02/2018) |
| 02/05/2018 | 87 | ORDER that an evidentiary hearing on the motion is scheduled for February 15, 2018 at 1:00 p.m. Furthermore, it is ORDERED that Defendant shall file by February 9, 2018 a list of specific areas in which he believes that his counsel is deficient. Defendant's counsel shall respond with brief comments on each of those specific areas by February 14, 2018 at noon. However, Defendant's counsel may seek additional time to respond if Defendant fails to identify the areas of deficiency with appropriate specificity. Signed by District Judge Robert E. Payne on 2/2/2018. (jsmi, ) (Entered: 02/05/2018) |
| 02/15/2018 | 94 | Minute Entry for proceedings held before District Judge Robert E. Payne: Hearing on 85 Motion to Withdraw as Attorney as to Richard Todd Haas held on 2/15/2018. Motion DENIED; Portions of hearing designated under seal; Defendant to write down specifics for attorney by 2/22/18; Defendant to notify court if he has retained private counsel or will represent himself by 2/26/18; Motion for extension of time 84 granted - response due |

| | | |
|---|---|---|
| | | by 2/27/18, reply due by 3/6/18. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 02/16/2018) |
| 02/16/2018 | 90 | ORDER as to Richard Todd Haas that Defendant's MOTION TO WITHDRAW AS COUNSEL (ECF No. 85 ) is denied. It is further ORDERED that Defendant may obtain private counsel if he so elects and is able to obtain funding to retain an attorney. Defendant shall determine whether he is obtaining private counsel and advise the Court of his decision by February 26, 2018. It is further ORDERED that Defendant may represent himself if he so chooses but that Mr. Charles A. Gavin shall remain as stand-by counsel for Defendant during any proceedings in which Defendant does so. Defendant shall determine whether he is representing himself and advise the Court of his decision by February 26, 2018. It is further ORDERED that Defendant shall provide the Court with a list of actions he would like his attorney to take in proceeding with his case by February 22, 2018. This list shall be provided directly to the Court by way of the United States Marshals as described in the record. It is further ORDERED that the section of the transcript of the hearing held on February 15, 2018 designated as under seal shall be filed under seal. The Court finds that sealing the transcript is necessary in the interests of justice and under this Court's Local Rules. It is so ORDERED. Signed by District Judge Robert E. Payne on 2/15/2018. Clerk placed a copy in the U.S. Marshals box. (sbea, ) (Entered: 02/16/2018) |
| 02/22/2018 | 98 | Letter by Richard Todd Haas dated February 20, 2018. (Attachment: # 1 Envelope). (sbea, ) (Entered: 02/28/2018) |
| 02/28/2018 | 99 | ORDER as to Richard Todd Haas. It is hereby ORDERED that, by March 30, 2018, Mr. Haas shall retain private counsel and such counsel shall have noted his or her appearance herein. Mr. Gavin shall file a response to UNITED STATES' NOTICE OF INTENT AND MOTION TO INTRODUCE OTHER ACTS EVIDENCE PURSUANT TO FED. R. EVID. 414 AND 404(b) (ECF No. 81 ) and the MOTION FOR EXTENSION OF TIME FOR FILING (ECF No. 84 ) is granted. See Order for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 2/28/2018. Order was mailed to defendant: Inmate No. 1849209, Northern Neck Regional Jail, P. O. Box 1060, Warsaw, VA 22572. (sbea, ) (Entered: 02/28/2018) |
| 03/02/2018 | 100 | RESPONSE to United States Notice of Intent to Introduce Other Acts 414/401(b) by Richard Todd Haas re 81 Notice of Intent and Motion to Introduce Other Acts Evidence Pursuant to Fed. R. Evid. 414 and 404(b) (Gavin, Charles). Modified docket text on 3/5/2018 (sbea, ). (Entered: 03/02/2018) |
| 03/21/2018 | 116 | NOTICE OF ATTORNEY APPEARANCE David V. Harbach, II appearing for USA. (Harbach, David) (Entered: 03/21/2018) |
| 03/26/2018 | 117 | MOTION to Continue by Richard Todd Haas. (Gavin, Charles) (Entered: 03/26/2018) |
| 03/28/2018 | 119 | MOTION to Extend Deadline re: 99 Order by Richard Todd Haas. (Gavin, Charles). Modified docket text on 3/28/2018 (sbea, ). (Entered: 03/28/2018) |
| 04/04/2018 | 121 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the MOTION TO EXTEND DEADLINE (ECF No. 119 ) is granted and, by April 25, 2018, Mr. Haas shall retain private counsel and such counsel shall have noted his or her appearance herein. It is hereby ORDERED that the MOTION TO CONTINUE (ECF No. 117 ) is granted and the jury trial scheduled for April 23, 2018 is continued generally pending further order of the Court, said continuance being in the interest of justice and the interest of justice thereby to be served outweigh the interest of the defendant and the public and a speedy trial within the time prescribed by 18 U.S.C. § 3161. **It is further ORDERED that a status hearing is scheduled for 10:30 a.m. April 26, 2018** for the purposes of setting a schedule of further proceedings in this case. The defendant shall be present at the hearing, |

| | | |
|---|---|---|
| | | along with his newly retained counsel, if any, his current counsel, Charles A. Gavin, Esquire, and counsel for the United States. See Order for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 4/4/2018. (sbea, ) (Entered: 04/04/2018) |
| 04/05/2018 | | Jury Trial continued generally as to Richard Todd Haas: (khan, ) (Entered: 04/05/2018) |
| 04/05/2018 | | Set/Reset Hearings as to Richard Todd Haas: Status Conference set for 4/26/2018 at 10:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 04/05/2018) |
| 04/26/2018 | 122 | Minute Entry for proceedings held before District Judge Robert E. Payne (Court Reporter Peterson, OCR): Matter came on for Status Conference as to Richard Todd Haas on 4/26/2018. Counsel heard. Hearing continued to 1:30 PM to allow for appearance of newly retained counsel, Jeff Everhart, Esq. Status Conference reset for 4/26/2018 at 1:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. Defendant remanded to custody (rpiz) (Entered: 04/26/2018) |
| 04/26/2018 | 123 | Minute Entry for proceedings held before District Judge Robert E. Payne:Status Conference as to Richard Todd Haas held on 4/26/2018. Matter came on for status hearing. Attorney Everhart appeared; not formally retained as of this date. Once counsel retained, he is to file notice of appearance and scheduled telephone conference to occur the first/second week of May to set trial date. (Court Reporter Peppy Peterson, OCR.) (cgar) (Entered: 04/27/2018) |
| 05/11/2018 | 124 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Lee Everhart appearing for Richard Todd Haas (Everhart, Jeffrey) (Entered: 05/11/2018) |
| 05/11/2018 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference as to Richard Todd Haas held on 5/11/2018. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 05/22/2018) |
| 05/14/2018 | | Set/Reset Hearings as to Richard Todd Haas: Jury Trial set for 9/10/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (khan, ) (Entered: 05/14/2018) |
| 05/14/2018 | 125 | ORDER as to Richard Todd Haas. **The trial in this matter shall begin on September 10, 2018.** Furthermore, new counsel having appeared on behalf of Defendant, it is ORDERED that Defendant's current counsel shall file a notice by May 18, 2018 indicating whether he intends to adopt DEFENDANT'S RESPONSE TO UNITED STATES NOTICE OF INTENT TO INTRODUCE OTHER ACTS 414/401 (b) (ECF No. 100 ). If he does not intend to adopt that document, he shall file a replacement response by May 21, 2018. It is so ORDERED. Signed by District Judge Robert E. Payne on 5/14/2018. (sbea, ) (Entered: 05/14/2018) |
| 05/18/2018 | 126 | MOTION to Adopt by Richard Todd Haas. (Everhart, Jeffrey) (Entered: 05/18/2018) |
| 05/21/2018 | 127 | ORDER as to Richard Todd Haas that the MOTION TO ADOPT/JOIN (ECF No. 126 ) is granted and the defendant's current counsel, Jeffrey L. Everhart, is permitted to adopt the previously filed DEFENDANT'S RESPONSE TO UNITED STATES NOTICE OF INTENT TO INTRODUCE OTHER ACTS 414/401(b) (ECF No. 100 ). It is so ORDERED. Signed by Magistrate Judge David J. Novak on 5/21/2018. (sbea, ) (Entered: 05/21/2018) |
| 07/23/2018 | 128 | MOTION to Suppress and Motion for a Franks Hearing by Richard Todd Haas (Everhart, Jeffrey). Modified docket text on 7/24/2018 (sbea, ). (Entered: 07/23/2018) |
| 08/06/2018 | 129 | RESPONSE in Opposition by USA as to Richard Todd Haas re: 128 MOTION to Suppress and Motion for a Franks Hearing (Mansfield, Heather). Modified docket text on 8/7/2018 (sbea, ). (Entered: 08/06/2018) |

| | | |
|---|---|---|
| 08/15/2018 | | Set Hearing: [128](#) Motion to Suppress and [81](#) Motion to Introduce Other Acts Evidence set for 8/16/2018 at 01:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 08/15/2018) |
| 08/15/2018 | [130](#) | ORDER as to Richard Todd Haas that **oral argument on both motions is scheduled for August 16, 2018 at 1:30 p.m.** It is so ORDERED. Signed by District Judge Robert E. Payne on 8/15/2018. (sbea, ) (Entered: 08/15/2018) |
| 08/16/2018 | [131](#) | Minute Entry for proceedings held before District Judge Robert E. Payne: Motion Hearing as to Richard Todd Haas held on 8/16/2018 re [81](#) Motion 404(B) and 414 Evidence & [128](#) Motion to Suppress; Government to file supplemental briefing by 8/23/18; response by 8/30/18; reply by 9/06/18; matter continued for additional hearing to 9/12/18 at 10:00 a.m.; jury trial rescheduled to 9/24/18-9/28/18; defendant remanded to custody. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 08/16/2018) |
| 08/17/2018 | [132](#) | ORDER as to Richard Todd Haas. It is hereby ORDERED that the parties shall submit supplemental briefs concerning the admissibility of the evidence referenced in the UNITED STATES' NOTICE OF INTENT AND MOTION TO INTRODUCE OTHER ACTS EVIDENCE PURSUANT TO FED. R. EVID. 414 AND 404(b) (ECF No. [81](#) ) on the following schedule: the Government shall file its supplemental brief by August 23, 2018; Defendant shall respond by August 30, 2018; and the Government shall reply by September 6, 2018. **It is further ORDERED that oral argument on the motion is scheduled for September 12, 2018, at 10:00 a.m. It is hereby ORDERED that the trial in this matter is continued to September 24, 2018, to conclude by September 28, 2018.** See Order for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/17/2018. (sbea, ) (Entered: 08/17/2018) |
| 08/17/2018 | | Set Hearing: [81](#) Motion for 404(B) and 414 Evidence set for 9/12/2018 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 08/17/2018) |
| 08/17/2018 | | Reset Hearing as to Richard Todd Haas: Jury Trial set for 9/24/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 08/17/2018) |
| 08/23/2018 | [133](#) | MEMORANDUM OPINION as to Richard Todd Haas. See Opinion for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/22/2018. (sbea, ) (Entered: 08/23/2018) |
| 08/23/2018 | [134](#) | ORDER as to Richard Todd Haas. It is hereby ORDERED that DEFENDANT'S MOTION TO SUPPRESS AND MOTION FOR A FRANKS HEARING (ECF No. [128](#) ) is denied. It is so ORDERED Signed by District Judge Robert E. Payne on 8/22/2018. (sbea, ) (Entered: 08/23/2018) |
| 08/24/2018 | [135](#) | Supplemental Brief on Motion to Introduce Other Acts of Evidence Pursuant to Fed. R. Evid. 404(B) and 414 re: [81](#) Notice of Intent and Motion to Introduce Other Acts of Evidence by USA as to Richard Todd Haas (Hood, Brian). Modified docket text on 9/12/2018 (sbea, ). (Entered: 08/24/2018) |
| 08/30/2018 | [136](#) | Proposed Jury Instructions by Richard Todd Haas (Everhart, Jeffrey) Clerk replaced document 136 on 8/30/2018 with corrected copy per filing attorney. NEF was regenerated. Modified docket text on 8/30/2018 (sbea, ). (Entered: 08/30/2018) |
| 08/30/2018 | [137](#) | Supplemental Memorandum by Richard Todd Haas re [81](#) MOTION 404(B) Evidence *and 414 Evidence*, [135](#) Supplemental MOTION 404(B) Evidence (Everhart, Jeffrey) (Entered: 08/30/2018) |
| 09/05/2018 | [138](#) | REPLY TO RESPONSE to USA as to Richard Todd Haas re [137](#) Supplemental |

14

| | | |
|---|---|---|
| | | Memorandum *re: Government's Motion 404(b) Evidence and 414 Evidence* (Hood, Brian) (Entered: 09/05/2018) |
| 09/12/2018 | 139 | Minute Entry for proceedings held before District Judge Robert E. Payne: Hearing as to Richard Todd Haas held on 9/12/2018 re 81 Motion *404(B) Evidence and 414 Evidence*. Arguments heard - opinion to issue; parties to notify Court if there will be a non-trial disposition. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 09/12/2018) |
| 09/12/2018 | 140 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the UNITED STATES' NOTICE OF INTENT AND MOTION TO INTRODUCE OTHER ACTS EVIDENCE PURSUANT TO FED. R. EVID. 414 AND 404(b) (ECF No. 81 ) is denied. It is so ORDERED. Signed by District Judge Robert E. Payne on 9/12/2018. (sbea, ) (Entered: 09/12/2018) |
| 09/13/2018 | 141 | MEMORANDUM OPINION as to Richard Todd Haas. See Opinion for details. It is so ORDERED. Signed by District Judge Robert E. Payne on 9/13/2018. (sbea, ) (Entered: 09/13/2018) |
| 09/17/2018 | 142 | Proposed Jury Instructions by USA as to Richard Todd Haas (Hood, Brian) (Entered: 09/17/2018) |
| 09/19/2018 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference as to Richard Todd Haas held on 9/19/2018 (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 10/04/2018) |
| 09/21/2018 | 146 | Proposed Voir Dire by USA as to Richard Todd Haas (Hood, Brian) (Entered: 09/21/2018) |
| 09/23/2018 | 147 | EXHIBIT LIST by USA as to Richard Todd Haas (Mansfield, Heather) (Entered: 09/23/2018) |
| 09/23/2018 | 148 | WITNESS LIST by USA as to Richard Todd Haas (Mansfield, Heather) (Entered: 09/23/2018) |
| 09/24/2018 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Voir Dire held on 9/24/2018 as to Richard Todd Haas. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 09/24/2018) |
| 09/24/2018 | 149 | Minute Entry for proceedings held before District Judge Robert E. Payne: Jury Trial (Day 1) as to Richard Todd Haas held on 9/24/2018. Jury sworn & examined on voir dire; jury empaneled & sworn to try issue; opening statements made; matter continued to 09/25/18 for Day 2 of trial; defendant remanded to custody. (Attachments: # 1 Exhibit & Witness List, # 2 Court Exhibit 1)(Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 09/24/2018) |
| 09/24/2018 | | Set Hearing as to Richard Todd Haas: Jury Trial (Day 2) set for 9/25/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 09/24/2018) |
| 09/25/2018 | 150 | Minute Entry for proceedings held before District Judge Robert E. Payne: Jury Trial (Day 2) as to Richard Todd Haas held on 9/25/2018. Government rested, defendant rested, evidence concluded; arguments heard; jury charged by the court; jury retired for deliberations; matter continued to 09/26/18 for Day 3 of trial; defendant remanded to custody. (Attachments: # 1 Exhibit & Witness List, # 2 Court Exhibit 2, # 3 Court Exhibit 3)(Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 09/25/2018) |
| 09/25/2018 | | Set Hearing as to Richard Todd Haas: Jury Trial (Day 3) set for 9/26/2018 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 09/25/2018) |

15

| | | |
|---|---|---|
| 09/26/2018 | 151 | Minute Entry for proceedings held before District Judge Robert E. Payne: Jury Trial (Day 3) as to Richard Todd Haas held on 9/26/2018. Jury returned verdict of GUILTY AS CHARGED in Counts 1, 2, 3 and 4; defense's renewed rule 29 motion denied; PSR ordered; sentencing guideline order entered; all exhibits returned to counsel, specifically government; matter continued for sentencing at 2:00 p.m. on 12/06/2018; defendant remanded to custody. (Attachment: # 1 Court Exhibit 4) (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 09/26/2018) |
| 09/26/2018 | 152 | JURY VERDICT as to Richard Todd Haas. GUILTY on Counts 1s, 2s, 3s, 4s. (nbrow) (Entered: 09/26/2018) |
| 09/26/2018 | 153 | Jury Instructions as to Richard Todd Haas. (nbrow) (Entered: 09/26/2018) |
| 09/26/2018 | 154 | Sentencing Guideline Order as to Richard Todd Haas. Signed by District Judge Robert E. Payne on 09/26/2018. (nbrow) (Entered: 09/26/2018) |
| 09/26/2018 | | Set Hearing as to Richard Todd Haas: Sentencing set for 12/6/2018 at 02:00 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 09/26/2018) |
| 09/26/2018 | 155 | ORDER. For good cause appearing to the Court, it is ORDERED that the jurors in the above entitled case be kept together in the custody of the United States Marshal, who shall furnish them BREAKFAST on September 25, 2018 and September 26, 2018 and LUNCH on September 24, 2018, September 25, 2018, and September 26, 2018, submitting the bill to the Clerk of this Court for payment. And it is so ORDERED. Signed by District Judge Robert E. Payne on 09/26/2018. (nbrow) (Entered: 09/26/2018) |
| 10/25/2018 | 156 | MOTION to Continue *Sentencing* by USA as to Richard Todd Haas. (Hood, Brian) (Entered: 10/25/2018) |
| 10/26/2018 | 157 | ORDER as to Richard Todd Haas. It is hereby ORDERED that the GOVERNMENT'S UNOPPOSED MOTION TO CONTINUE DEFENDANT'S SENTENCING HEARING (ECF No. 156 ) is granted. It is further ORDERED that **the sentencing** scheduled for 2:00 p.m. December 6, 2018 **is continued to 2:00 p.m. January 17, 2019.** Signed by District Judge Robert E. Payne on 10/26/2018. Order was distributed as directed. (sbea, ) (Entered: 10/26/2018) |
| 10/26/2018 | | Set Hearing as to Richard Todd Haas: Sentencing set for 1/17/2019 at 02:00 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 10/26/2018) |
| 12/14/2018 | 158 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Richard Todd Haas. Objections to PSI due 12/27/2018. (drumheller, dorothy) (Entered: 12/14/2018) |
| 01/03/2019 | 159 | MOTION for Extension *of Time to File Sentencing Pleadings* by USA as to Richard Todd Haas. (Hood, Brian) (Entered: 01/03/2019) |
| 01/04/2019 | 160 | ORDER that United States' 159 Motion for Extension of Time as to Richard Todd Haas is GRANTED. The United States shall file its sentencing pleadings by January 7, 2019. Signed by District Judge Robert E. Payne on 1/4/2019. (jsmi, ) (Entered: 01/04/2019) |
| 01/04/2019 | 161 | First MOTION for Extension by Richard Todd Haas. (Everhart, Jeffrey) (Entered: 01/04/2019) |
| 01/04/2019 | 162 | ORDER that Defendant's 161 Motion for Extension of Time is GRANTED. The defendant shall file his sentencing pleadings by January 7, 2019. Signed by District Judge Robert E. Payne on 1/4/2019. (jsmi, ) (Entered: 01/04/2019) |
| | | |

16

| | | |
|---|---|---|
| 01/07/2019 | 163 | SENTENCING MEMORANDUM by Richard Todd Haas (Everhart, Jeffrey) (Entered: 01/07/2019) |
| 01/08/2019 | 164 | Position on Sentencing by USA as to Richard Todd Haas (Hood, Brian) (Entered: 01/08/2019) |
| 01/08/2019 | 165 | MOTION for Upward Departure *, or in the Alternative, Upward Variance* by USA as to Richard Todd Haas. (Hood, Brian) (Entered: 01/08/2019) |
| 01/08/2019 | 166 | MOTION for Variance Sentence by Richard Todd Haas. (Everhart, Jeffrey) (Entered: 01/08/2019) |
| 01/09/2019 | 167 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Richard Todd Haas. (smith, lisa) (Entered: 01/09/2019) |
| 01/15/2019 | 169 | Position on Sentencing by Richard Todd Haas *Addendum* (Everhart, Jeffrey) (Entered: 01/15/2019) |
| 01/16/2019 | 170 | Position on Sentencing by USA as to Richard Todd Haas re: 169 *Responding to Defendant's Addendum on Position With Respect to Sentencing Factors* (Hood, Brian). Modified docket text on 1/17/2019 (sbea, ). (Entered: 01/16/2019) |
| 01/17/2019 | 172 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) *2nd Addendum Included* as to Richard Todd Haas. (frere, laurie) (Entered: 01/17/2019) |
| 01/17/2019 | 173 | Minute Entry for proceedings held before District Judge Robert E. Payne: Sentencing held on 1/17/2019 for Richard Todd Haas. Government's motion for upward departure or upward variance (ECF No. 165 ) denied as moot; defense's motion for variance sentence (ECF No. 166 ) denied; Count 1: LIFE imprisonment, LIFE supervised release, $100 special assessment; Count 2: 240 months imprisonment (concurrent), LIFE supervised release (concurrent), $100 special assessment; Count 3: 120 months imprisonment (concurrent), LIFE supervised release (concurrent), $100 special assessment; Count 4: 120 months imprisonment (concurrent), LIFE supervised release (concurrent), $100 special assessment; advised of right to appeal; remanded to custody. (Attachment: # 1 Exhibit & Witness List)(Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 01/18/2019) |
| 01/17/2019 | 174 | CONSENT ORDER OF FORFEITURE as to Richard Todd Haas. *See for complete details*. Signed by District Judge Robert E. Payne on 01/17/2019. (nbrow) (Entered: 01/18/2019) |
| 01/18/2019 | 176 | ORDER as to Richard Todd Haas. The Defendant's objections to the Presentence Report as set forth in DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS AND ARGUMENTS FOR DOWNWARD VARIANCE (ECF No. 166 ) and ADDENDUM TO DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS (ECF No. 169 ) are OVERRULED. The United States' MOTION FOR UPWARD DEPARTURE, OR, IN THE ALTERNATIVE, UPWARD VARIANCE as set forth in UNITED STATES' POSITION WITH RESPECT TO SENTENCING FACTORS AND MOTION FOR UPWARD DEPARTURE, OR, IN THE ALTERNATIVE, UPWARD VARIANCE (ECF No. 165 ) and UNITED STATES' POSITION WITH RESPECT TO DEFENDANT'S ADDENDUM ON POSITION WITH RESPECT TO SENTENCING FACTORS (ECF No. 170 is DENIED as moot. Defendant's MOTION FOR VARIANCE SENTENCE as set forth in DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS AND ARGUMENTS FOR DOWNWARD VARIANCE (ECF No. 166) and ADDENDUM TO DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS (ECF No. 169 ) is DENIED. It is so |

17

| | | ORDERED. Signed by Senior United States District Judge Robert E. Payne on 1/18/2019. (sbea, ) (Entered: 01/18/2019) |
|---|---|---|
| 01/24/2019 | 177 | ORDER that for the reasons set forth on the record on January 17, 2019, and with the consent of the defendant, it is hereby ORDERED that defense counsel's oral motion to withdraw as counsel is granted. The Clerk shall remove Jeffrey L. Everhart, Esquire and appoint William J. Dinkin, Esquire as counsel for the defendant. It is further ORDERED that Mr. Everhart shall provide his files to Mr. Dinkin and to offer any assistance Mr. Dinkin may require in undertaking representation of the defendant. It is so ORDERED. Signed by District Judge Robert E. Payne on 01/24/2019. Copy mailed to Defendant. (walk, ) (Entered: 01/24/2019) |
| 01/24/2019 | | CJA 20 as to Richard Todd Haas: Appointment of William J. Dinkin, Esquire to represent Richard Todd Haas re: 177 Order. (walk, ) (Entered: 01/24/2019) |
| 01/24/2019 | 178 | JUDGMENT as to Richard Todd Haas (1), INDICTMENT - Counts 1, 2, 3, 4, 5: DISMISSED ON MOTION OF GOVERNMENT; SUPERSEDING INDICTMENT - Count 1s: LIFE IMPRISONMENT, LIFE SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT; Count 2s: 240 MONTHS IMPRISONMENT, LIFE SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT; Count 3s-4s: 120 MONTHS IMPRISONMENT, LIFE SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT. Signed by District Judge Robert E. Payne on 01/24/2019. (nbrow) (Entered: 01/24/2019) |
| 01/24/2019 | 179 | SEALED Statement of Reasons as to Richard Todd Haas. Signed by District Judge Robert E. Payne on 01/24/2019. (nbrow) (Entered: 01/24/2019) |
| 01/31/2019 | 180 | NOTICE OF APPEAL by Richard Todd Haas as to 178 Judgment, (Dinkin, William) (Entered: 01/31/2019) |
| 02/01/2019 | 181 | Transmission of Notice of Appeal to 4CCA as to Richard Todd Haas to US Court of Appeals re 180 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 02/01/2019) |
| 02/01/2019 | | USCA Case Number 19-4077, USCA Case Manager T.Fischer for 180 Notice of Appeal filed by Richard Todd Haas. (lbre, ) (Entered: 02/01/2019) |
| 02/01/2019 | 182 | ORDER of USCA as to Richard Todd Haas re 180 Notice of Appeal : The court appoints William Jeffrey Dinkin to represent appellant. (lbre, ) (Entered: 02/01/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/14/2019 10:56:24 | | | |
| PACER Login: | sda101shockoe:2960311:0 | Client Code: | haas, richard todd |
| Description: | Docket Report | Search Criteria: | 3:16-cr-00139-REP |
| Billable Pages: | 16 | Cost: | 1.60 |

18



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:16CR 139 |
| | ) | |
| | ) | 18 U.S.C. § 1591(a)(1) |
| | ) | Sex Trafficking of a Child |
| | ) | (Count One) |
| v. | ) | |
| | ) | 18 U.S.C. § 2252A(a)(2)(A) |
| | ) | Receipt of Child Pornography |
| | ) | (Count Two) |
| | ) | |
| | ) | 18 U.S.C. § 2252A(a)(5)(B) |
| RICHARD TODD HAAS, | ) | Possession of Child Pornography |
| | ) | (Counts Three, Four, and Five) |
| | ) | |
| Defendant. | ) | 18 U.S.C. § 2253 |
| | ) | Forfeiture Notice |

## INDICTMENT

November 2016 Term — At Richmond, Virginia.

THE GRAND JURY CHARGES THAT:

### COUNT ONE
(Sex Trafficking of a Child)

From in or about May 2016 to August 13, 2016, in the Eastern District of

Virginia, the defendant, RICHARD TODD HAAS, in or affecting interstate or foreign

commerce, knowingly recruited, enticed, and solicited by any means a person knowing

that the person had not attained the age of 18 years of age and would be caused to engage

in a commercial sex act.

(In violation of Title 18, United States Code, Section 1591(a)(1))

19

## COUNT TWO
### (Receipt of Child Pornography)

On or about July 19, 2016, in the Eastern District of Virginia, the defendant, RICHARD TODD HAAS, knowingly received child pornography, as defined by 18 U.S.C. § 2256, to wit: one video file entitled "FM_Ceja-White-Hilo.wmv," which depicts an actual child engaged in sexually explicit conduct, specifically a prepubescent female engaged in the lascivious exhibition of the genitals; that had been mailed, and, using any means or facility of interstate or foreign commerce, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

(In violation of Title 18, United States Code, Section 2252A(a)(2)(A))

## COUNT THREE
### (Possession of Child Pornography)

On or about September 1, 2016, in the Eastern District of Virginia, the defendant, RICHARD TODD HAAS, knowingly possessed child pornography, as defined by 18 U.S.C. § 2256, to wit: one image file entitled "0036.jpg," which depicts an actual child engaged in sexually explicit conduct, specifically a prepubescent female engaged in sadistic or masochistic abuse, the lascivious exhibition of the genitals, and simulated genital-genital sexual intercourse, that had been mailed, and, using any means or facility of interstate or foreign commerce, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer; or that was produced using materials that had been mailed, shipped, and transported in or affecting interstate or foreign commerce by any means, including by computer.

(In violation of Title 18, United States Code, Section 2252A(a)(5)(B))

2

20

## COUNT FOUR
(Possession of Child Pornography)

On or about September 1, 2016, in the Eastern District of Virginia, the defendant,

RICHARD TODD HAAS, knowingly possessed child pornography, as defined by 18

U.S.C. § 2256, to wit: one image file entitled "1189039333600.jpg," which depicts an

actual child engaged in sexually explicit conduct, specifically a prepubescent female

engaged in the lascivious exhibition of the genitals, that had been mailed, and, using any

means or facility of interstate or foreign commerce, shipped and transported in and

affecting interstate and foreign commerce by any means, including by computer; or that

was produced using materials that had been mailed, shipped, and transported in or

affecting interstate or foreign commerce by any means, including by computer.

(In violation of Title 18, United States Code, Section 2252A(a)(5)(B))

## COUNT FIVE
(Possession of Child Pornography)

On or about September 1, 2016, in the Eastern District of Virginia, the defendant,

RICHARD TODD HAAS, knowingly possessed child pornography, as defined by 18

U.S.C. § 2256, to wit: one video file entitled "babshivid-

notmyassagaindad01(withsound_PTHC pedo rape anal).avi," which depicts an actual

child engaged in sexually explicit conduct, specifically a prepubescent female and adult

male engaged in sadistic and masochistic abuse, actual or simulated masturbation, and the

lascivious exhibition of the genitals, that had been mailed, and, using any means or

facility of interstate or foreign commerce, shipped and transported in and affecting

interstate and foreign commerce by any means, including by computer; or that was

3

21

produced using materials that had been mailed, shipped, and transported in or affecting

interstate or foreign commerce by any means, including by computer.

(In violation of Title 18, United States Code, Section 2252A(a)(5)(B))

## FORFEITURE NOTICE

Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the

defendant is hereby notified that, if convicted of any of Counts One through Five, the

defendant shall forfeit to the United States his interest in any visual depiction produced,

transported, mailed, shipped, or received in violation of Title 18, United States Code,

Sections 2251 *et seq.*, and any property, real or personal, constituting or traceable to gross

profits or other proceeds or used or intended to be used to commit or promote the

commission of such offense(s), including, but not limited to the following:

**One (1) Gateway laptop computer, S/N NXY1UAA030323099603400, including
internal hard drives and associated peripheral equipment (*i.e.*, keyboard, mouse,
monitor, cables);**

**One (1) 700 MB Staples CDR.**

(In accordance with Title 18, United States Code, Section 2253).

A TRUE BILL:     Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

FOREPERSON

DANA J. BOENTE
UNITED STATES ATTORNEY

Samuel E. Fishel IV
Special Assistant United States Attorney

4

22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No.  3:16CR139 |
| | ) | |
| RICHARD TODD HAAS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant, Richard Todd Haas, by counsel, moves for this Court to suppress the evidence seized from Mr. Haas, to wit, his laptop computer and a GPS device, and their contents, on or about September 1, 2016, as such evidence was seized pursuant to a search warrant issued without probable cause to seize the computer and the GPS device, and search their contents.

*Relevant Facts*

On June 16, 2016, a confidential witness for the government (CW), whose reliability was not reported in the search warrant, contacted law enforcement.  *See* Attached Ex. 1, Affidavit in support of Search Warrant, at pp. 11-12 (hereinafter "Affid.").  She allegedly reported that she saw child pornography images on the defendant's computer.  She also allegedly reported that Mr. Haas told her about his own activity with juveniles and his interest in CW helping with production of images and videos of child pornography.  Telephone conversations were recorded but included no specific information about possession or production of child pornography or any computer devices.

Nowhere in the search warrant is there an attestation to the reliability or credibility of the CW.  There is no information regarding the context under which this information was provided

1

23

to law enforcement or the reasons why this facially unreliable witness[1] with no apparent history of cooperation would provide such information to the authorities.  No corroboration of the information regarding any illegal material on Mr. Haas's computer reported by the CW is provided under the four corners of the application for the search warrant or the affidavit.

This information was insufficient to justify Mr. Haas's arrest or the issuance of a search warrant, as no actions were taken against him by law enforcement pursuant to this information. It was only after subsequent information in August of 2016 was obtained by law enforcement that actions were taken against Mr. Haas by law enforcement.

On August 18, 2016, a complaint was received by Richmond police that Mr. Haas had inappropriate contact with an eleven year old.  *See* Affid. at pp. 13-14.  The alleged victim, however, was unable to identify a picture of Mr. Haas as the person responsible for the inappropriate conduct.  *See* Affid. at ¶ 19.  There is no evidence that a computer was used or involved with the inappropriate conduct, nor is there any information provided that Mr. Haas showed the alleged victim any images of child pornography or produced any images of child pornography with this alleged victim.  Although charges were brought in Chesterfield County in relation to these allegations, those state charges were dismissed by prosecutors before Mr. Haas was arrested on these federal charges.

There is also no information in the search warrant or affidavit to tie the GPS device to any unlawful activity.

---

[1]  This witness was characterized in the affidavit to the search warrant as an "escort" who had provided services to Mr. Haas for approximately four years; however, the affidavit also states that the two had "parted ways" for four years.  Affid. at ¶ 7.  It is Mr. Haas's understanding and belief that the CS is a convicted felon (and was a convicted felon at the time of her cooperation), and that she had pending felony charges at the time of her statements to the authorities.

2

24

*Argument*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Further, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. A search warrant must contain probable cause to allow police to search a particular locale in order to satisfy the requirements of the Fourth Amendment. *United States v. Harris*, 403 U.S. 573, 577 (1971). The Supreme Court has stated that "probable cause exist[s] where the *known facts and circumstances* are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (emphasis added). The sufficiency of the known facts and circumstances is evaluated by a totality-of-the-circumstances standard. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). If the known facts and circumstances to support a search warrant are insufficient to establish probable cause under a totality-of-the-circumstances standard, the evidence "is subject to suppression under the exclusionary rule… the overarching purpose of which is 'to deter future unlawful police conduct.'" *United States v. Andrews*, 577 F.3d 231, 235 (4th Cir. 2009).

A reasonably prudent person would not have been justified in believing that the totality-of-the-circumstances surrounding Mr. Haas's alleged crimes suggested that evidence of such crimes might be found on Mr. Haas's computer. Therefore, the affidavit in support of the search warrant for Mr. Haas's computer was not supported by probable cause.

3

25

The eleven year old never claimed that Mr. Haas's computer was connected to the offenses being investigated; the evidence presented by the CW was unreliable to the degree that no finding of probable cause could arise from the information she provided.

Therefore, because the search warrant and affidavit for Mr. Haas's computer and GPS contains insufficient evidence that such computer and GPS contained evidence of criminal activity, the evidence collected from the computer and the GPS device should be suppressed.

**I.    *The facts known to police at the time of the warrant could not lead a reasonable person to believe evidence of criminal activity would be found on Mr. Haas's computer.***

The information from CW was wholly unreliable and was unsupported by any tangible investigation or corroboration.  And the information regarding the eleven year old (who failed to identify the defendant) bore no relationship to Mr. Haas's computer or the GPS device.

**A.  *The Fourth Circuit has found that evidence of child molestation alone does not support probable cause to search for child pornography.***

In *United States v. Doyle*, 650 F.3d 460 (4th Cir. 2011), the Fourth Circuit determined that there was a lack of probable cause to execute a search warrant to seize electronic materials inside of an alleged sexual offender's home.  *Id*. at 476.  In *Doyle*, the defendant was accused of three separate instances of sexual assault against minor victims.  *Id*. at 464.  One of the victims even maintained that the defendant had shown him child pornography during the commission of one of the assaults.  *Id*.  "But," the Fourth Circuit stated, "evidence of child molestation alone does not support probable cause to search for child pornography."  *Id*. at 472.  Even with the allegation that the defendant had shown the minor victim child pornography (which is not present in this case), the appellate court still found that there was no probable cause to search the electronic devices in the defendant's home.  *Id*. at 476.

4

A similar situation exists here.  It is improper to allow police who apparently "established probable cause for one crime (child molestation) but designed and requested a search for evidence of an entirely different crime (child pornography)," for which probable cause was lacking, to seize digital evidence unwarranted by evidence of the molestation.  *See Doyle*, 650 F.3d at 472 (quoting *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008)).  As such, it would be unlawful to allow federal authorities to seize and search Mr. Haas's computer or GPS device, as there were insufficient allegations or evidence to suggest the computer or GPS devicew contained evidence of unlawful activity.

### B.     The affidavit fails to connect the alleged crimes of sexual assault against the eleven year old to Mr. Haas's computer.

Special Agent Gonzalez's 37-page affidavit in support of the search warrant for Mr. Haas's computer and GPS device makes no assertion that Mr. Haas took lewd pictures of the eleven year old cooperating witness or sent any pictures to her, or that the GPS device had any relationship to this offense.  Furthermore, the affidavit makes no connection between the eleven year old's account of sexual assault and Mr. Haas's laptop.  The affidavit describes the Special Agent's background, definitions, technical terms, background of the investigation and probable cause (which describes the witnesses's statements to law enforcement), characteristics common to those who possess, produce and distribute child pornography, a background on computers and child pornography, a section on forensic analysis, and the kinds of electronic data to be seized. After providing all of this information, Special Agent Gonzalez stated that probable cause existed to seize and search Mr. Haas's laptop computer and his GPS device.

Connecting the search of the computer and the GPS device with the statements of the eleven year old is unjustified based on the evidence Gonzalez provided in the affidavit.  In *United States v. Shanklin*, No. 2:12CRL62, 2013 U.S. Dist. LEXIS 161947, at *2 (E.D. Va. Nov.

13, 2013), for example, the court held that a detective's general knowledge of sexual offenders and conclusory statements in an affidavit connecting the offenses of sexual assault and child pornography are not alone "material facts sufficient to establish probable cause to seize… multimedia devices from Defendant's bedroom." *Id*. at *23. In *Shanklin*, police arrested a schoolteacher for sexual battery and abduction of a minor student. *Id*. at *2. The affidavit in support of the warrant to obtain the defendant's multimedia equipment cited the defendant's "cell phone images of minor females along with statements made by the victim that Defendant may have assaulted other students and the detective's own knowledge that offenders use social media to contact potential victims." *Id*. at *3. The court held that because none of those facts implicated any multimedia device use, merely citing "a possibility that the computers contain[ed] evidence of the exploitation of children [is] a speculation that is insufficient to establish probable cause." *Id*. at 25.

Just as there was "little or no probability that evidence of sexual battery or abduction at school could have been uncovered through the search of a home computer" in *Shanklin*, there is also little or no probability that evidence of sexual assault of the eleven year old could have been uncovered through the search of Mr. Haas's computer or his GPS device.  Special Agent Gonzalez's conclusory statements in his affidavit do not adequately connect the computer or the GPS device to the alleged sexual assault of the eleven year old.

**C.    *Failure to assert the credibility of the CW or to corroborate her statements is fatal to a finding of probable cause***

The only information in the affidavit prepared by Special Agent Gonzalez connecting Mr. Haas with illegal activity on his computer comes from the CW at Paragraph 8, in which the CW states that she saw child pornography on Mr. Haas's laptop.  The Gonzalez affidavit, however, failed to provide any information regarding the reliability or veracity of the

cooperating witness. Additionally, there was no information in the affidavit to corroborate the CW's claims regarding pornography on the computer through independent investigation. Further, there is significant information to cast doubt on the reliability or veracity of the CW that was not included in the affidavit.[2] There is also a question of staleness, as the information, however unreliable, of child pornography on Mr. Haas's computer was allegedly communicated to law enforcement in June of 2016, and was related to the alleged viewing of the computer in May of 2016. *See* Affid. at ¶¶ 7-8. The search warrant was executed in September of 2016. *See United States v. Raymonda*, 780 F.3d 105, 115-16 (2nd Cir. 2015) (inference of hoarding child pornography must be established in affidavit before staleness claim can be rebutted). This laptop was found in Mr. Haas's truck, not in his residence. No inference of extended possession of child pornography can be drawn from the possession of a laptop computer in a tractor trailer truck. Nothing in the affidavit connected CW's claims with the GPS device.

When information forming the basis for probable cause comes from an informant, the informant's "veracity" and "reliability" are critical to the totality of the circumstances test. *United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016); *see also United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) (quoting *Gates*, 462 U.S. at 233, 103 S.Ct. 2317). When an informant supplies the facts provided to the issuing judge, the probable cause determination turns on the informant's credibility. *Id.* In *Lull*, the Fourth Circuit found that:

> Investigator Welch's omissions [of the informant's problemmatic reliability in the affidavit] therefore prevented a neutral magistrate from being able to accurately assess the reliability and the veracity, and thus the significance, of the informant's statements. *See United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014) (concluding that an affidavit that "omitted all information regarding the

---

[2] Because of the affidavit's failure to provide information relevant to the unreliability of the informant, the defendant requests a *Franks* hearing to assess whether the knowing failure to provide such information was a material failure by Agent Gonzalez. *See Lull*, 824 F.3d at 117-120. Upon information and belief, the CW is a convicted felon and had pending offenses against her when she was providing information to authorities regarding Mr. Haas.

informant's credibility ... undermined the issuing magistrate's ability to perform his role as a neutral arbiter of probable cause").

*Lull*, 824 F.3d at 118.  In this case, there is no corroboration for the CW's statements regarding child pornography on Mr. Haas's computer.  Additionally, there is no indication that the laptop observed by law enforcement in the tractor-trailer truck on August 31, 2016, which is the subject of the affidavit, is the same laptop allegedly viewed by the CW in May of 2016.

*Conclusion*

Mr. Haas respectfully requests that the Court suppress all digital evidence obtained pursuant to the unlawful search and seizure of his computer and GPS device on September 1, 2016.

Respectfully Submitted,
RICHARD TODD HAAS

By: _____/s/_____
Counsel

Robert J. Wagner, Esq.                    Valencia Roberts, Esq.
VSB# 27493                                 VSB #44999
Office of the Federal Public Defender      Office of the Federal Public Defender
701 E. Broad Street, Suite 3600            701 E. Broad Street, Suite 3600
Richmond, VA 23219                         Richmond, VA 23219
(804) 565-0808 (phone)                     (804) 565-0885 (phone)
(804) 648-5033 (fax)                       804) 648-5033 (fax)
robert_wagner@fd.org                       valencia_roberts@fd.org

8

30

**CERTIFICATE OF SERVICE**

       I hereby certify that on this 3rd day of January 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to Thomas Johnstone, Assistant United States Attorney, United States Attorney's Office, 600 East Main Street, Suite 1800, Richmond, Virginia, 23219.

                                     _____/s/_____

Robert J. Wagner, Esq.
VSB# 27493
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0808 (phone)
(804) 648-5033 (fax)
robert_wagner@fd.org

Valencia Roberts, Esq.
VSB #44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0885 (phone)
(804) 648-5033 (fax)
valencia_roberts@fd.org

31

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1995 Ford Tractor-Trailer Truck, license plate 26-392,<br>VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5,<br>model SM-G900V, 990004913336164 | )<br>)<br>)<br>)<br>)<br>) Case No. 3:16 MS 371<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Virginia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachments A and B, fully incorporated by reference herein

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment C, fully incorporated by reference herein

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ___9/15/2016___
*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been
established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Roderick C. Young _____.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  9/1/2016 @ 11:05am _____      ___/s/___ _____
                                                                    Roderick C. Young
                                                                    United States Magistrate Judge
City and state:     Richmond, VA _____      *Printed name and title*

32

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| ***Return*** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| ***Certification*** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*


_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 990004913336164

Case No. 3:16mS371

**Filed Under Seal**

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The vehicle known as a 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN:

1FTYY90V6SVA73472, a picture of which is below.

30



34



31

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a<br>Samsung Galaxy S5, model SM-G900V,<br>990004913336164 | Case No. _____<br><br>**Filed Under Seal** |

## ATTACHMENT B

## DESCRIPTION OF LOCATION TO BE SEARCHED

The cellular phone known as a Samsung Galaxy S5, model SM-G900V,

990004913336164, a picture of which is below.

32

36



33

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

F I L E D

SEP - 1 2016

CLERK, US DISTRICT COURT
RICHMOND, VA

IN RE:  SEARCH WARRANT FOR
**1995 Ford Tractor-Trailer Truck, license plate**
**26-392, VIN: 1FTYY90V6SVA73472, and a**
**Samsung Galaxy S5, model SM-G900V,**
**990004913336164**

No. 3:16MS371

**Filed Under Seal**

## ORDER
(Sealing Order)

The United States has submitted a Motion to Seal pursuant to Local Rule 49(B),

requesting the Court to issue an Order sealing the Motion to Seal, this Order, and the search

warrant with the same case number as captioned above (hereafter referred to as "the search

warrant") until further order of the Court.

Upon due consideration, the Court determines that there is reason to believe that

notification of the existence of the search warrant will seriously jeopardize the investigation,

including by giving targets an opportunity to flee or continue flight from prosecution, destroy or

tamper with evidence, change patterns of behavior, or notify confederates.

38

IT IS THEREFORE ORDERED that the government's Motion to Seal, this Order, and the search warrant, including its supporting application and affidavit, are sealed until otherwise ordered by the Court.

IT IS SO ORDERED

/s/

Roderick C. Young
United States Magistrate Judge

Date 9/1/2016
Richmond, Virginia

2

39

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



---

IN RE:  SEARCH WARRANT **FOR**

**1995 Ford Tractor-Trailer Truck, license
plate 26-392, VIN: 1FTYY90V6SVA73472,
and a Samsung Galaxy S5, model SM-
G900V, 990004913336164**

No. 3:16MS371

**Filed Under Seal**

---

**MOTION TO SEAL SEARCH WARRANT
UNDER LOCAL RULE 49(B)**

The United States requests, under Local Rule 49(B), that the Court seal this motion, any

resulting order, and the search warrant, including its supporting application and affidavit, until

further order of the Court.

It is generally recognized that the public has a common law right of access, but not a First

Amendment right of access, to judicial documents, including documents associated with *ex parte*

proceedings such as search warrant affidavits. *Media General Operations, Inc. v. Buchanan*, 417

F.3d 424, 429 (4th Cir. 2005); *In re Washington Post Company v. Hughes*, 923 F.2d 324, 326

(4th Cir. 1991).  But the right of access is qualified, and a judicial officer may deny access to

search warrant documents if sealing is "essential to preserve higher values" and "narrowly

tailored to serve that interest." *Media General Operations*, 417 F.3d at 429 (internal citations

omitted); *see also In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) ("The trial court has

supervisory power over its own records and may, in its discretion, seal documents if the public's

right of access is outweighed by competing interests").  Sealing search warrants, their

accompanying affidavits and application, and any related pleadings is within the discretionary

powers of a judicial officer where, among other things, an affidavit contain[s] sensitive details of

1

40

an ongoing investigation and "it is clear and apparent from the affidavits that any disclosure of the information there would hamper th[e] ongoing investigation." *Media General Operations*, 417 F.3d at 430 (internal citations omitted); *see also In re Search Warrant for Matter of Eye Care Physicians of America*, 100 F.3d 514, 518 (7th Cir. 1996).

Before a district court generally may seal judicial records or documents, it must (a) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (b) consider less drastic alternatives to sealing the documents, and (c) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000).

However, regarding the notice requirement in the specific context of a search warrant, the Fourth Circuit has cautioned that "the opportunity to object does not arise prior to the entry of a sealing order when a search warrant has not been executed." *Media General Operations*, 417 F.3d at 429. "A rule to the contrary would endanger the lives of officers and agents and allow the subjects of the investigation to destroy or remove evidence before the execution of the search warrant." *Id.*; *see also Franks v. Delaware*, 438 U.S. 154, 169 (1978). Accordingly, in the context of search warrants, "the notice requirement is fulfilled by docketing 'the order sealing the documents,' which gives interested parties the opportunity to object after the execution of the search warrants." *Media General Operations*, 417 F.3d at 430 (quoting *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 65 (4th Cir. 1989)); *see also* Local Rule 49(B) ("Until an executed search warrant is returned, search warrants and related papers are not filed with the Clerk.").

As to the requirement of a court's consideration of alternatives, the Fourth Circuit counsels that, "[i]f a judicial officer determines that full public access is not appropriate, she 'must consider alternatives to sealing the documents,' which may include giving the public

2

41

access to some of the documents or releasing a redacted version of the documents that are the subject to the government's motion to seal." *Media General Operations*, 417 F.3d at 429 (quoting *Goetz*, 886 F.2d at 66).

Finally, regarding the requirement of specific findings, the Fourth Circuit's precedents state that, "in entering a sealing order, a 'judicial officer may explicitly adopt the facts that the government presents to justify sealing when the evidence appears creditable,'" *Media General Operations*, 417 F.3d at 430 (quoting *Goetz*, 886 F.2d at 65), so long as the ultimate decision to seal the papers is made by the judicial officer. *Goetz*, 886 F.2d at 65. "'Moreover, if appropriate, the government's submission and the [judicial] officer's reason for sealing the documents can be filed under seal.'" *Media General Operations*, 417 F.3d at 430 (quoting *Goetz*, 886 F.2d at 65); *see also In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986) ("[I]f the court concludes that a denial of public access is warranted, the court may file its statement of the reasons for its decision under seal").

Sealing is appropriate in this case because premature disclosure of the specific details of this ongoing investigation to the public would jeopardize this continuing criminal investigation in several ways. It would potentially alert possible targets of the investigation of its existence, thus giving them an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. Allowing potential targets to engage in this type of behavior would hinder the ability of the United States to identify, locate, and arrest the individuals involved in the suspected production and trafficking of child pornography and human trafficking referenced in the search warrant affidavit.

WHEREFORE, the United States requests that the Court order that this motion, any resulting order, and the search warrant, including its supporting application and affidavit, be

sealed until further order of the Court.  As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Thomas K. Johnstone IV
Special Assistant United States Attorney

4

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia ▾

FILED

SEP - 1 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

1995 Ford Tractor-Trailer Truck, license plate 26-392,
VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5,
model SM-G900V, 990004913336164

)
)
)
)
)
)

Case No. 3:16MS3 71

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under
penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the*
*property to be searched and give its location):*

See Attachments A and B, fully incorporated by reference herein;

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the*
*person or describe the property to be seized):*

See Attachment C, fully incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(2)(a) | Possession, Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2251 | Production of child pornography |

The application is based on these facts:

See attached Affidavit, fully incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Melvin Gonzalez, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/s/ _____

Roderick C. Young
United States Magistrate Judge

Date: _____09/01/2016_____

City and state: Richmond, Virginia

Hon. Roderick C. Young, United States Magistrate Judge
*Printed name and title*

44

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a
Samsung Galaxy S5, model SM-G900V, 990004913336164

Case No. *2:16m3371*

FILED UNDER SEAL

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Melvin Gonzalez, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed by the FBI for over ten years.  I am currently assigned to the Richmond Field Office, Richmond, VA.  I am assigned to the Child Exploitation Task Force which conducts investigations pertaining to child sex trafficking, child pornography, and child abductions.  I have received training from the FBI in the areas of child exploitation.  I was previously assigned for three years to the San Juan Field Office, where I investigated violent crimes, gangs, and drug trafficking.  During my career in law enforcement, I have received extensive training in the conduct of a variety of investigations, including drug investigations, organized crime, violent crime, white collar crime, and others.  In my experience, I have participated in a wide range of investigations.  That experience has included receiving and analyzing information, conducting interviews, collecting and processing physical evidence, and preparing evidence for trial.

1



RECEIVED
SEP - 1 2016
CLERK U S DISTRICT COURT
RICHMOND, VA

45

2.    In the course of my employment as a sworn law-enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of computers, magnetic storage media for computers, other electronic media, and other items evidencing violations of state and federal laws, including various sections of Title 18, United States Code §§ 1591, 2251, 2252, and 2252A, involving child exploitation and child pornography offenses.

3.    I have probable cause to believe that a 1995 Ford Tractor Trailer, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, IMEI 990004913336164 ("SUBJECT PROPERTY") contains contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of:  18 U.S.C. § 2251 (production of child pornography); 18 U.S.C. § 2251A (Selling or Buying of Children); 18 U.S.C. § 2252 (possession of, knowing access or attempted access with intent to view, child pornography); 18 U.S.C. § 2422 (enticement or coercion of a minor to engage in illegal sexual activity); and 18 U.S.C. § 1591( sex trafficking of children).  I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT PROPERTY, as further described in Attachments A and B, incorporated herein by reference, which is located in the Eastern District of Virginia. Located within the SUBJECT PROPERTY to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations.  I request authority to search the entire SUBJECT PROPERTY, including any computer, communication devices, and electronic media located therein where the items specified in Attachment C may be found, and to seize all items listed in Attachment C as contraband and instrumentalities, fruits, and evidence of crime.

4.    The statements contained in this affidavit are based in part on:  information provided by FBI Special Agents, FBI Task Force Agents, and other law-enforcement officers; written reports

about this and other investigations that I have received, directly or indirectly, from other law-enforcement agents; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law-enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training, and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## DEFINITIONS

5. The following definitions apply to this Affidavit and attachments hereto:

   a. "Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

   b. "**Child Pornography**," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

3

   c. **Visual depictions** include undeveloped film and videotape, and data stored on computer disk or by electronic means, which are capable of conversion into a visual image, and data which are capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. See 18 U.S.C. § 2256(5).

   d. **Minor** means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

   e. **Sexually explicit conduct** means actual or simulated: (i) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

## TECHNICAL TERMS

**6.** Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. "**Computer**," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

   b. "**Computer Server**" or "**Server**," as used herein is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a

4

48

computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

c.  **"Computer hardware,"** as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d.  **"Computer software,"** as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.

5

It commonly includes programs to run operating systems, applications, and utilities.

e. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

f. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable

6

50

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

g. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

h. **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that

7

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

i.   **PDA**: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

j.   **Tablet**: A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook, which is primarily operated by touching the screen.  Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets

typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those

8

functions.  Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

k.   The "**Internet**" is a global network of computers and other electronic devices

that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

l.   "**Internet Service Providers**" ("ISPs"), as used herein, are commercial

organizations that are in business to provide individuals and businesses access to

the Internet.  ISPs provide a range of functions for their customers including

access to the Internet, web hosting, e-mail, remote storage, and co-location of

computers and other communications equipment.  ISPs can offer a range of

options in providing access to the Internet including telephone based dial-up,

broadband based access via digital subscriber line ("DSL") or cable television,

dedicated circuits, or satellite based subscription.  ISPs typically charge a fee

based upon the type of connection and volume of data, called bandwidth, which

the connection supports.  Many ISPs assign each subscriber an account name – a

user name or screen name, an "e-mail address," an e-mail mailbox, and a personal

password selected by the subscriber.  By using a computer equipped with a

modem, the subscriber can establish communication with an Internet Service

Provider ("ISP") over a telephone line, through a cable system or via satellite, and

can access the Internet by using his or her account name and personal password.

9

m.  **"Internet Protocol address"** or "IP address" refers to a unique number used by a computer to access the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

n.  "The terms **"records,"** **"documents,"** and **"materials,"** as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o.  **"Website"** consists of textual pages of information and associated graphic

10

54

images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7. On June 16, 2016, members of the FBI Richmond Child Exploitation Task Force, received information regarding a suspect, Richard Todd Haas, which indicated that Haas was both interested in and actively producing child pornography. The information was provided by a confidential witness (CW), who has known Haas for approximately four years. During that time, CW provided escort services to Haas. Haas advised CW during one of their encounters that he had an interest in what he described as younger females. Haas advised CW that he had a neighbor who was approximately 12 years old that would come over and perform oral sex on him. CW and Haas parted ways shortly after that conversation four years ago.

8. According to CW, in May 2016, CW and Haas reconnected, and the two arranged to meet at his residence located in Chesterfield County, Virginia. CW was dropped at a house she identified as being the residence at which she met Haas four years ago. During this visit, Haas again brought up his interest in juvenile females. Haas displayed his laptop to CW, which contained images of juvenile females. CW described the images as depicting juvenile females between the ages of 5 and 12 in various stages of undress and engaged in sexually explicit acts. CW advised that she was shown between 50 and 100 images of these girls. Haas advised CW that he knew the victims because they lived in his neighborhood. While Haas displayed the images to the CW, he masturbated to the photos. Haas told CW that he would like for CW to be involved in the production of images and videos of child pornography with juvenile females and

11

inquired as to whether CW would be able to help provide these females for such production. CW advised that, while she was disgusted with what Haas was suggesting, CW played along in order to get more information for what crimes Haas may be committing.

9. Agents displayed a photo to CW, which CW identified as Haas. CW also provided FBI agents with a phone number for Haas—804-402-6003. FBI agents cross searched 804-402-6003 with law-enforcement databases and were able to determine that it has been used as a contact number for Haas in law-enforcement investigations.

10. On July 21, 2016, FBI agents met with CW again. CW advised that she had multiple telephone conversations with Haas and had met Haas in person one additional time in the vicinity of Henrico County, Virginia. CW advised that Haas was driving a light-colored Jetta. Haas constantly discussed the production of child pornography with CW and requested CW to find an underage female in order to produce child pornography. Haas also requested CW to obtain nude images of an underage female in exchange for money.

11. On August 12, 2016, and August 13, 2016, CW recorded two telephone calls with Haas at 804-402-6003. During the calls, Haas advised CW that he was previously trying to contact CW because he was with someone and wanted to meet with CW. CW understood that Haas was referring to an underage female. Haas also advised CW that he was out of town in New Jersey taking care of a job and later advised that he was in the country. CW understood Haas to be referring to the production of child pornography. Haas also requested nude photos of underage females in exchange of money. Haas requested CW to coordinate a meeting between him and an underage female not older than 12 years old. Haas advised CW that the younger the better inasmuch as the others prefer younger females. Haas advised CW that she could make a lot of

12

money from it.  Before the call terminated, Haas requested that CW refer to underage females as shoes and to specify their age using shoe sizes.

12.  Based on these recordings, FBI agents believe that Haas may be involved with others in the production and distribution of child pornography.  FBI agents also believe that Haas could be traveling outside of Virginia in order to engage in criminal activity.

13.  CW identified a photo of the residence located at 661 Greencastle Road, North Chesterfield, Virginia 23236 as the residence at which she visited Haas and where he displayed the child pornography images.  According to CLEAR records, Haas was the owner of the 661 Greencastle Rd. residence until July 2016 when he sold the residence.

14.  On August 18, 2016, FBI agents received a complaint from the Richmond Police Department, indicating that Haas had sexually molested an 11-year-old female ("CV1") on occasions.  According to the police report, since September 2015, CV1 was sent by her mother to Haas's residence to provide cleaning services.  Haas picked up the child and transported her to his residence.

15.  CV1 was forensically interviewed and provided the following information.  CV1 was living at the Richmond Inn located at 6346 Midlothian Turnpike, Richmond, Virginia 23225 before February 2016 with her biological mother and her biological father. CV1 states that she and her father would go "beg for money" close to the Richmond Inn.  The first time CV1 remembers meeting Haas, who she refers to as Todd, she was panhandling with her father.  CV1 states that Todd came by where they sat one day and gave her father five dollars.  A short time later, Todd came back, gave her father sixty dollars, and asked him if CV1 could come to his house to babysit.  The father declined to let CV1 babysit initially, but, when Todd asked if she

13

could come clean his house instead, the father agreed.  Todd picked CV1 up at the hotel later that day and brought her to his house in Chesterfield County.

16.  During the initial visit to Todd's house, CV1 cleaned the kitchen by doing the dishes and vacuuming.  At some point, Todd asked CV1 to come to the living room where he was sitting on the floor in front of the couch.  Todd asked CV1 to lie down on the couch, which she did.  CV1 said that Todd pulled her pants down and pushed her shirt up.  CV1 sat up and pulled her pants up and attempted to exit the room.  Todd stopped her and told her to lie back down on the couch.  Todd again pulled down her pants and rubbed her on the outside of her vagina skin to skin.  CV1 asked to go home, and Todd drove her back to the Richmond Inn, gave her $200, and told her to give it to her parents.  Todd told CV1 that she could not tell anyone what he had done or he would be arrested and sent to jail.  CV1 advised that this happened on at least 5 occasions with each time being the same as the first, although the amount of money he gave her would change each time.

17.  On August 26, 2016, CV1's guardian was interviewed.  CV1's guardian advised that CV1 told her that Haas had given her from $200 to $600 every time she had an encounter with him.  CV1's guardian stated that she has had custody of CV1 since April 2016 and that she was not aware that CV1's mother had access to CV1 when CV1 was visiting other family members.  CV1's guardian said the last time Haas had access to CV1 he picked her up at her brother's residence and sexually abused CV1 in his vehicle.  CV1's guardian said that CV1's mother coordinated the meeting.  CV1's guardian believes this meeting took place sometime in June 2016.

14

58

18. CV1 advised her guardian that Haas told her that CV1's mother was in the process of giving him custody of CV1 so she didn't have to beg for money again. CV1 also advised her guardian that Haas told her not to worry because he also sexually abused one of his kids.

19. While CV1 was unable to identify a photo of Haas, CV1's guardian confronted CV1's mother and obtained a telephone number for Haas, which was 804-402-6003. CV1's guardian called Haas to corroborate his identity. CV1's guardian told law-enforcement that the man who answered her call identified himself as Richard Todd Haas. CV1's mother advised CV1's guardian that Haas has a tree service business.

20. FBI agents served Verizon Wireless with a Subpoena and obtained Subscriber information for 804-402-6003. According to the records obtained, 804-402-6003 is registered to Richard T Haas, Account 552599036-1, PO Box 35085, North Chesterfield, Virginia.

21. According to CLEAR reports, PO Box 35085, North Chesterfield, Virginia belongs to Haas. Haas's Virginia DMV records also display the address of PO Box 35085, North Chesterfield, Virginia. Virginia DMV records also indicate a new dwelling address for Haas in Chesterfield County, Virginia, which was added on July 14, 2016.

22. FBI agents conducted a telephone analysis and discovered that Haas's cellular telephone number had contacted the Richmond Inn at 804-276-8500 five times in April 2016. FBI agents also identified more than 60 text messages and 100 telephone calls between Haas's cellular telephone number and CV1's mother's phone number from May 2016 to July 2016.

23. The FBI conducted surveillance at the Haas's new residence for several days. On numerous occasions, including August 29, 2016, the surveillance team observed Haas depart the

15

residence in a 2015 white VW Jetta, License plate VEU2010.  Haas has been observed driving to

his work location at TMS Services LLC, 270 Labrook Concourse, Richmond, Virginia 23234.

24.  According to CLEAR Records, Haas is the principle executive for TMS Services LLC,

an equipment and leasing business, which was incorporated in 2001 with a registered address of

661 Greencastle Road, North Chesterfield, Virginia 23236.

25.  Based on this information, the FBI obtained a search warrant for Haas's new residence

from this Court on August 31, 2016.  The FBI executed the search warrant early on September 1,

2016, but found that Haas had already left for work.  FBI agents proceeded to Haas's work

location at 270 Labrook Concourse, Richmond, Virginia 23234, where they encountered Haas

sitting in the driver's seat of his work vehicle, a 1995 Ford tractor-trailer truck, license plate

number 26-392.   Haas was arrested pursuant to a Virginia arrest warrant charging him with

aggravated sexual battery of a minor.  During the search incident to arrest, agents recovered a

Samsung Galaxy S5, model SM-G900V, IMEI 990004913336164, from Haas's person.  Also,

during a protective sweep of the tractor-trailer truck, an FBI agent observed a GPS device

attached to the windshield, as well as a laptop bag, which contained a laptop computer.  After

seeing the laptop bag, the agent ceased his protective sweep and exited the vehicle.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, COLLECT, RECEIVE CHILD PORNOGRAPHY AND SEEK TO SEXUALLY EXPLOIT CHILDREN

27.  Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I

have had discussions, I know there are certain characteristics common to individuals who utilize

web-based sites to seek children to sexually exploit them by having sexual encounters or

16

60

obtaining images of child pornography:

    a.    Individuals who access with intent to view, possess, collect, receive and distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

    b.    Individuals who access with intent to view, possess, collect and receive child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

    c.    Individuals who access with intent to view, possess, collect and receive child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

17

d.      Likewise, individuals who access with intent to view, possess, collect and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.      Individuals who access with intent to view, possess, collect and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.      Individuals involved in sexually exploiting children and who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images and children victims of sexual exploitation. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.      Individuals who access with intent to view, possess, collect and receive child

18

62

pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.      Individuals involved in sexually exploiting children sometimes have double lives and concealed forms of communication with these victims. These individuals also create fictitious profiles pertaining to web base accounts such as emails, chatting and forum sites. These individuals with double lives can be involved in children related activities in order to have direct access to new victims. It is common for these individuals to use mobile devices connected to public Wi-Fi internet to communicate with victims and schedule dates for sexual encounters.

i.      Individuals who are child predators and sexually exploit children search for children who are vulnerable and easily manipulated. These individuals seek for children with low self-esteem and who are experiencing problems at home.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

28. Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. It has also revolutionized the methods that individuals will use to interact with and sexually exploit children. Computers serve four functions in connection with child pornography: production, communication, distribution, and storage.

29. **Production.** Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred

19

to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

30. **Distribution and Communication.** A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

31. **Storage.** The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

20

64

In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

32. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

33. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

34. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically

21

stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35. As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PROPERTY in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36. *Probable cause.* I submit that if a computer or storage medium is found in the SUBJECT PROPERTY, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

22

Depending on a variety of factors, a particular computer could easily not

overwrite deleted files with new data for many months, and in certain cases,

conceivably ever.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten. In

addition, a computer's operating system may also keep a record of deleted data in

a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it. To give a few

examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files. Computer

users typically do not erase or delete this evidence, because special software is

typically required for that task. However, it is technically possible to delete this

information.

d. Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

37. *Forensic evidence.* As further described in Attachment B, this application seeks

permission to locate not only computer files that might serve as direct evidence of the crimes

23

67

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PROPERTY because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.   Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

24

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

25

f.   I know that when an individual uses a computer to engage in a child pornography

offense (whether it be to produce, distribute, transport, receive or possess child

pornography), the individual's computer will generally serve both as an

instrumentality for committing the crime, and also as a storage medium for

evidence of the crime.  The computer is an instrumentality of the crime because it

is used as a means of committing the criminal offense.  The computer is also

likely to be a storage medium for evidence of crime.  From my training and

experience, I believe that a computer used to commit a crime of this type may

contain: 1) data that is evidence of how the computer was used; 2) data that was

sent or received; 3) notes as to how the criminal conduct was achieved; 4) records

of Internet discussions about the crime; and 5) other records that indicate the

nature of the offense.

38.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a
thorough search of a premises for information that might be stored on storage media often
requires the seizure of the physical storage media and later off-site review consistent with the
warrant.  In lieu of removing storage media from the SUBJECT PROPERTY, it is sometimes
possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a
complete electronic picture of the computer's data, including all hidden sectors and deleted files.
Either seizure or imaging is often necessary to ensure the accuracy and completeness of data
recorded on the storage media, and to prevent the loss of the data either from accidental or
intentional destruction.  This is true because of the following:

26

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time in the SUBJECT PROPERTY could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the SUBJECT PROPERTY.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

27

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIFICITY OF SEARCH WARRANT RETURN

40.     Consistent with the Court's current policy, the search warrant return will list the model(s) and serial number(s) of any and all computers seized in the SUBJECT PROPERTY and include a general description of any and all associated peripheral equipment that has been seized. Additionally, the search warrant return will include the total numbers of each type of digital media that has been seized (*e.g.,* "ten (10) 3.5" diskettes; twenty (20) CDs; twenty (20) DVDs; three (3) USB drives; one (1) 256 MB flash memory card," etc.)

## NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

41.     Moreover, the Government will file a written pleading in this case within 120 days after the execution of the search warrant notifying the court that the imaging process of digital evidence seized from the target location is complete, and the forensic analysis of computers and media has begun. Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun. Such notice to the defendant and the Court is not intended to mean, and should not be construed to mean, that the forensic analysis

28

is complete, or that a written report detailing the results of the examination to date will be filed with the Court or provided to the defendant or his counsel. This notice does not create, and is not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

## CONCLUSION

42.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment C of this Affidavit, are located in the SUBJECT PROPERTY, described in Attachments A and B. I respectfully request that this Court issue a search warrants for the SUBJECT PROPERTY, authorizing the seizure and search of the items described in Attachment C.

Melvin Gonzalez
Special Agent
Federal Bureau of Investigation


Seen and approved by:

Thomas K. Johnstone IV
Special Assistant United States Attorney


Sworn to me this 1st day of September 2016


/s/
Roderick C. Young
United States Magistrate Judge

29

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| IN THE MATTER OF THE SEARCH OF:<br>1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 99004913336164 | Case No. 3:16ms3__ |
|---|---|

Filed Under Seal

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The vehicle known as a 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN:

1FTYY90V6SVA73472, a picture of which is below.

30

74



31

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>1995 Ford Tractor-Trailer Truck, license plate 26-<br>392, VIN: 1FTYY90V6SVA73472, and a<br>Samsung Galaxy S5, model SM-G900V,<br>990004913336164 | Case No. _3:16mS371_<br><br>**Filed Under Seal** |

## ATTACHMENT B

## DESCRIPTION OF LOCATION TO BE SEARCHED

The cellular phone known as a Samsung Galaxy S5, model SM-G900V,

990004913336164, a picture of which is below.

32

76



33

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 990004913336164 | Case No. 3:16mS371 |
| | **Filed Under Seal** |

SEP - 1 2016

## ATTACHMENT C

### EVIDENCE TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2251(production of child pornography); 18 U.S.C. § 2251A(Selling or Buying of Children); 18 U.S.C. § 2252 (possession of, knowing access or attempted access with intent to view, child pornography); 18 U.S.C. § 2422(enticement or coercion of a minor to engage in illegal sexual activity); and 18 U.S.C. § 1591( sex trafficking of children).

1. Computers or storage media used as a means to commit the violations described above.

2. GPS devices

3. Any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

34

78

browsing history, user profiles, email, email contacts, "chat," instant messaging

logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious

software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

35

    k.  records of or information about Internet Protocol addresses used by the

        COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including

        firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

        web pages, search terms that the user entered into any Internet search engine, and

        records of user-typed web addresses; and

    m.  contextual information necessary to understand the evidence described in this

        attachment.

4. Routers, modems, and network equipment used to connect computers to the Internet.

5. Child pornography and child erotica.

6. Any cameras capable of producing paper or digital photographs and/or audio-visual

   recordings

7. Records, information, and items relating to violations of the statutes described above

   including

    a.  Records, information, and items relating to the occupancy or ownership of the

        SUBJECT PROPERTY, including utility and telephone bills, mail envelopes, or

        addressed correspondence; Records, information, and  items relating to the

        ownership or use of computer equipment found in the SUBJECT PROPERTY,

        including sales receipts, bills for Internet access, and handwritten notes and

        ownership of vehicles in the SUBJECT PROPERTY;

    b.  Records and information relating to the identity or location of the persons

        suspected of violating the statutes described above; and

36

80

c.   Records and information relating to sexual exploitation of children.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

37

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:16CR139 |
| | ) | |
| RICHARD TODD HAAS, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

## **RESPONSE OF THE UNITED STATES TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

COMES NOW the United States of America, by its United States Attorney for the Eastern District of Virginia, Dana J. Boente, and his Special Assistant United States Attorney, Samuel E. Fishel, and respectfully submits the following Response of the United States to Defendant's Motion to Suppress Evidence:

### **I. Introduction**

The defendant moves this Court to suppress evidence seized by law enforcement officers pursuant to the execution of a federal search warrant. The United States opposes this Motion because the warrant-authorized search was consistent with the Fourth Amendment.

### **II. Statement of Facts**

On August 31, 2016, Special Agent Melvin Gonzales of the Federal Bureau of Investigation ("FBI"), applied for a search warrant for the residence of the defendant, Richard Todd Haas, located at 236 Monath Road, North Chesterfield, Virginia, 23236, and for the defendant's vehicle listed as a 2015 White VW Jetta, license plate VEU2010, VIN

82

3VW2K7AJ4FM357543.  (Government's Exhibit A; Application and Search Warrant Affidavit).

The affidavit supporting probable cause for issuance of the search warrant detailed the FBI's

investigation into violations of federal child pornography laws, specifically the warrant was

obtained pursuant to 18 U.S.C. §2252A (possession, receipt, and distribution of child

pornography), and 18 U.S.C. §2251 (production of child pornography).  *Id.*

On June 16, 2016, the FBI received information from a confidential witness ("CW")

indicating the defendant was sexually interested in minor females.  (Gvt's Ex. A, ¶7).  The CW,

an adult female, had known the defendant four years after having provided "escort services" to

him.  (Gvt's Ex. A, ¶8).  Specifically, the CW informed FBI agents that Haas had told her he

received oral sex from a 12 year-old neighbor four years ago.  *Id.*  CW further stated that, more

recently, in May of 2016, Haas showed her images of minor females ages 5 to 12 years-old

engaged in "sexually explicit acts."  *Id.*  She stated that she viewed 50 to 100 of these images.

*Id.*  Haas indicated he knew the victims because they "lived in his neighborhood."  *Id.*  He then

masturbated to the photos of the abused children as he displayed them to her.  *Id.*  The defendant

also told CW he would like her to be involved in the production of images and videos of child

pornography with juvenile females, and asked whether she could provide such minors for the

production.  *Id.*

Following CW's statements, FBI agents displayed a photo of the defendant, which she

positively identified as Haas.  (Gvt's Ex. A, ¶9).  CW also provided agents a phone number,

which she said was the defendant's number.  *Id.*  Agents entered the number into law

enforcement databases and discovered the number was associated with Richard Haas.  *Id.*

On July 21, 2016, CW again met with FBI agents and advised that she had since had

numerous conversations with Haas, and had actually met him in person.  (Gvt's Ex. A, ¶10).  She

noted that the defendant drove a "light colored Jetta." *Id.* She further stated that during their conversations Haas "constantly" discussed producing child pornography with her, and had even offered her money to obtain "nude images of an underage female." *Id.*

On two additional dates in August of 2016, CW recorded telephone conversations with Haas, calling the same number she had provided FBI agents in June. (Gvt's Ex. A, ¶11). During these conversations, Haas requested nude photos of underage females for money, and specifically requested a meeting between him and an underage female "not more than 12 years-old." *Id.* The defendant further added "the younger the better," and that CW "could make a lot of money from it." *Id.* He also advised her to, in the future, refer to potential victims' ages as "shoe sizes." *Id.*

In the course of their due diligence, agents had CW identify a photo of the residence where she had met Haas and where he had shown her the sexually explicit images of children. (Gvt's Ex. A, ¶13). She positively identified the image, which was a photo of the residence located at 661 Greencastle Road, North Chesterfield, Virginia, 23236. *Id.* Agents again checked pertinent databases which revealed Haas was the owner of the residence at 661 Greencastle Road, until he sold it in July of 2016. *Id.*

Completely separate from the above facts, on August 18, 2016, FBI agents received a complaint from the Richmond Police Department involving the defendant. (Gvt's Ex. A, ¶14). The complaint originated from an 11 year-old female ("CV1") who stated that Haas sexually molested her on several occasions. *Id.*

Following the report, a trained forensic interviewer spoke with CV1 about the incidents. (Gvt's Ex. A, ¶15). According to CV1, in September of 2015, Haas convinced CV1's parents to allow her to clean the defendant's house for money. *Id.* During her time at his residence, the

defendant asked CV1 to lie down on the couch at which point he "pulled her pants down and pushed her shirt up." (Gvt's Ex. A, ¶16).  CV1 attempted to leave the room, but the defendant stopped her and told her to lie back down.  *Id.*  He then proceeded to again pull down her pants and rub her "on the outside of her vagina skin to skin."  *Id.*  Following the assault, he gave CV1 $200 and told her not to tell anyone what had occurred.  *Id.*  CV1 stated that the defendant engaged in this same conduct with her at least five additional times, and would give her varying amounts of money afterwards each time.  *Id.*

Agents also spoke with CV1's guardian who corroborated much of what CV1 had stated about the circumstances of her meeting the defendant.  (Gvt's Ex. A, ¶17).  The guardian provided agents with a telephone number for Haas, which matched the number earlier provided by CW.  (Gvt's Ex. A, ¶19).

The agents conducted further corroboration to verify the identity of the defendant.  A subpoena result from Verizon revealed that the aforementioned telephone number belonged to a Richard T. Haas at P.O. Box 35085, North Chesterfield, Virginia.  (Gvt's Ex. A, 20).  DMV records also indicated that P.O. Box 35085, North Chesterfield, Virginia, belonged to Haas. (Gvt's Ex. A, ¶21).  Agents analyzed subpoenaed cell phone records of the aforementioned telephone number and discovered that the number had sent 60 text messages and 100 calls to the phone number of CV1's mother between May 2016 and July 2016.  (Gvt's Ex. A, ¶22).  Records also indicated that Haas was the principal executive for an equipment leasing business with a registered address at the 661 Greencastle Road address previously identified by CW and CV1. (Gvt's Ex. A, ¶24).  Finally, the agents conducted surveillance for several days outside the defendant's new address at 236 Monath Road, North Chesterfield, Virginia, where the search warrant was ultimately executed, and observed Haas depart the residence on several occasions in

a 2015 white VW Jetta, with license plate VEU2010, which matched the description provided by CW.  (Gvt's Ex. A, ¶23).

Agents executed the search warrant at 236 Monath Road, and on the white VW Jetta, on September 1, 2016.  During the course of the search they seized a Gateway Laptop computer and a GPS device.  A subsequent forensic examination of the laptop revealed that the defendant had saved approximately 17,000 images and videos of children, including prepubescent children, engaged in sexually explicit conduct, to include sadomasochistic conduct.

## III. Argument

### A.  The search warrant is supported by ample probable cause.

#### a.  The search warrant contains a bevy of facts related to child pornography, in addition to actual hands-on molestation, leading agents to reasonably conclude child pornography would be found at the defendant's residence.

The Supreme Court has held that the probable cause inquiry entails a "practical, common-sense" evaluation of the facts recited in support of a search warrant to determine whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates,* 462 U.S. 213, 238 (1983).  The Supreme Court has adopted a "totality-of-the-circumstances" test to determine whether probable cause supported the issuance of a search warrant.  *Id.*  Moreover, the probable cause standard "does not deal with hard certainties, but with probabilities," and law enforcement officers are entitled to "formulate[] certain common-sense conclusions about human behavior."  *Id.* at 231 (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).  Consequently, the facts presented to the magistrate only need to "warrant a [person] of reasonable caution in the belief" that evidence of a crime will be

found; there is no requirement "that such a belief be correct or more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742 (1983) (internal quotation marks omitted).

"The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 (1978). Furthermore, to establish probable cause for a search there must be a sufficient nexus between the criminal conduct, the items to be seized and the place to be searched. *See United States v. Lalor,* 996 F.2d 1578, 1582-83 (4th Cir. 1993).

The affidavit in the instant case contains a plethora of facts to lead a reasonably prudent person to conclude that child pornography would be found in the defendant's residence and his vehicle, which he parked at the residence. First, CW stated that defendant showed her sexually explicit images of children on his laptop computer in May of 2016. (Gvt's Ex. A, ¶8). Not only this, she gave specifics to their age and number of images shown, specifically that the child victims in the images were ages 5 to 12 years-old, and that the defendant showed her 50 to 100 images. *Id.* She also noted the defendant had said that the victims "lived in his neighborhood," and then proceeded to masturbate to the images in front of her. *Id.*

Those facts alone, which detail child pornography crimes, are a sufficient nexus in a probable cause determination to search for child pornography in the defendant's residence. But there was more. According to CW, on no less than four separate occasions did the defendant actually solicit her to find a child "younger than 12 years old" to produce child pornography for money. (Gvt's Ex. A, ¶¶8-11). The first incident occurred simultaneously to the incident where Haas showed her the child pornography on his laptop. (Gvt's Ex. A, ¶8). The second incident occurred in July of 2016 where CW again met the defendant, and later told agents he

"constantly" talked about producing child pornography, and even asked her if she could get him "nude images of children." (Gvt's Ex. A, ¶9). Regarding the final two incidents, CW recorded two phone calls between her and the defendant in August of 2016, where he specifically requested a meeting between him and an underage female not more than 12 years-old. (Gvt's Ex. A, ¶11). He commented "the younger the better," and stated that CW "could make a lot of money from it." *Id.* He also advised her to in the future refer to potential victims' ages as "shoe sizes." *Id.*

CW's numerous statements to the agents detailing specifically how the defendant possessed child pornography, and how he desired to produce child pornography was a sufficient nexus to obtain the search warrant at issue. But beyond CW's statements, agents subsequently obtained actual recordings where the defendant clearly asks CW to find children to produce child pornography. It is difficult to imagine a scenario with facts more probative to indicate that the defendant was possessing and even producing child pornography, and that such material was naturally located in his residence. Any reasonably prudent person would reach such a conclusion as the agents and magistrate did in this case.

**b. The agents went above and beyond in their due diligence to corroborate CW's statements and verify her credibility.**

CW first approached FBI agents in June of 2016 when she stated that Haas had, four years earlier, received oral sex from a 12 year-old neighbor. (Gvt's Ex. A, ¶8). She also stated during that June meeting that the defendant had shown her 50 to 100 images of children ages 5 to 12 engaging in sexually explicit acts on his laptop, and that he was interested in her recruiting females under the age of 12 to be in child pornography for money. *Id.* At that point, agents could have immediately run to a magistrate to obtain a search warrant, and may have been

justified in doing so, but instead they conducted a thorough investigation over the next three months in order to verify and corroborate CW and her facts. (Gvt's Ex. A, ¶¶8-11). They met with CW a second time in July of 2016 where she told agents that the defendant again had "constantly" talked of producing child pornography with children. (Gvt's Ex. A, ¶9). Finally, in August of 2016, agents had CW record two separate conversations with the defendant. (Gvt's Ex. A, ¶10). The defendant in those recordings specifically requested a meeting between him and an underage female not more than 12 years-old. *Id.* He commented "the younger the better," and stated that CW "could make a lot of money from it." *Id.* Thus, the recordings themselves unequivocally corroborated what CW had informed agents during their first two meetings.

But agents went further. CW provided a specific phone number associated with the defendant during her first meeting in June with the agents. (Gvt's Ex. A, ¶9). During the course of their investigation, agents verified with Verizon that the number belonged to Richard T. Haas. (Gvt's Ex. A, ¶20). Agents had CW also identify a photo of the defendant. (Gvt's Ex. A, ¶9). And they then had her identify the address of the defendant's residence where he had shown her the child pornography images. (Gvt's Ex. A, ¶13). CW additionally stated that the defendant drove a "light colored VW Jetta." (Gvt's Ex. A, ¶10). Agents subsequently confirmed through surveillance that Haas drove a 2015 white VW Jetta, with license plate VEU2010. (Gvt's Ex. A, ¶23).

Above and beyond all of this, agents analyzed cell phone records of the number CW provided, checked law enforcement databases, conducted "several days" of surveillance outside the defendant's residence where they witnessed the defendant and his Jetta, checked DMV records, and checked the defendant's business records. (Gvt's Ex. A, ¶¶21-24). Short of asking

CW to meet with the defendant face-to-face and standing directly next to them as they met, it is difficult to imagine additional steps the agents could have taken to corroborate CW's credibility and her statements about the defendant.  CW was a credible informant who provided a large amount of information (gleaned over several encounters with the defendant) that clearly showed the defendant's involvement in child pornography crimes.  The agents rightfully verified that information and then justifiably relied on it.

   *c.  The evidence of defendant's molestation of an 11 year-old victim simply serves to bolster the affidavit, and further evinces the defendant's deviant sexual interest in children.*

   A court reviewing the affidavit at issue could stop at paragraph 13 and easily find there is probable cause to issue a warrant to search for production, possession, and distribution of child pornography.  Agents, however, included additional information provided to them by the Richmond Police Department concerning a wholly separate set of incidents that occurred contemporaneous to the events described by CW.

   An 11 year-old female victim, CV1, reported that beginning in September of 2015 and on several different occasions afterwards, the defendant had sexually molested her.  (Gvt's Ex. A, ¶15).  Specifically, she stated the defendant would rub her vagina "skin-to-skin" and subsequently pay her hundreds of dollars and tell her not to tell anyone.  *Id.*

    CV1's guardian corroborated much of CV1's statements by describing the circumstances by which defendant was alone with CV1.  (Gvt's Ex. A, ¶17).  Notably, the guardian provided a phone number she said was the defendant's, which was the same number CW had provided agents and had called to record her conversations with him.  (Gvt's Ex. A, ¶19).

Thus, in this separate egregious act, the defendant engaged in conduct similar to conduct depicted in child pornography, and similar to the activity sought from CW when he solicited her to find children to abuse. Further, the defendant's modus operandi is similar in his interactions with both CW and CV1: he seeks to facilitate the abuse and exploitation of children by offering money.

The defendant attempts to assert that the molestation of CV1 was the only evidence upon which agents and the magistrate relied upon when applying for and issuing the search warrant. But, as outlined above, and as contained in paragraphs 7 through 13 of the affidavit, this is patently false. There were plenty of other facts detailing child pornography crimes specifically, and the evidence of molestation of the 11 year-old was simply in addition to that. Indeed, if anything, the defendant's sexual abuse of an 11 year-old serves to bolster the fact that the defendant has a criminal and deviant sexual interest in children that involves molesting and exploiting his victims.

The defendant relies on *United States v. Robert Doyle*, 650 F.3d 460 (4th Cir. 2011), for the proposition that molestation alone does not constitute probable cause for a child pornography search. The undersigned (unfortunately) prosecuted that particular case federally in the Western District of Virginia where he inherited a state search warrant that had already been executed, and that had an affidavit comprised of just two sentences. The sentences read: "Three minor children have come forward and stated that Robert Doyle Jr. has sexually assaulted them at the Doyle residence. One [sic] victims disclosed to an Uncle that Doyle had shown the victim pictures of nude children." From this, the sheriff's deputies obtained a search warrant for child pornography offenses. The Fourth Circuit, understandably, not only ruled there was no probable cause, but that the good faith exception did not apply because the affidavit was so completely

(and amazingly) bare bones, which again was a reasonable conclusion.  The thorough affidavit in the instant matter, it goes without saying, does not nearly approach the bareness contained in the Doyle affidavit, and clearly provides specific facts relating to child pornography crimes beyond molestation.

But for the Court's edification, and also contrary to defendant's assertions, there is an undeniable link between molestation and child pornography offenses.  In 2005, researchers at the Federal Correctional Institution located in Butner, North Carolina conducted a study of 155 inmates over an 18-month period who were convicted solely of non-contact child pornography offenses (possession, receipt and distribution) where there was no evidence of hands-on sexual abuse of children.  Of this group, 85% admitted to having sexually molested a child at some point in the past.  This study is generally regarded as the foremost study in the Internet age of convicted child pornographers and their tendencies towards hands-on sexual abuse.  The researchers revisited the study and addressed its critiques in a 2009 publication entitled "The 'Butner Study' Redux: A Report of the Incidence of Hands-On Child Victimization by Child Pornography Offenders," *Journal of Family Violence*, Vol. 24, pp. 183-191 (2009).

The U.S. Supreme Court has also recognized the link between molestation and child pornography, holding that it is of paramount importance that the production and dissemination of child pornography be controlled because pedophiles often use child pornography to seduce other children into performing sexual acts.  *Osborne v. Ohio*, 495 U.S. 103, 109-11 (1990);  *See also*, *United States v. Grimes*, 244 F.3d 375, 382 (5th Cir. 2001).

And the Ninth Circuit recognized such a link in *United States v. McCalla*, 545 F.3d 750 (9th Cir. 2008).  That court held:

> In enacting the Child Pornography Prevention Act, Congress
> specifically expressed the idea . . . that child pornography begets

> more child pornography regardless of its origin: "the existence of
> and traffic in child pornographic images . . . inflames the desires
> of child molesters, pedophiles, and child pornographers who prey
> on children, thereby increasing the creation and distribution of
> child pornography and the sexual abuse and exploitation of actual
> children who are victimized as a result of the existence and use of
> these materials . . .

*Id*. at 756.

**B.  *The good faith exception would clearly apply in this case.***

Assuming, *arguendo*, the warrant here were defective, the evidence should not be

suppressed because the agents relied on it in good faith.  The Supreme Court carved out a "good

faith" exception to the exclusionary rule because "suppressing evidence obtained in objectively

reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial

costs of exclusion."  *United States v. Leon*, 468 U.S. 897, 922 (1984).  In creating the exception,

the Court emphasized that "the exclusionary rule is designed to deter police misconduct," *id*. at

916, so "suppression of evidence obtained pursuant to a warrant should be ordered . . . only in

those unusual cases in which exclusion will further the purposes of the exclusionary rule."  *Id*. at

918.

The good faith exception applies unless: (1) the warrant is based on a "bare bones"

affidavit so lacking in evidence of probable cause as to render official belief in its existence

entirely unreasonable; (2) the warrant is based upon deliberate or reckless material

misrepresentations by the affiant; (3) the issuing magistrate has wholly abandoned the required

neutral and detached judicial role; or (4) the warrant's particularization of the place to be

searched or the items to be seized is "so facially deficient . . . that the executing officers cannot

reasonably presume it to be valid."  *Id*. at 923; *United States v. Crews,* 502 F.3d at 1136.

Should this Court determine there was no probable cause to issue the warrant, it is patently clear the good faith exception should apply. The affidavit in this matter was by no means bare bones. Even a cursory comparison to the affidavit in *Doyle*, which has been ruled an example of a bare bones affidavit, shows that it is not, as it consists of 35 pages of relevant facts. Furthermore, there is nothing to indicate the affiant gave deliberate or material misrepresentations. If anything, the agents' work over three months to verify the facts presented demonstrate the complete opposite. Additionally, there is, of course, no evidence that the magistrate abandoned his neutral judicial role in this instance. And finally, the warrant lists with extreme particularity the place to be searched by describing the house and vehicle in Attachments A and B of the affidavit. And Attachment C clearly delineates computers and GPS devices as items to be seized; facts not challenged by the defense in this case.

### IV.  Conclusion

For the foregoing reasons, the United States respectfully asks this Court to deny the defendant's Motion, as the search warrant was clearly supported by ample probable cause, and in the alternative, the agents relied on its issuance in good faith.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:      _____/s/_____
Samuel E. Fishel
Special Assistant United States Attorney
Virginia Bar Number 48280
Virginia Office of Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: 804-786-3870
sfishel@oag.state.va.us

13

94

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of January 2017, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

> Valencia Roberts, Esq.
> Carolyn Grady, Esq.
> Robert Wagner, Esq.
> Assistant Federal Public Defenders
> 701 East Broad Street, Suite 3600
> Richmond, Virginia 23219-1884

> _____/s/_____
> Samuel E. Fishel
> Special Assistant United States Attorney
> Virginia Bar Number 48280
> Virginia Office of Attorney General
> 202 North Ninth Street
> Richmond, Virginia 23219
> Telephone: 804-786-3870
> sfishel@oag.state.va.us

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No.   3:16CR139 |
| | ) | |
| RICHARD TODD HAAS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO
MOTION TO SUPPRESS EVIDENCE**

Defendant, Richard Todd Haas, by counsel, submits his Reply to the Government's

Response to his Motion to Suppress Evidence.  Based on the failure of the government's

affidavit to draw a credible connection between the defendant's computer and GPS device seized

from his tractor-trailer truck, and any criminal activity, the Court must suppress the seized

evidence.  The Court should also grant the defendant's request for a *Franks* hearing to allow the

defendant to demonstrate to the Court that there were intentional misrepresentations and material

omissions in the affidavit for the search warrant that would defeat any plausible showing of

probable cause.  In its Response, the government failed to address the request for a *Franks*

hearing and, further, made representations that are either false or unsupported in the record.[1]  For

---

[1]   For example, the government stated in its Response that during the search of the defendant's
residence and white Jetta, the agents seized the computer and GPS at issue.  Gov't Resp. at 5.  It
was the search of the defendant's tractor trailer that allegedly resulted in the seizure of the laptop
and the GPS device (Affid. at ¶ 25), although this calls into question where exactly these items
were recovered.
    The government further stated in its Response that in the recordings of telephone calls
between the CW and the defendant, "the defendant clearly asks CW to find children to produce
child pornography."  Gov't Response at 7.  The defendant has transcribed the two calls at issue
and nowhere in those calls does the defendant ask the CW to find children to produce child
pornography.  No mention is made in either of those calls to "child pornography" or pictures of
nude children.  *See* Attached Exs. 2 and 3.

1

these reasons and those discussed in the original motion, this Court should suppress evidence adduced through the seizure of the computer and GPS device.

*Argument*

The defendant's position rests principally upon the premise that the confidential source lacks the credibility and veracity required for a finding of probable cause by this Court regarding Special Agent Gonzalez's affidavit.  Almost all of the information provided in the affidavit which the government relied upon to attempt to establish probable cause - outside of a single statement by the CW that illegal images were on Mr. Haas's computer - draws no relevant connection between the defendant's alleged unlawful activity and the seized computer.  In its Response, the government does not even address the defendant's request for a *Franks* hearing and fails to acknowledge the substantial impeaching information regarding the confidential source that Special Agent Gonzalez left out of the affidavit.

There is a very significant statement in the recorded phone calls that was not included in the affidavit.  This statement has substantial probative value; it demonstrated a distinct separation between Mr. Haas and the alleged request for children; and it should have been provided to the magistrate for his determination whether probable cause for the execution of the search warrant existed.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978).  In the recorded phone calls, the CW tried to elicit from the defendant a statement regarding the age of the person who he wants her to bring to a meeting.  *See* Ex. 3 at 2.  The CW states, "what's the range that you like?"  Rather than answering the question posed, the defendant states, "it aint so much **me** as it is like **other** . . . ." *Id*. (emphasis added).  It is clear from the recording that the defendant is stating that whatever it is they are talking about, or whoever it is that the defendant is talking about with the CW, this person or juvenile is not intended for **him**, but for **some other person or**

2

**persons**.  This information reflects on the truthfulness - or lack thereof - of what the CW was telling the agents; it reflects on the truthfulness of statements in the affidavit as presented by the agent; it reflects on whether any images or evidence of the exploitation of children would be found on **his** computer; and it raises doubts with regard whether the defendant had any interest in child pornography or producing child pornography.  *See* Affid. at ¶ 7.  The omission of this statement from the affidavit was a material omission and should be explored through the questioning of the agent and the CW in a *Franks* hearing.

The affidavit also stated that the recorded telephone conversations between the CW and Mr. Haas included references to Mr. Haas asking for "nude photos of underage females in exchange of [sic] money."  Affid. at ¶ 11.   Nowhere in the recorded phone calls does the defendant request nude photos of underage females.  *See* Exs. 2 and 3.[2]  The false reference to nude pictures constitutes misleading evidence of the defendant's propensity for child pornography.  Affid. at ¶ 8.  This statement regarding "nude" photos constituted a material misrepresentation in the affidavit, and was presented with intent to mislead or with reckless disregard for the truth.

In the affidavit, Special Agent Gonzalez stated that "Haas constantly discussed the production of child pornography with CW and requested CW to find an underage female in order to produce child pornography."  Affid. at ¶ 10.  Nowhere in the recorded conversations does Haas ever reference child pornography or reference finding a child to produce child pornography.  *See* Exs. 2 and 3.  In the first call, the conversation is almost entirely about Mr. Haas and the CW getting together themselves.  Ex. 2.  In the second call, although there is some

---

[2]  At one point, Mr. Haas stated "Get me some pictures too," but says nothing of nude pictures.  Ex. 3 at 2.  The CW then stated that she will "see whenever she can get me the pictures," and that she "wasn't able to get the pictures," but says nothing of nude pictures.  *Id*. at 3.

discussion about younger people,[3] there is absolutely no reference to child pornography.  Mr. Haas never mentions child pornography or nude children in the calls and the CW never references child pornography either. The CW knows the calls are being recorded, she knows that the calls are intended to develop incriminating evidence against Mr. Haas, but **she** never even references child pornography, much less, elicits from Mr. Haas that producing child pornography is what he wanted to do.

The issue before this Court is whether probable cause to search Mr. Haas's computer or GPS device existed at the time the search warrant was executed.  To do this, the government has the burden of demonstrating the credibility and veracity of the CW or that the remainder of the affidavit established probable cause to search the computer and GPS device. Nothing in the calls corroborates the information necessary to establish probable cause that evidence of unlawful activity can be found on Mr. Haas's computer or GPS device.  *See United States v. Doyle*, 650 F.3d 460 (4th Cir. 2011) and *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016).

### *Veracity of Confidential Source*

Critical to a finding of probable cause under the affidavit is the veracity and credibility of the CW.  Unlike so many affidavits presented in federal court that involve cooperating witnesses, no statement attesting to the CW's credibility was presented to the magistrate in the affidavit in support of the search warrant and no explanation for this failure was provided by the government in its Response.  The only remaining inquiry is to what extent the information provided by the CW was corroborated in the affidavit, and whether that corroborated information, based on a totality of the circumstances, warrants a probable cause finding that

---

[3]  It is also clear from the transcript of the second call that Mr. Haas and the CW have not previously discussed this matter in any detail.  Haas asks the CW, "How do you know her?" [referring to the woman from Baltimore who allegedly has the contacts with younger people]; "How many people like know about it?;" "Have they ever done this before or is this like the first time or what, do you know?"  Ex. 3 at 3.

unlawful material would be found on Mr. Haas's computer or GPS device.  Under *Franks*, "It is

established law that a warrant affidavit must set forth particular facts and circumstances

underlying the existence of probable cause, so as to allow the magistrate to make an independent

evaluation of the matter."  *See Lull*, 824 F.3d at 116.  In this case, important information that

should have been provided in the affidavit was withheld from the magistrate -- information

known to Special Agent Gonzalez that would have impacted the credibility of the CW.

      The CW was a convicted felon.  Very shortly before these phone calls were made, she

was charged in Henrico County with felony and misdemeanor charges.  These charges

constituted violations of court supervision conditions for her in Chesapeake, Virginia.

Following her cooperation, serious charges were dismissed.  All of this information should have

been disclosed to the magistrate in assessing the credibility of this critical witness.

      The only statement in the affidavit that connected Mr. Haas's computer to unlawful

activity is that in May of 2016, the CW said she saw images of child pornography on a laptop

computer at Mr. Haas's home.  Affid. at ¶ 8.  Not only was this four months before the execution

of the search warrant and, therefore, potentially stale, but there was insufficient corroborating

information in the affidavit to accept the CW's statement regarding pornography on the laptop as

reliable.  *See United States v. Prideaux-Wentz*, 543 F.3d 954, 958 (7th Cir. 2008).  Further, there

was no information in the affidavit to suggest that the computer in the tractor trailer was the

same laptop that the CW saw in May of 2016.  In fact, the laptop in the truck was more likely to

be a work computer and thus less likely to contain child pornography.

      As pointed out above, there was considerable false and misleading information in the

affidavit which confirmed the "intentionality" of the agent's actions, and the "materiality" of the

omissions and misstatements.  *See Lull*, 824 F.3d at 115.  This would include false statements in

the affidavit stating that the telephone calls specifically referenced "nude" photographs,

"production of child pornography," and that any juveniles discussed in the conversations were

not intended for Mr. Haas, but for other people.  *See infra.* at pp. 3-4

### *Connection Between Information in Affidavit and the Computer and GPS Device*

There exists no credible evidence in the affidavit that any illegal material would be found

on Mr. Haas's computer.  In its Response, the government tried to distinguish *Doyle* from this

case and attempted to argue that evidence of sexual abuse of a child necessarily allows for the

search for evidence of child pornography ("there is an undeniable link between molestation and

child pornography offenses").  Gov't Resp at 11-12.   This is exactly what the Fourth Circuit in

*Doyle* compels district courts not to do.  *Doyle* states the following:

> The bulk of the information supplied in the affidavit concerned allegations of
> sexual assault. But evidence of child molestation alone does not support probable
> cause to search for child pornography.  *See United States v. Hodson*, 543 F.3d
> 286, 292 (6th Cir.2008) ("[I]t is beyond dispute that the warrant was defective for
> lack of probable cause-Detective Pickrell established probable cause for one
> crime (child molestation) but designed and requested a search for evidence of an
> entirely different crime (child pornography).  Consequently, the warrant did not
> authorize the search and, barring some other consideration, the evidence obtained
> during that search must be excluded from trial."); *see also United States v. Falso*,
> 544 F.3d 110, 124 (2d Cir.2008) ("[A]lthough Falso's crime allegedly involved
> the sexual abuse of a minor, it did not relate to child pornography. That the law
> criminalizes both child pornography and the sexual abuse (or endangerment) of
> children cannot be enough.") (citation omitted).

*Doyle* at 472.

While it is understood that the corroboration required in an affidavit is limited, (*see*

*United States v. Wilhelm,* 80 F.3d 116 (4th Cir.1996)), there must be some credible corroboration

to support the veracity requirement of the unnamed source.  And this Court must parse out any

false or misleading statements and include any material omissions to properly assess the

credibility of the source and corroboration of the source by the agent.  After that analysis is

6

101

completed, the failure of the remaining information in the affidavit to establish probable cause to search the computer and the GPS device renders the affidavit defective and the search unlawful.

The allegations regarding the exploitation of the eleven year old adds nothing to this analysis because these allegations bear no relationship to the computer or GPS device, and the eleven year old failed to identify Mr. Haas as the perpetrator.  In rebutting these claims in the Response, the government tries to distinguish *Doyle* from this case.  Gov't Resp. at 10.  The government stated that the affidavit in *Dolye* was "comprised of just two sentences."  Gov't Resp. at 10.  This Fourth Circuit case reports that far more than two sentences were provided in the affidavit.  *Doyle*, 650 F.3d at 464.  The affidavit appeared to have a section which included what was to be searched, the relevance of that material, and then how the affiant learned the relevant information, which included far more than two sentences.  *Id.*

The takeaway from *Doyle* should be that a child molestation offense is very different than a child pornography offense, and any allegations of child molestation in an affidavit cannot establish probable cause for the issuance of a search warrant for child pornography.  The government fails to recognize the import of this finding.

### Request for Franks Hearing

The affidavit failed to point out very significant evidence known to law enforcement that would have demonstrated that the CW could not be relied upon.  At age 23, she was a convicted felon several times over.  She had pending felony charges which she was apparently trying to work off with the police while cooperating against Mr. Haas.  And it would appear that she ended up receiving benefits from the government for her cooperation.  A *Franks* hearing is required to demonstrate that the agent in this case was well aware of the deficiencies of his

source and problems with the information from his source, but intentionally failed to present this material information to the magistrate.

In *Lull*, the Fourth Circuit found that:

> As mentioned above, in *Franks*, the Supreme Court addressed the question of whether a criminal defendant has the right to challenge the veracity of statements made in an affidavit supporting an application for a search warrant. The Court held that the defendant must first "make[ ] a substantial preliminary showing" of the intentionality and materiality prongs; if the defendant does so, 'the Fourth Amendment requires that a hearing be held at the defendant's request.' *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674. If the defendant is able to satisfy both prongs by a preponderance of the evidence at this hearing, the search warrant is voided. *Id.* at 156, 98 S.Ct. 2674. In the context of an omission, we have found a Fourth Amendment violation only where "affiants omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *Colkley*, 899 F.2d at 300 (citation and internal quotation marks omitted).

*Lull*, 824 F.3d at 115.

Mr. Haas has made far more than a substantial preliminary showing that Special Agent Gonzalez intentionally excluded material information from the affidavit, and included false information as well.  Mr. Haas will demonstrate at the hearing that both the intentionality and materiality prongs as set forth in *Lull* are satisfied.

### *Good Faith Exception*

The government in its Response relied upon the good faith exception in the event the Court finds that there is insufficient evidence in the affidavit to support a finding of probable cause.  To rebut this claim, the defendant asks the Court to find that there were material misstatements and omissions in the affidavit known to Special Agent Gonzalez.  Such proof of bad faith precludes the government from relying on the good faith exception.  The Supreme Court and Fourth Circuit have found that the good faith exception to the exclusionary rule does not apply  "if the magistrate or judge in issuing a warrant was misled by information in an

8

103

affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (citing to *United States v. Leon*, 468 U.S. 897, 923 (1984). The defendant intends to prove at the hearing of this matter that the magistrate was misled by information that the affiant knew was false, and by failing to include information known to be material.

### *Conclusion*

Mr. Haas respectfully requests that the Court suppress all digital evidence obtained pursuant to the unlawful search and seizure of his computer and GPS device on September 1, 2016.

Respectfully Submitted,
RICHARD TODD HAAS


By: _____/s/_____
                    Counsel

Robert J. Wagner, Esq.
VSB# 27493
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0808 (phone)
(804) 648-5033 (fax)
robert_wagner@fd.org

Valencia Roberts, Esq.
VSB #44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0885 (phone)
(804) 648-5033 (fax)
valencia_roberts@fd.org

9

104

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to Gene Fischel, Assistant United States Attorney, United States Attorney's Office, 600 East Main Street, Suite 1800, Richmond, Virginia, 23219.



Robert J. Wagner, Esq.
VSB# 27493
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0808 (phone)
(804) 648-5033 (fax)
robert_wagner@fd.org


Valencia Roberts, Esq.
VSB #44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0885 (phone)
(804) 648-5033 (fax)
valencia_roberts@fd.org

10

105

**EX. 2 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-14-16**
(DISC 305A-RH-2068374-102)

MUSIC RING TONE

CW: [CW]. Hello?

HAAS:  You are a troublemaking motherfucker.

CW:  (Laughing) Where the hell you been?

HAAS:  Ah man, had to go up near, not far from Jersey and actually working a job for somebody that's fucking (getting back from that?? *indecipherable*) didn't plan on going up, it was like last minute, so.  Anyway, just getting back and I gotta take some shit out to the country right now, long story.  Um, like, long story on that shit like we talked about before, but, anyway, not much, man, what you been into?

CW:  Not too much. I had been in town for a little while.  Obviously, I was freaking locked up.  That was hell.

HAAS:  Yeah, that's not fun, that's fucked up, man, I'm sorry.

CW:  Yeah, it's all good though cause I'm out now.  So I don't have court for like a couple more months or whatever so I should be good and then, you know, it's just stupid driving so after like your third one you get like 10 days or something.

HAAS:  Damn, dude, that's fucked up.  Not good.

CW:  Yeah, it should be alright though.

HAAS:  Not good, man.  Tell me about the girlfriend thing, man, you going to pick somebody up or what?

CW:  Yeah, one of my girlfriends from down where I'm from, I'm gonna pick her up.  She's gonna come up here with me for a while and then we might go to Baltimore or whatever, so.

HAAS:  You motherfucker, (*indecipherable*).  Yeah, she coming up tonight or when is she coming?

CW:  Um, I was gonna leave in the morning and pick her up.  Or tomorrow afternoon probably.

HAAS:  Ok, alright, cool, man.  What's she, like what's her deal, what's she look like?

CW:  She kind of looks like me but she's a little bit thicker.

HAAS:  Ok, gotcha.

CW:  Yeah, I know you like them skinny but you'll like her.

HAAS:  Yeah, yeah, I definitely do.  Yeah, that way I can make money on them too, man, so keep that shit in mind, (*indecipherable*) you're ever  gonna hook me up on, that's fine, that's no problem, that's cool.

CW:  Wait, what?

HAAS:  I still love your ass.

CW:  Oh hell no, you're the one that's always bullshitting, don't even go there.

HAAS:  (*indecipherable*)

106

**Page 2 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-14-16**

CW:  You are a bull-shitter.

HAAS:  (Laughing) You're a trip, dude.  Well, I want to definitely see you if I can.  Tomorrow is totally out for me so if I do, it's gotta be tonight but I've got to do this thing that I'm doing right now for very obvious reasons.  I'll tell you about it later, but it's gonna be late, late.  Are you going to be up really late or…?

CW:  When, tonight?

HAAS:  Yeah.

CW:  Yeah, I'll be up pretty late.

HAAS: Ok cool, man, I'll holler at you when I'm done.  I'm thinking like probably 4 hours from right now, I'll be done, so, um…

CW:  Damn.

HAAS:  I can, like, pick you up…Yeah, I know, man, it's fucked up.  But, are you, um, you want me to just pick you up or what?

CW:  It doesn't matter, wherever you wanna go.  Are we going to your house?

HAAS:  Yeah, I'll probably just run over here.  Yeah, if that's cool with you.

CW:  Oh ok, yeah, that's fine.  Are you gonna have anybody with you?

HAAS:  Um, possibly, I might be, I might be able to.  That's a possibility, dude, what are you thinking?  You don't want to or you do?

CW:  Doesn't matter to me, you're the one that says I always bullshit.

HAAS:  (Laughing)  I love you, man.  I love you, you're awesome, man.  I just worry about you, man.  I'm never sure, like, how you're (*indecipherable*),  I'm never sure if you, like, want to or don't.  Or if you're bullshitting me or what, I don't know, so, I just don't want to get you (*indecipherable*).

CW:  Hell no, we've done a lot of crazy stuff together, shoot.

HAAS: Yeah, I just wanna make sure you're down with shit, you really wanna do it and not just saying and stuff.

CW:  I'm down with money, I like money, so hey.

HAAS:  Fuck yeah, bitch, that's what I am talking about, man.

CW:  That's what the fuck I'm talking about. (loud ringing)

HAAS:  That is what I'm talking about.  Let me see, I think it's probably going to be too late for that, but, let me see if I can make that happen.  Probably not, but let me see, let me see.  So, cool man, well if you don't hear from me like in 4 hours from right now, buzz me and text me the address and I'll scoop you up, girl.

CW: Alright, cool, sounds good.

HAAS:  Alright dude, be good.

**Page 3- TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-14-16**


CW:  Alright baby, you too.

HAAS:  Later.

CW:  Bye.

**END OF RECORDING**

**EX. 3 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-16-16**
(DISC 305a-RH-2068374-103)

MUSIC RING TONE

CW:  Hello?

HAAS:  What's Up, girl?

CW:  Hey Baby, how you doing?

HAAS:  I'm not doing too bad.  Man, you turned your phone off the other night, man, I was ready to see you.

CW:  I fell asleep, I was out (laughing).

HAAS:  I knew you were, man, I was like, as soon as she got off the phone with me, I was like that motherfucker is not gonna be up in no 4 hours, man, you were like "Oh yeah, yeah, 4 hours."

CW:  (Laughing)

HAAS:  You were like, "Fuck that motherfucker, man." So, where are you at right now?

CW:  I just hung out with my home girls for a little bit, so...

HAAS:  Oh ok, you in Richmond or back at the beach?

CW:  Oh no, no, no, I'm in Richmond

HAAS:  Ok cool, man.  I have, ah, dude, that, I was, that thing, ah, this morning I set up for just a little bit, but, ah, it is not, it ain't happening no more.  Um, but I was definitely hoping I could get you with that thing then because that (     ), that could have been fucking tight, but um...

CW:  No, why not? That's no fair. You always don't hit me up whenever you get what you need.

HAAS:  I actually called you, man, I definitely did. I called you...

CW:  Oh yeah, whenever you called me around 12?

HAAS:  Yeah, yep, I had a little window right there, man, but anyhow, I'm gonna still try to hook it up.  How long are you gonna be here before you're in Baltimore?

CW:  Um, I'll be here.  If I go then I'm just gonna go and come right back. So, it's not that far for me to drive anyway.

HAAS:  Alright.  Let me see, during the day is a lot easier for me to hook that up, um, that part of it, and so I'll try to see if I can't hook it up again tomorrow, and give you a buzz, but I might be able to break away this evening and come see ya.  Are you still living off of Nine Mile?

CW:  Ah yeah, yeah, um, my home girl over here so we'll probably, like I said, we'll probably have to get a room or go to your crib or whatever.

HAAS:  Alright, yeah, that'll work, man, that'll definitely work.  I'll, we've got a couple of places we can go, so that's cool.

**Page 2 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-16-16**

CW:  Ok cool, and if, um, if I do make that trip to Baltimore, like I've told you before, you can't bullshit because you know she can't be riding, you know, the girl around and stuff like that, just everywhere going, nobody get pulled over or nothing like that whenever she's on her way down and, you know how that goes.

HAAS:  Now if you, I'm serious, you tell me when that shit's hooked up, man, because that'll definitely make you, make you some too, man, and I mean a lot actually.  So depending, depending on how it, I can't say a lot because it just depends on how it works out, but, um...

CW:  Yeah

HAAS:  ...but, dude, definitely hook that up, man, I'm serious.  Get me...

CW:  How do you, huh?

HAAS:  Get me some pictures too, man, because I can like set it up to where we can make some money beforehand, so...

CW:  Ok, and how does it work with, um, like the way that you do it, is it like the, the um, the younger the more moola, or?

HAAS:  Yeah

CW:  Yeah?

HAAS:  Yeah, yep, yep.

CW:  Alrighty then, we'll see what I can do (laughing).

HAAS:  You need to fucking hook it up, girl.

CW:  Alright, awesome, we can do that.

HAAS:  Need to hook it up, man.

CW:  What's the um, what's the range that you like?

HAAS:  Um, it ain't so much me as it is like other, but you know, around like exactly what you were saying before, you know, give or take a little bit, you remember what you were talking about before?  That is, that is like the most.

CW:  I remember I said I had a 12 and a 8

HAAS:  Yeah that's, the lower side of that is definitely better.

CW:  Ok.

HAAS:  I mean there's definitely, there's definitely money in other but you know, um, it's not as much as the other.

CW:  Right, right, I can understand that.

HAAS:  Yeah, cause it's, because there's lots, lots of it, you know what I'm saying, so...

**Page 3 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-16-16**

CW:  Right.

HAAS:  But, gotta hook that shit up, dude, and make some money, man.

CW:  Yeah, baby, I'm all about my moolah.

HAAS:  That's exactly right.  How do you know her?

CW:  Bitches need to eat (laughing).

HAAS:  That's exactly right, they damn sure do.  How do you know her?  I mean…

CW:  Through my friend in Baltimore.

HAAS:  Ok, like, how many people like know about it?

CW:  Oh, you know I don't deal with a lot of people when it comes to that, you know what I'm saying.  Gotta keep that really on the down-low so it's just one other person that I deal with up there, you know, I don't like to really meet people, other people and stuff like that, so I only deal with one person and, you know, she's the one that produces, you know, the product, so.

HAAS:  Ok, yeah, hell yeah, ok.  Alright, have they like ever done before or is this like the first time or what, do you know?

CW:  No, no, yeah, they've, that's what she does, she, you know, she's the boss of all of them so you know, she's got them, they know what is going on, like they know what they have to do so it's not their first time.

HAAS:  Ok, alright.

CW:  And like you told me before, might have to force a little bit, but you know what I'm saying, that's, you know how that goes.

HAAS:  Yeah, well that is, that is definitely you, man, and you know, me too, but you know, dude, I'm telling you, man, the dollars are big for that, so.

CW:  Ok, sweetness.  I'm gonna call her too and then see whenever she can get me the pictures because she was gonna send them to me whenever we met that one time, but then remember I had got with the freaking po-po and got locked up for a little bit, so.

HAAS:  That's fucked up.

CW:  Yeah, I wasn't able to get the pictures, but, it's whatever.

HAAS:  That's fucked up.

CW:  It is fucked up, I hate the fucking police, man.

HAAS:  Yeah, that's right.  Well, I'm gonna call, I am gonna call them shoes so, um, tell me like what size shoes and how much they are and all, and when you can get them and that kind of stuff, and we will go from there, and start making some money, bitch.

**Page 4 - TRANSCRIPT OF TELEPHONE CALL BETWEEN HAAS AND CW1 - 8-16-16**

CW:  Ah, don't talk (*indecipherable*) motherfucker. Ok, let me know about tomorrow as soon as you find out.

HAAS:  I definitely will.  I'm gonna try to get out and see you tonight, but I cannot guarantee you that the other won't happen tonight, so, um, but I might come see you, so.

CW:  Alright, sweet.

HAAS:  Alright, girl, well holler…

CW:  Don't be bullshitting, don't be bullshitting now.

HAAS:  Now, you know what, man, I ain't even gonna talk to you about that because your black ass went to sleep the other night, it wasn't me.

CW:  Ah, you're funny.

HAAS:  Alright girl, be good.

CW:  Alright, baby, you too.

HAAS:  See ya, hook it up, we'll see you.

CW:  Alright.

HAAS:  Bye.

CW:  Bye babe.

**END OF RECORDING**

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3

```
4   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
                                    )
5   UNITED STATES OF AMERICA        )
                                    )
6   v.                              )     Criminal No.
                                    )     3:16CR139
7   RICHARD TODD HAAS               )
                                    )     February 8, 2017
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
```

9

10

11     COMPLETE TRANSCRIPT OF MOTION TO SUPPRESS
       BEFORE THE HONORABLE ROBERT E. PAYNE
12          UNITED STATES DISTRICT JUDGE

13

14

15   APPEARANCES:

16   Heather Hart Mansfield, Asst. United States Attorney
     Office of the U.S. Attorney
17   SunTrust Building
     919 East Main Street, Suite 1900
18   Richmond, Virginia   23219

19          Counsel for the United States

20   Valencia D. Roberts, Asst. Federal Public Defender
     Office of the Federal Public Defender
21   701 E. Broad Street, Suite 3600
     Richmond, Virginia   23219

22

23          Counsel for the Defendant

24              DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT

2

I N D E X

|                    | DIRECT | CROSS | REDIRECT |
|--------------------|--------|-------|----------|
| Melvin Gonzalez    | 9      | 55    | 58       |

E X H I B I T S

DEFENDANT'S EXHIBITS:                                    Page

| A | Search warrant                    | 5  |
|---|-----------------------------------|----|
| B | Search warrant                    | 5  |
| C | Search warrant return             | 5  |
| D | Transcript of phone calls 8-14-16 | 53 |
| E | Transcript of phone calls 8-16-16 | 53 |
| F | Stipulations                      | 54 |
| G | Text messages                     | 61 |

 1          (The proceedings in this matter commenced at

 2    10:10 a.m.)

 3

 4          THE CLERK:  Case No. 3:16CR139, the United

 5    States of America versus Richard Todd Haas.

 6          The United States is represented by Heather

 7    Mansfield.  The defendant is represented by Valencia

 8    Roberts and Carolyn Grady.

 9          Are counsel ready to proceed?

10          MS. MANSFIELD:  The United States is ready,

11    Your Honor.

12          MS. ROBERTS:  The defense is ready.

13          THE COURT:  All right.  I have reviewed the

14    papers.  Do you have anything to say on whether a

15    *Franks* hearing is required other than what you've said

16    in your papers?

17          MS. ROBERTS:  No, Your Honor.

18          THE COURT:  Ms. Mansfield, do you have

19    anything to say other than what you've said in your

20    papers on whether a *Franks* hearing is required?

21          MS. MANSFIELD:  Nothing, Your Honor, in

22    addition to what we have said in our papers.

23          THE COURT:  All right.  I find that the

24    showing required for a *Franks* hearing has not been

25    made and therefore there is no need for a *Franks*

4

1    hearing.

2         All right.  Is there any evidence on the

3    issue itself underlying the validity vel non of the

4    search warrant?

5         MS. MANSFIELD:  Your Honor, the parties have

6    stipulated to the search warrants coming in that the

7    government attached to its responses, Government's

8    Exhibits A and B, respectively.  So the government at

9    this time would have no additional evidence as to the

10   validity of the search warrants on the *Doyle* issue and

11   the nexus issue.  Only argument.

12        THE COURT:  What evidence do you have?

13   Anything?

14        MS. ROBERTS:  Yes, Your Honor.

15        THE COURT:  You agree Government's Exhibit A

16   and B can come in?

17        MS. ROBERTS:  Your Honor --

18        THE COURT:  Do you agree that A and B can

19   come in?  She said you stipulated.  Do you agree?

20   Looks like you attached them to your papers, too.

21        MS. ROBERTS:  I did, Your Honor.

22        THE COURT:  The answer is yes, they can come

23   in, right?

24        MS. ROBERTS:  The government is not

25   presenting A and B.  Defense does have the warrants

116

1   and we're prepared to submit it to the Court.

2           MS. MANSFIELD:  As they were stipulated to,

3   Your Honor, there was a written stipulation.

4   Initially, they were marked as defense exhibits.  I'm

5   fine calling them Defense A and B or Government's A

6   and B.

7           THE COURT:  We will call them Defendant's

8   Exhibits A and B.  They are admitted.

9           (Defendant's Exhibits A and B are entered

10  into evidence.)

11          THE COURT:  All right.  Any other evidence?

12          MS. ROBERTS:  Your Honor --

13          THE COURT:  Yes or no?  Is there any more

14  evidence?

15          MS. ROBERTS:  Yes, Your Honor, there is

16  additional evidence.

17          THE COURT:  What is it?

18          MS. ROBERTS:  Your Honor, with regards to the

19  additional evidence, we would, through testimony,

20  present evidence showing --

21          THE COURT:  Excuse me.  Who are you going to

22  call as your witnesses?

23          MS. ROBERTS:  Agent Gonzalez, Your Honor.

24          THE COURT:  What are you going to have him

25  testify to?

1        MS. ROBERTS:  Your Honor, Agent Gonzalez will

2   provide testimony to the Court with regards to the

3   reliability of the confidential informant and what

4   information --

5        THE COURT:  What difference does that make at

6   this stage?  Don't you determine the fact of the

7   reliability of the informant based on what's in the

8   application?

9        MS. ROBERTS:  Yes, Your Honor, but it's our

10  purpose to demonstrate that there was far more

11  information known to Agent Gonzalez that suggest the

12  unreliability --

13       THE COURT:  What difference does that make if

14  what is known suggests it?  That's what I'm trying to

15  get at.

16       MS. ROBERTS:  Your Honor, the difference that

17  it makes is that if the agent knew of information and

18  intentionally left it out --

19       THE COURT:  That's a *Franks* issue.  I've held

20  that you haven't made the showing on that.

21       MS. ROBERTS:  Your Honor, it's also a prong

22  with regards to the good faith exception in *Leon* where

23  information that the affiant knew was false or would

24  have known was false --

25       THE COURT:  False is different than omitted.

118

1  You're saying he omitted something, not that he made

2  something false.

3         MS. ROBERTS:  Or reckless disregard.

4         THE COURT:  I'll hear the evidence, but I'm

5  going to tell you something.  Neither one of you have

6  put the issue into proper focus.  Get the evidence on

7  so I can get the hearing accomplished.  And get right

8  straight to it, please.

9         MS. ROBERTS:  Yes, Your Honor.

10        Your Honor, I would call Agent Gonzalez to

11  the stand.

12        THE COURT:  Is that the only witness you

13  have?

14        MS. ROBERTS:  That's the only witness we

15  anticipate, Your Honor.

16        Your Honor, pursuant to Rule 611(c)(2), I

17  would ask the Court for permission to treat Agent

18  Gonzalez as an adverse party or witness identified as

19  an adverse party.  As such, we would ask the Court to

20  allow me to examine him using leading questions.

21        THE COURT:  I'm waiting.

22        MS. MANSFIELD:  I guess, Your Honor, at this

23  point in this proceeding I would object to that.  I

24  don't believe there's any basis.  We haven't even

25  begun the questioning of Agent Gonzalez yet to treat

1  him as an adverse or hostile party.

2          MS. ROBERTS:  Your Honor, I'm not seeking to

3  treat him as hostile, but Rule 611(c) says that,

4  "Leading questions should not be used on direct

5  examination except as necessary to develop the

6  witness's testimony.  Ordinarily, the Court should

7  allow leading questions:

8              (1) on cross-examination; and

9              (2) when a party calls a hostile witness, an

10  adverse party, or a witness identified with an adverse

11  party."

12          Agent Gonzalez is -- it is my position that

13  he is a witness identified --

14          THE COURT:  Why are you standing here arguing

15  all this?

16          MS. ROBERTS:  Your Honor, because I intended

17  to --

18          THE COURT:  I thought the rule says that

19  rules of evidence don't apply in these proceedings

20  necessarily.

21          MS. ROBERTS:  I don't understand the Court's

22  question.  My request --

23          THE COURT:  This is a preliminary hearing,

24  the status to which the rules of evidence don't apply,

25  is it not?

GONZALEZ - DIRECT                    9

1          MS. ROBERTS:  In which case, Your Honor, I

2  would say --

3          THE COURT:  In which case, you would say you

4  did not even need to make the motion.  You just go

5  ahead and ask the questions.

6          MS. ROBERTS:  Yes, Your Honor.

7          THE COURT:  That's what you usually do.

8

9      MELVIN GONZALEZ, called by the Defendant, first

10  being duly sworn, testified as follows:

11      DIRECT EXAMINATION

12  BY MS. ROBERTS:

13  Q   Would you please state your full name for the

14  Court?

15  A   Melvin Gonzalez.

16  Q   Agent Gonzalez, how are you employed?

17  A   I'm a special agent with the FBI assigned to the

18  Richmond Field Office.

19  Q   Agent Gonzalez, how long have you been employed

20  with the FBI?

21  A   It's been over 11 years.

22  Q   Agent Gonzalez, do you lead investigations in all

23  areas, in all subject matters, or do you have a

24  particularized area in which you investigate crimes?

25  A   I have previously worked in another division,

1   cases involving violent crimes, corruption, drug

2   trafficking.  Here in Richmond I'm assigned to the

3   Child Exploitation Task Force.  I work sex trafficking

4   cases involving children and child pornography.

5   Q   How long have you been working this particular

6   assignment with sex trafficking and child exploitation

7   in the Richmond Division?

8   A   It's been a little over two years.

9           THE COURT:  I think the issue you wanted to

10  develop was what knowledge he had about the

11  reliability about the informant in this case.  Can we

12  get right to that?

13  BY MS. ROBERTS:

14  Q   Agent Gonzalez, when did you first meet the

15  individual identified in the affidavit as CW?

16  A   It was in June 2016.

17  Q   Prior to the meeting, was CW an individual known

18  to you?

19  A   No.

20  Q   Was CW working with another law enforcement

21  officer or agent associated with this investigation?

22  A   Not with this investigation.  She had previously

23  worked with the FBI out of the Norfolk Division.

24          THE COURT:  As what?  As an employee or what?

25          THE WITNESS:  She was a witness to child

1   exploitation investigations in that division.

2           THE COURT:  So she didn't work for the FBI?

3           THE WITNESS:  No.

4           THE COURT:  She was a witness --

5           THE WITNESS:  She was a witness.

6           THE COURT:  Wait a minute.  She was a witness

7   in a case being investigated by the FBI; is that what

8   you're saying?

9           THE WITNESS:  Yes, Your Honor.

10          THE COURT:  All right.

11  BY MS. ROBERTS:

12  Q   Agent Gonzalez, you failed to include that

13  information in the affidavit; is that correct?

14  A   I believe it was not included in the affidavit

15  that she had been a previous witness.

16  Q   When CW came to you --

17          THE COURT:  That was in two cases or one?

18          THE WITNESS:  I'm sure it was one case that

19  she assisted in.  She had previously provided

20  information to the Norfolk Division in other matters,

21  but she was a witness to one case.

22          THE COURT:  Did you know all this in

23  June 2016 when you applied for the warrant or have you

24  learned it since?

25          THE WITNESS:  When we met with the agent and

GONZALEZ - DIRECT                    12

1    the informant in Norfolk on June, I believe the 16th,

2    the special agent advised us that she had previously

3    been a witness on a case -- in a case in the Norfolk

4    Division, a previous witness.

5           THE COURT:  Then you went on to say in

6    addition to that that she had given other information

7    in the Norfolk office to the FBI.  Did you know that

8    when you applied for the search warrant or did you

9    learn that on the day you interviewed her?

10          THE WITNESS:  No, we -- I learned that

11   through the investigation after.

12          THE COURT:  Before or after the search

13   warrant?

14          THE WITNESS:  It was after the search

15   warrant.

16          THE COURT:  All right.  But as of the time of

17   the search warrant, you knew she had been a witness in

18   one case or two cases?

19          THE WITNESS:  In one case, Your Honor.

20          THE COURT:  Okay.  In one case in Norfolk and

21   it was child exploitation.

22          THE WITNESS:  It was a child exploitation sex

23   trafficking matter.

24          THE COURT:  Okay.  And she testified in

25   court?

GONZALEZ - DIRECT                    13

1           THE WITNESS:  I believe so, but I don't have

2    any details towards her testimony or her part in the

3    investigation.

4           THE COURT:  And you learned this from an FBI

5    agent?

6           THE WITNESS:  Yes, Your Honor.

7           THE COURT:  And you didn't put it in your

8    affidavit?

9           THE WITNESS:  No, it was not included in the

10   affidavit.  I believe it was not.

11          THE COURT:  All right.  All right.  Go ahead.

12          MS. ROBERTS:  I did have one question

13   prompted by your question of the agent.

14   BY MS. ROBERTS:

15   Q   With regards to testifying in the Norfolk matter,

16   is it your testimony that you do not know whether or

17   not she testified?

18   A   I do not know if she testified or not.

19   Q   Okay.  Now, when CW came to you with the

20   information regarding her observing child pornography

21   on Mr. Haas's laptop in May 2004, did you take -- what

22   measures, if any, did you --

23          THE COURT:  May 2004?

24          MS. ROBERTS:  I'm sorry.

25   Q   May 2016.  What measures, if any, did you take to

GONZALEZ - DIRECT                14

1   verify that information?

2   A    After she provided the information, we

3   corroborated Mr. Haas's identity with the CW.  She

4   provided his phone number.  We conducted subpoenas.

5   We collected records, and when we met with her, we

6   displayed his photo.  She fully identified him.  And

7   after that we conducted our normal record checks, and

8   we --

9            THE COURT:  Record check of the witness?

10           THE WITNESS:  No, of the subject involved in

11  the investigation, not the witness.

12  BY MS. ROBERTS:

13  Q    And through these record checks, the information

14  that you were able to verify were basic pieces of

15  information such as his name, and date of birth, and

16  address; is that right?

17  A    Addresses, businesses, associates.

18  Q    You were not able to verify any of the information

19  that went to the specific allegation made regarding

20  his possession of child pornography; is that right?

21  A    Well --

22  Q    Through --

23           THE COURT:  Him or the witness?  What are you

24  talking about?  We're talking about the reliability of

25  the witness.

1          MS. ROBERTS:  Yes, Your Honor, but I'm asking
2    what measures the agent took.  He said that he
3    verified basic information; name, social security
4    number, address.
5          THE COURT:  Just ask the question again.
6          THE WITNESS:  Do you want me to explain what
7    we did before we wrote the affidavit?
8    Q    No.  I wanted you to explain what specific
9    measures did you take to verify the allegation that he
10   possessed child pornography in May of 2016.
11   A    Well, we met with our CW after that in July 21,
12   and she provided additional details that she had
13   continued texting with Mr. Haas, and they were engaged
14   in multiple telephone calls, that he had continued to
15   approach the idea of producing child pornography with
16   a child that -- or CW was going to provide.  That he
17   also had a child who he can bring into the production
18   of child pornography and was requesting our CW to
19   engage in sex with the child in order for him to
20   produce the child pornography.
21        Before we wrote the affidavit, we conducted -- it
22   was August 12.  We did an attempt consensual telephone
23   call.  It didn't go through, but Mr. Haas did text our
24   CW after the attempt.  We provided a recording device
25   for CW, and she was able to conduct two consensual

GONZALEZ - DIRECT                                    16

1   recordings of telephone calls.  These calls were calls

2   from Mr. Haas to our CW.

3       During these calls, they clearly discuss the plan

4   to meet and produce child pornography.  And based on

5   that information and the information previously

6   provided, we wrote an affidavit.

7   Q   So if I can stop you for a minute and back you up,

8   Agent Gonzalez.  With regards to the two conversations

9   that the CW alleged occurred between Mr. Haas and

10  herself in June of 2016, those were not recorded; is

11  that correct?

12  A   Yes, they were.  I'm sorry?  In --

13          THE COURT:  Why don't you get the dates and

14  be specific.

15          THE WITNESS:  Yes, I'm sorry.  The telephone

16  calls recorded were in August.  I'm sorry.

17  Q   Right.  So the two conversations that allegedly

18  occurred in June, those dates weren't specified by the

19  CW, correct?  She didn't give specific dates as to

20  when those conversations allegedly occurred?

21  A   Which conversations?  When they first -- they

22  first met in May.  According to our CW, they met in

23  May.

24          THE COURT:  Is that on the telephone or in

25  person?

128

GONZALEZ - DIRECT                    17

1           THE WITNESS:  No, Mr. Haas called our CW.

2           THE COURT:  On the telephone?

3           THE WITNESS:  She's an escort.  She's a

4    prostitute.  He responded to an ad she had posted on

5    Backpage.  They agreed to meet.  Our CW met Mr. Haas

6    at his residence, and this took place sometime in May.

7    BY MS. ROBERTS:

8    Q   Right.  My question is --

9           THE COURT:  Go on.

10          MS. ROBERTS:  I'm sorry?

11          THE COURT:  I want to hear the rest of this

12   so I understand it.

13          THE WITNESS:  So after --

14          THE COURT:  Met in May and then what

15   happened?

16          THE WITNESS:  They met in May.  In May,

17   that's when Mr. Haas displayed the computer.  It was a

18   laptop that contained numerous images of child

19   pornography.  And the witness described the images.

20   She said they were young, female, from the ages

21   probably five to early teens, probably 12 years old.

22   They were all engaged in sexual acts.  Multiple

23   pictures were of multiple girls in a bed at the same

24   time with an adult male.  They were being penetrated.

25   So she was very descriptive of the photos that she

129

GONZALEZ - DIRECT                18

1    observed.

2          THE COURT:  Excuse me.  This viewing of the

3    computer, the viewing was on the computer.  Was that

4    in the house, the defendant's house?

5          THE WITNESS:  That was in the defendant's

6    house according to the CW.

7          THE COURT:  All right.  Excuse me.  Go ahead,

8    Ms. Roberts.

9    BY MS. ROBERTS:

10   Q   So as it relates to the June 2016 phone calls that

11   CW reported having occurred between Mr. Haas and

12   herself, those calls, those June calls, and the

13   substance, those were not recorded, correct?

14   A   The months of June and July, they were not

15   recorded, but we did obtain telephone records which

16   indicated hundreds of calls between them and text

17   messages.

18         THE COURT:  Between who?

19         THE WITNESS:  Between our CW and Mr. Haas.

20   BY MS. ROBERTS:

21   Q   And with regards to the text messages, you

22   actually were able to obtain the substance of the text

23   messages; is that correct?

24   A   Partially.

25   Q   In the substance of the text messages, they did

1    not mention underage females specifically, correct?

2    A    They did not.  I would assume they would not do

3    such a thing.

4    Q    They didn't contain or make mention of underage

5    females.  That's a correct statement?

6    A    Not in text messages, no.

7    Q    Okay.  And the text messages contained no mention

8    of child pornography, correct?

9    A    Not in the text messages.

10   Q    Okay.  And in the text messages, they did make

11   clear that Mr. Haas and the CW were currently engaged

12   in sexual relations among one another, correct?

13   A    It appeared that they were in some way engaged in

14   sex, in sexual acts.  She is a prostitute and he was

15   her client.

16   Q    And the substance of these text messages indicate

17   that CW would reach out to Mr. Haas and/or Mr. Haas

18   would reach out to CW for the purpose of the two of

19   them hooking up for sex; is that correct?

20   A    I believe so, but they did not -- after their

21   encounter in May, according to our CW they did not

22   engage in any additional sex acts.

23   Q    According to the CW?

24   A    According to the CW, they did not.  They met in

25   person one time in July, and Mr. Haas provided some

GONZALEZ - DIRECT                    20

1   money to our witness and continued to request and --
2   to request photos of the alleged 12-year-old that we
3   obviously made up, and he discussed his plan to
4   produce child pornography with the child.
5   Q   And the text messages, going back to the text
6   messages, the text messages contained no discussion of
7   youth, correct?
8   A   I already said no.
9   Q   No discussion of nude pictures of children,
10  correct?
11  A   It was not discussed during the text messages,
12  only through the consensual recordings.
13  Q   So in fact there was nothing in the substance of
14  the text messages that you reviewed that would lead
15  you or that would -- there was nothing in the
16  substance of the text messages that connected the
17  conduct?
18          THE COURT:  Text messages in May?
19          MS. ROBERTS:  No.  The text messages in June
20  and July.
21  Q   There was nothing in the substance of those text
22  messages that would have indicated to you Mr. Haas's
23  interest in child pornography, correct?
24  A   It didn't mention anything regarding child
25  pornography.

GONZALEZ - DIRECT                21

1              THE COURT:  I think we've been through this
2  six times now, and I don't want any more of it.  I've
3  heard enough.  I understand what he says, and it's not
4  going to change.  It's been repeated, repeated,
5  repeated.  So move on.
6  BY MS. ROBERTS:
7  Q   If I go back to the confidential witness's
8  criminal history, did you -- after you met her in June
9  of 2016, did you run a criminal history check?
10  A   No.
11  Q   Of the CW?
12  A   No, we did not.
13  Q   Prior to swearing out the affidavit, did you?
14  A   No, we did not.
15  Q   Prior to swearing out the affidavit, did you run a
16  criminal history check of the CW?
17  A   No, we did not.
18  Q   Did you run a check of the CW's driving history?
19              THE COURT:  Driving?
20              MS. ROBERTS:  Yes, Your Honor.
21              THE COURT:  What's that have to do with?
22              THE WITNESS:  I don't think so.  We ran her
23  CLEAR report.
24              THE COURT:  What's that?
25              THE WITNESS:  CLEAR, just to obtain her

GONZALEZ - DIRECT                    22

1  address and personal information.

2         THE COURT:  What does CLEAR mean?

3         THE WITNESS:  CLEAR is just a software that

4  we use.  It's like Accurint.

5         THE COURT:  You may think that I know that,

6  but you'd be wrong.  So tell me what it is.

7         THE WITNESS:  It's just a software that we

8  log into and we run names and biographical information

9  to obtain addresses.  We can run comprehensive

10 reports.

11        THE COURT:  Does it produce criminal

12 histories?

13        THE WITNESS:  Only if we order a full

14 comprehensive report with criminal history.

15        THE COURT:  It's capable of it?

16        THE WITNESS:  It's capable.

17        THE COURT:  But you didn't do it?

18        THE WITNESS:  No.  And it won't give you full

19 details.  It would only say that X person has a

20 criminal record or a court case in X, Y state.

21 BY MS. ROBERTS:

22 Q   Agent Gonzalez, when you swore out the affidavit

23 in August of 2016, you were aware that the CW had been

24 convicted of a felony in Chesapeake in 2012, correct?

25        THE COURT:  Excuse me.  The question is what

134

1  you were aware of at the time you swore out the
2  warrant.
3          THE WITNESS:  She advised that she had been
4  arrested in Virginia Beach for prostitution.  And when
5  we swore out the affidavit in -- in September, you
6  said?
7  BY MS. ROBERTS:
8  Q   No.  You swore the affidavit, the first affidavit
9  was sworn on August 31st, 2016 --
10  A   August 31st.
11  Q   -- is that correct?
12  A   Yes.  We were aware that she had been charged also
13  in Henrico with a felony.
14  Q   My question to you, Agent Gonzalez, is were you
15  aware on August 31st when you swore the first
16  affidavit that the CW had been convicted in 2012 of a
17  felony offense in Chesapeake, Virginia?
18  A   No, no, no.
19  Q   When you swore out the affidavit first on
20  August 31st and then on September 1st of 2016, were
21  you aware that the CW was on felony probation
22  supervision with the State of Virginia?
23  A   Yes.
24  Q   And you didn't include that information in the
25  affidavit, correct?

1    A    No.

2            THE COURT:  Excuse me.  You knew then that

3    she was on -- I don't know what felony probation

4    means.  You knew if she was on probation, she had been

5    convicted of some offense; is that right?

6            THE WITNESS:  Yes.

7            THE COURT:  What offense did you know she'd

8    been convicted of to get her on probation?

9            THE WITNESS:  She said that she was driving

10   without a license in Virginia Beach, and she was

11   arrested.  And this took place in -- we had a meeting

12   with her in July, and she advised that she had been

13   pulled over by a police officer in Henrico, that she

14   was not supposed to be driving, so she provided false

15   information to a police officer.  And when we got

16   involved in that, we then were aware that she was

17   actually in probation, and I believe she was in

18   probation -- it was something related to Virginia

19   Beach.  I don't know if it was the driving without the

20   license or she was -- because we know and we knew back

21   then that she was involved in prostitution --

22           THE COURT:  Whoa, whoa, whoa.  I'm just lost

23   with all this.  Now, the question is:  As of

24   August 31, 2016, did you know she had been convicted

25   of a felony in 2012 in Chesapeake?  And your answer to

GONZALEZ - DIRECT                    25

1    that was, no, you didn't know that.  Right?

2            THE WITNESS:  Not the 2012 felony.  I knew

3    she had a --

4            THE COURT:  Just a moment.

5            THE WITNESS:  Okay.

6            THE COURT:  But you knew she was -- as of the

7    time of the affidavit, you knew she was on probation.

8            THE WITNESS:  Yes.

9            THE COURT:  Then you said that she told you

10   that she was on probation for driving without a

11   license in Virginia Beach.  And then you mention

12   something about lying to a police officer in Henrico

13   where she was arrested for driving without a license.

14   To me, that's somewhat inconsistent.  So I want you to

15   clarify that.  Take it one at a time.

16           THE WITNESS:  Okay.

17           THE COURT:  You knew she was on probation as

18   of the time you executed the affidavit, right?

19           THE WITNESS:  Yes.

20           THE COURT:  What was the offense for which

21   she was on probation?

22           THE WITNESS:  Well, I thought it had to be

23   something related to prostitution, but we did not run

24   her criminal record until January of 2017 when the

25   AUSAs requested it.

GONZALEZ - DIRECT                    26

1          THE COURT:  That's not the question I asked

2     you.  What offense did you know she was on probation

3     for?

4          THE WITNESS:  I don't know what she was on

5     probation for.

6          THE COURT:  So you never verified that?

7          THE WITNESS:  No.

8          THE COURT:  Okay.

9     BY MS. ROBERTS:

10    Q   And, Agent Gonzalez, did I understand you to say

11    that CW told you she was on probation for a

12    prostitution offense?

13    A   No.

14    Q   In Virginia Beach?

15    A   No.  She advised she had been previously arrested

16    for prostitution and that she was on probation, but

17    she never said she was on probation for prostitution

18    or for driving without a license.  She did not have a

19    license.  That's what she said.

20         THE COURT:  Well, what is this all about?

21         MS. ROBERTS:  Your Honor, I'm going straight

22    to the Henrico false statement right now.

23         THE COURT:  You're not going anywhere until I

24    understand basically what he just said.  Excuse me.  I

25    have to understand that.

GONZALEZ - DIRECT                    27

1              It's very important that I know what you knew

2     in August of 2016, not what you found out in January

3     of 2017 or later.  If somebody wants to develop that,

4     they can develop it.  Right now we're talking about

5     2016.

6              THE WITNESS:  Uh-huh.

7              THE COURT:  So 2016, right?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  You did not know of the felony

10    2012 conviction in Chesapeake?

11             THE WITNESS:  No.

12             THE COURT:  In August of 2016, before you did

13    the search warrant affidavit for the house, you knew

14    from her that she was on probation?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  And you learned that from her

17    when?

18             THE WITNESS:  I learned that from her

19    July 21.

20             THE COURT:  All right.  Did you ever

21    thereafter before you issued the affidavit search

22    warrant determine what the offense was for which she

23    was on probation?

24             THE WITNESS:  No, Your Honor.

25             THE COURT:  Now, you mention the confidential

1    witness had told you she had been arrested for
2    prostitution.  When did she tell you that?
3            THE WITNESS:  During the course of the
4    investigation when we talked to her, but I don't
5    recall the exact date.
6            THE COURT:  Give me a month and a year.
7            THE WITNESS:  It was definitely before we
8    wrote the affidavit.
9            THE COURT:  Okay.  And she told you she was
10   arrested for prostitution?
11           THE WITNESS:  Yes, Your Honor.
12           THE COURT:  And is it from what you said
13   earlier, I understood you to say you assumed that the
14   reason she was on probation was because she had been
15   arrested for prostitution; is that what you assumed?
16           THE WITNESS:  I assumed that.
17           THE COURT:  You know as a law enforcement
18   officer that she could not have been on probation if
19   she weren't convicted.  You know that, don't you?
20           THE WITNESS:  Yes, Your Honor.
21           THE COURT:  So you also assumed that she had
22   been convicted of prostitution; is that right or not?
23   It had never crossed your mind?
24           THE WITNESS:  I didn't give importance to it.
25           THE COURT:  What?

140

GONZALEZ - DIRECT                    29

1          THE WITNESS:  I didn't think it was important
2     at the time, so I didn't look into it.
3          THE COURT:  Do you know whether prostitution
4     for which she was arrested was a felony?
5          THE WITNESS:  Well, we --
6          THE COURT:  Did you know as of August 31,
7     2016?
8          THE WITNESS:  No, but we work along with
9     vice, different vice groups, and we detain many
10    individuals that are involved in prostitution, and
11    they're not charged with felonies but charged with
12    misdemeanors, and their charges related to
13    prostitution but they're not felonies.  So I can't say
14    that I knew that she was on probation for a
15    prostitution charge.
16         THE COURT:  You just assumed that?
17         THE WITNESS:  I assumed it.
18         THE COURT:  At the time if you were arrested
19    on a misdemeanor probation charge and had been
20    convicted, could you be on probation as well?  Is
21    probation a permissible sentence for a misdemeanor
22    conviction for prostitution?
23         THE WITNESS:  I don't know.
24         THE COURT:  All right.  Go right ahead.  You
25    want to get into the Henrico thing?

GONZALEZ - DIRECT                                    30

1          MS. ROBERTS:  Yes, Your Honor.

2          THE COURT:  Let's get into the details.

3    BY MS. ROBERTS:

4    Q    Now, you met with CW on July 21st of 2016 in a

5    parking lot located here in the City of Richmond,

6    correct?

7    A    I believe it was Henrico.

8    Q    In Henrico, here in the general Richmond area,

9    correct?

10   A    Yes, ma'am.

11   Q    And the meeting is summarized in a report authored

12   by you dated September 1st, 2016, correct?

13   A    I would have to see the report.  Yes, this is the

14   report.

15   Q    And, Agent Gonzalez --

16         THE COURT:  Is that a 302?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Go on, now.

19   BY MS. ROBERTS:

20   Q    On that date, did the CW tell you that she had

21   been -- had an encounter with Henrico County Police

22   one week earlier on July 14, 2016?

23   A    She voluntarily advised us of that, yes.

24   Q    And did she tell you at that time -- did she tell

25   you on July 21st that when she had that encounter one

GONZALEZ - DIRECT                31

1   week prior that she provided a false statement to the

2   officer with regards to her identity?

3   A   Yes, she did.

4   Q   Did she also tell you that she provided

5   identifying information to the officer which belonged

6   to her sister?

7   A   Yes, she did.

8   Q   And when she provided that information to the

9   officer, did she tell you that she also signed her

10  sister's name to each of the summonses that were

11  issued?

12  A   I'm pretty sure she did.

13  Q   In fact, the Henrico police officer released her

14  on July 14, 2016, not knowing that she had forged the

15  uniform summons; is that correct?

16  A   Yes, that is correct.

17  Q   And all of this information you knew prior to your

18  swearing the affidavit for the search warrant on

19  August 31st, correct?

20  A   I knew the information, and I advised the

21  prosecutor of what was going on.

22  Q   But you failed to include that information in your

23  affidavit submitted to the magistrate on a

24  determination of probable cause, correct?

25  A   I didn't know I was obligated to include it in the

1  affidavit.

2  Q   Now, when CW was encountered by Henrico Police on

3  June 14th, she was cited for driving on a suspended

4  operator's license, correct?

5  A   That is correct.

6  Q   I'm sorry.  When she was encountered on July 14th,

7  correction to the date, by Henrico police officers,

8  she was cited for driving on a suspended operator's

9  license, correct?

10  A   Yes.

11  Q   Now, after CW told you that she'd lied to Henrico

12  police, did you give her any instructions with regards

13  to correcting or reporting her false statements?

14  A   I didn't have to give her instructions because she

15  voluntarily provided the information to us, and she

16  stated that she wanted to take care of it.  So I

17  contacted one of our Henrico P.D. TFOs and explained

18  what was going on.  He stated he was going to reach

19  out to the Commonwealth's Attorney Office.  He talked

20  to a Henrico prosecutor.  He got back with me and told

21  me that they had agreed to meet with her -- I think it

22  was the 25th that she had her next hearing.  So I did

23  not have to turn her in Friday or Thursday when she

24  released the information to us.

25     So on the 25th, I made sure that she got to the

GONZALEZ - DIRECT                33

1    court.  So we drove to a hotel where she was staying

2    at.  We picked her up.  We drove her to the Henrico

3    Court.  We walked her to the courtroom.  The TFO

4    obtained a felony arrest warrant for providing false

5    information.  She was charged.  She was not given bail

6    and she was held in jail.

7             THE COURT:  What's TFO?

8             THE WITNESS:  He's an FBI task force agent.

9             THE COURT:  She was charged with felony what?

10            THE WITNESS:  She was charged with a felony

11   that day.  I don't know the exact charges, but I guess

12   for providing false information to a police officer

13   who previously stopped her.

14            THE COURT:  And she then was detained as a

15   result of that charge?

16            THE WITNESS:  She was detained, yes, Your

17   Honor.

18            THE COURT:  And that happened in court in

19   Henrico?

20            THE WITNESS:  In Henrico, yes.

21            MS. ROBERTS:  One moment, Your Honor.

22            Thank you, Your Honor.

23   BY MS. ROBERTS:

24   Q   Agent Gonzalez, my question to you was whether or

25   not you advised CW to contact Henrico Police.

GONZALEZ - DIRECT                    34

1           THE COURT:  He said that he did not have to
2    because she volunteered.  She told him she wanted to
3    make it straight, and he therefore helped her do that.
4    We heard him testify to that completely.  Let's go.
5    BY MS. ROBERTS:
6    Q   Agent Gonzalez, in the report that you authored
7    that summarized the interview of CW on July 14th, in
8    your report you state that agents advised CW that she
9    needed to clarify this with Henrico County Police; is
10   that correct?
11   A   Yes.
12          THE COURT:  That interview was, I thought you
13   said, was July 21.
14          THE WITNESS:  It was July 21.
15          MS. ROBERTS:  I'm sorry.  The July 21 was the
16   interview.
17          THE COURT:  Yeah.
18          MS. ROBERTS:  Yes, Your Honor.
19          THE COURT:  So you put the wrong date in the
20   question.  That's what I'm saying.  Let's just keep it
21   straight, please.
22          All right.  So in his 302, he said that he
23   told her what?
24          MS. ROBERTS:  That she needed to clarify
25   this.

GONZALEZ - DIRECT                      35

1           THE COURT:  Okay.

2               MS. ROBERTS:  With Henrico County Police.

3           THE COURT:  All right.  And that's in your

4    302?

5           THE WITNESS:  Yes.

6               MS. ROBERTS:  Your Honor --

7           THE WITNESS:  She voluntarily provided the

8    information to us.  She asked us how she could fix it,

9    and we told her that she needed to clarify it with

10   Henrico P.D.

11          THE COURT:  What he said before.

12          THE WITNESS:  We didn't instruct her to do

13   anything after that.  We picked her up and we

14   basically turned her in.

15   BY MS. ROBERTS:

16   Q   Agent Gonzalez, I've given you a copy of a

17   document.  Do you recognize that document?

18   A   Yes.

19   Q   And what do you recognize that document to be?

20   A   It's an FD-302.

21          THE COURT:  What we doing here?

22              MS. ROBERTS:  Your Honor, I'm about to move

23   the exhibit into evidence.

24          THE COURT:  Why?

25              MS. ROBERTS:  As Defense Exhibit --

1            THE COURT:  As impeachment?

2            MS. ROBERTS:  Yes, Your Honor.

3            THE COURT:  All right.  Any objection?

4            MS. MANSFIELD:  Your Honor, I believe the

5    agent has asked and answered the questions.  I know

6    the rules of evidence don't, per se, apply, but I

7    think he's asked and answered the questions related to

8    what this says.  I don't think there's any need to

9    admit his report into evidence.

10           THE COURT:  It's not impeachment.  Objection

11   sustained.  He's answered the thing truthfully.  He

12   just didn't say it quite the way you wanted him to say

13   it.

14   BY MS. ROBERTS:

15   Q   Agent Gonzalez, you were aware that CW had a court

16   date for the Henrico matters prior to your swearing

17   the affidavit on August 31st; is that correct?

18   A   Which court?  Are we talking about the July 25th

19   or --

20           THE COURT:  He testified he took her to court

21   on July the 25th, and it was at that time that a

22   charge was pressed against her.  So obviously he knew

23   that she had the court date before August 31.  I mean,

24   that's clear.  So we don't need to explore that any

25   further.  Are you asking about something different?

GONZALEZ - DIRECT                    37

1          MS. ROBERTS:  Convictions, Your Honor.  I'm

2    sorry.

3          THE WITNESS:  It was during that time in

4    court that we were fully aware that she was on

5    probation.  And after that we didn't follow-up with

6    her on any of her charges or what happened with her in

7    Henrico.

8          THE COURT:  I think the question is:  When

9    you swore out the affidavit for the search warrant,

10   had she been convicted to your knowledge of the charge

11   for which she was arrested on the 25th of July?

12         THE WITNESS:  I believe she was not.

13         THE COURT:  Had not been convicted?

14         THE WITNESS:  Had not been.

15         THE COURT:  Okay.

16   BY MS. ROBERTS:

17   Q   Agent Gonzalez --

18         MS. ROBERTS:  One moment, Your Honor.

19   BY MS. ROBERTS:

20   Q   Agent Gonzalez, you've testified that prior to the

21   instant matter you had never used CW as an informant,

22   correct?  That's your testimony?

23         THE COURT:  I don't think he's testified

24   about whether he had used her at all yet in this

25   hearing.

149

GONZALEZ - DIRECT                              38

1  BY MS. ROBERTS:

2  Q   Prior to the instant matter, had you ever used CW

3  as an informant?

4  A   No.  She was never open as an informant.  She's

5  addressed in our reports as a witness, a complainant.

6          THE COURT:  CW is a designation in the FBI

7  shorthand for witness.  CI is for confidential

8  informant; is that right?

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  So your designations treat her as

11  CW, a witness; is that what you're saying?

12          THE WITNESS:  Yes, we treat witnesses very

13  differently than we treat informants.

14          MS. ROBERTS:  Okay.

15  BY MS. ROBERTS:

16  Q   And it was -- moving to the CW's statements

17  regarding the images on the laptop in May of 2016.

18  Did CW specify when exactly in May 2016 Mr. Haas

19  allegedly showed her the CP on his computer?

20  A   Not the exact date.  According to telephone

21  records, we know that they were in contact May 23,

22  2016, and thereafter many, many times.

23  Q   And you don't know whether or not they had been in

24  contact prior to May 23rd by some other means other

25  than telephone?

GONZALEZ - DIRECT                39

1    A    Well, the witness advised that she knew Mr. Haas

2    from like four years ago.  So they have known each

3    other for a while.  She provided escort services to

4    him prior to their meet in May 2016.

5            THE COURT:  When you say "escort services,"

6    are you saying she serviced him as a prostitute?

7            THE WITNESS:  Yes, Your Honor.

8            THE COURT:  So she had been a prostitute, and

9    he had paid for her services before they met, and she

10   saw the images on his computer?

11           THE WITNESS:  Yes, Your Honor.  She advised

12   that she met Mr. Haas for the first time approximately

13   four years ago, and that Mr. Haas back then approached

14   her and talked to her about wanting to have sexual

15   encounters with younger females.

16   Q    But the CW did not report that alleged statement

17   to law enforcement, correct?

18   A    She did not.

19           THE COURT:  Wait just a minute.  I thought he

20   just said she told him.

21           MS. ROBERTS:  No.  She told him in 2016.

22           THE COURT:  That's not the issue.  You said

23   "she never."  Never is a forever period of time with

24   no date on it.  And he just now said that she reported

25   this to him.  He's a law enforcement officer.  So is

GONZALEZ - DIRECT                    40

1    your question that before, to his knowledge, did she

2    ever tell the police officers at or about the time of

3    the conversation in 2012 or so?  Is that your

4    question?

5              MS. ROBERTS:  Your Honor, whether prior to

6    telling him in 2016 whether she had provided that

7    information to law enforcement previously.

8              THE COURT:  All right.  Did she tell you

9    whether she had or not?

10             THE WITNESS:  She denied mention of any

11   information.  I am not aware if she provided the

12   information to another law enforcement agency but not

13   to myself.

14   BY MS. ROBERTS:

15   Q   And in fact for four years --

16             THE COURT:  What did she say that the

17   defendant said?  What did the CW tell you that the

18   defendant had told her in the conversation four years

19   before?  What was it he said?

20             THE WITNESS:  CW stated that Mr. Haas after

21   they had sexual encounters, she explained the type of

22   sexual encounters that Mr. Haas was interested in, and

23   that Mr. Haas advised her that he wanted or he was

24   interested in having sexual encounters with younger

25   females.  She understood that he was referring to

GONZALEZ - DIRECT                    41

1   underage --

2           MS. ROBERTS:  Objection, Your Honor.  I would

3   object to what she understood.

4           THE WITNESS:  That's what she stated.

5           THE COURT:  She said she understood?

6           THE WITNESS:  That's not what I understood.

7   That's what she understood.  That's what she advised

8   me.

9           THE COURT:  Overruled.

10          She said she understood that to mean what?

11          THE WITNESS:  To mean underage females.  But

12  it wasn't until her meeting with him in 2016 that she

13  actually observed the child pornography images.  And

14  that was the fact -- that was what prompted her to

15  approach law enforcement because she realized that Mr.

16  Haas was serious about it.  You see, a lot of these --

17          MS. ROBERTS:  Objection, Your Honor.

18  Objection at this point.  It's not responsive.  The

19  agent is testifying and going on.

20          THE WITNESS:  I'm stating what she said.

21          THE COURT:  You asked about the conversation.

22  He's saying what she said in it.

23          MS. ROBERTS:  Your Honor, I asked a specific

24  question which was whether or not she had reported the

25  alleged conduct.

GONZALEZ - DIRECT                    42

1          THE COURT:  I heard the question.  He's just

2    answering the question.  But I think we've gone far

3    enough.  The prosecutor can develop it if she wants

4    to.

5          When you open the door, the horse can come

6    in, you know, when there's no rules of evidence.

7          All right.

8    BY MS. ROBERTS:

9    Q   Agent Gonzalez, to be clear, between 2012 until

10   May of 2016, CW advised that she had had no contact

11   with Mr. Haas, correct?

12   A   She did not provide specific dates.  She said she

13   knew Mr. Haas from approximately four years.  That it

14   had been a long time since she had not met him, and

15   she recontacted or remet him in May 2016.  I don't

16   know the specific dates.  I don't know if they --

17   maybe they didn't meet for a year or two.  I do not

18   know.  She did not provide that information.

19         THE COURT:  Anything else?

20         MS. ROBERTS:  Yes, Your Honor.

21   BY MS. ROBERTS:

22   Q   Agent Gonzalez --

23         THE COURT:  Your purpose here is the

24   reliability of the informant.  You're getting far

25   afield now.  I really want it confined to that.

GONZALEZ - DIRECT 43

1         MS. ROBERTS: Your Honor, I think the

2  CW's engagement --

3         THE COURT: I just want it confined to that.

4         MS. ROBERTS: Yes, Your Honor. My

5  question --

6         THE COURT: Just do it. Do it. I don't need

7  to hear it and then hear you do it. Just do it.

8  BY MS. ROBERTS:

9  Q  Agent Gonzalez, I'm going to hand you a report, a

10  302, dated September 22nd of 2016. And this report

11  alleges that you were present for an interview of CW

12  on June 16th of 2016.

13  A  Yes.

14  Q  Is that correct?

15  A  Yes.

16  Q  Were you in fact present for the interview with CW

17  on June 16, 2016?

18  A  I was present, yes.

19  Q  And have you had an opportunity to review this

20  report, which was authored by John Holberg, one of

21  your FBI associates?

22  A  I have seen this report before, yes.

23  Q  Does this report accurately reflect the

24  information that CW provided to you and Agent Holberg

25  and others during that interview?

GONZALEZ - DIRECT                    44

1   A   I'm pretty sure it did, yes.  Or it does.

2   Q   According to this report, CW advised you that

3   after Mr. Haas -- I'm sorry.  One moment.

4          MS. ROBERTS:  I'm sorry, Your Honor.  I'm

5   trying to find the exact location in the report.

6   BY MS. ROBERTS:

7   Q   In the report, it notes that Mr. Haas first --

8          THE COURT:  Just ask him a question.  If you

9   are going to need to impeach him, then you can do it,

10  but we don't need to read through the report.  Just

11  ask him the question.

12  BY MS. ROBERTS:

13  Q   During the interview, CW advised you and others

14  that she had lost contact with Mr. Haas four years

15  ago, correct?

16  A   That is correct.

17  Q   And so between 2012, the earlier contact between

18  the two, between 2012 and May of 2016, CW had not had

19  contact in those four years with Mr. Haas, correct?

20  A   She did not provide that information, so I would

21  guess not.

22          THE COURT:  All right.  You've just wasted a

23  whole bunch of time over nothing.  Basically, he said

24  from the beginning that she said that she hadn't seen

25  him for about four years, and they got back together

GONZALEZ - DIRECT                                    45

1   in May of 2016.  You can argue from that that they

2   hadn't seen each other in four years.  Come on.  I

3   don't think it's disputed.  Let's go on.

4   BY MS. ROBERTS:

5   Q   With regards to --

6           THE COURT:  Not now.  You just simply haven't

7   gotten anything out of that line of questioning that

8   dealt with the reliability of the informant.  If your

9   next line of questioning doesn't deal with the

10  reliability of the informant, which is what you told

11  me you were putting him on for, then we're going to

12  stop the examination, let the government have their

13  cross, and then go on.

14          MS. ROBERTS:  Yes, Your Honor.

15          THE COURT:  Confine it to what we're doing.

16  BY MS. ROBERTS:

17  Q   With regards to the information about the laptop

18  that the CW said she observed in 2016, did she provide

19  you with any details regarding the laptop's

20  appearance?

21  A   She said it was a black laptop.

22  Q   She said it was a black laptop?

23  A   She said a black laptop.

24  Q   Agent Gonzalez, you did not include the

25  description in the affidavit or the information in the

GONZALEZ - DIRECT                    46

1  affidavit that the CW said it was a black laptop,

2  correct?

3  A   I would have to review the affidavit.

4        THE COURT:  Well, it's either there or it

5  isn't.

6  BY MS. ROBERTS:

7  Q   And she didn't identify the brand or manufacturer

8  of the laptop?  For example, she didn't say it was a

9  Dell or a Toshiba or a Vaio, correct?

10 A   No.

11 Q   She didn't provide any specific identifying marks

12 or tell you anything specifically about the laptop

13 other than what you now say she told you, which was

14 that it was a black laptop, correct?

15 A   That's correct, yes.  She described the images

16 that were on the laptop.  That's what we were --

17       THE COURT:  She's just asking about what she

18 said about the laptop itself and what the description

19 was.

20       Anything else?

21 BY MS. ROBERTS:

22 Q   Agent Gonzalez, the phone call, the recorded phone

23 calls which you reference in your August 31 and

24 September 1, 2016 search warrant affidavits, did you

25 listen to each of those phone calls prior to your

GONZALEZ - DIRECT                    47

1   swearing out the affidavit?

2   A   Many times.

3         MS. ROBERTS:  Your Honor, those are all of

4   the questions with regards to the reliability -- I'm

5   sorry.  One moment.

6         Your Honor, those are all the questions that

7   I have with regards to the reliability of the

8   confidential informant.  I do have questions for the

9   agent to clarify the details of the recovery of the

10  computer?

11        THE COURT:  She's not a confidential

12  informant.  She's a confidential witness.

13        MS. ROBERTS:  Confidential witness.  Your

14  Honor, I do have a line of questioning with regards to

15  the laptops that were recovered on September 1st.

16        THE COURT:  How many were recovered on

17  September 1st?

18        MS. ROBERTS:  Three, Your Honor.

19        THE COURT:  So what?  You haven't developed

20  anything in your papers about that at all.  We're not

21  giving you a rehearsal for trial or discovery.

22        MS. ROBERTS:  No, Your Honor.

23        THE COURT:  You didn't raise anything about

24  any of the disparity between laptops or a different

25  laptop or make any point of them that I know of.

GONZALEZ - DIRECT                    48

1   Maybe I misread it.

2        MS. ROBERTS:  Your Honor, it goes to

3   omissions by the affiant, Agent Gonzalez, with regards

4   to the affidavit that was sworn out on September 1st

5   for the third laptop that was recovered, which is the

6   search warrant that we are contesting here.

7        I'll tell the Court that --

8        THE COURT:  What are you trying to prove?

9   That he didn't mention three laptops or what?

10       MS. ROBERTS:  Your Honor, that at the time

11  that they had -- they first obtained the warrant for

12  Mr. Haas's home and personal vehicle, they executed

13  the warrant and they recovered two laptop computers

14  from the home.

15       THE COURT:  Oh, they did?

16       MS. ROBERTS:  Yes, Your Honor.  They then

17  went to Mr. Haas's work site and arrested him.  At the

18  time that they arrested him at the work site, agents

19  indicate that he was inside of his vehicle and that

20  when they removed him they saw another laptop.

21       THE COURT:  All right.

22       MS. ROBERTS:  The affidavit for the search

23  warrant relating to the 1995 tractor-trailer and the

24  laptop on which these images were allegedly found

25  failed to include information or to state that the

GONZALEZ - DIRECT                    49

1    agents had already issued or executed the warrant at

2    the home and recovered two laptops, which makes it

3    more likely or less likely --

4              THE COURT:  It looks to me like all that does

5    is help the government.  How does it help you?

6              MS. ROBERTS:  No, Your Honor, because it is

7    therefore less likely that a laptop found inside of a

8    work vehicle is the personal laptop that the agents --

9    that the CW referenced having seen at the home.

10             THE COURT:  She didn't describe it as a

11   personal laptop.  She described it as a laptop.  The

12   warrant says they can search for any laptops.  It

13   doesn't say one, two, three or four.

14             MS. ROBERTS:  Right, but that's the problem

15   with the second --

16             THE COURT:  No, it isn't.  It's not a

17   problem.  Just ask the simple question:  Had they

18   seized two previously?  Just go on and get it done so

19   I can have this over with.

20             We are treading in areas that just -- you

21   don't raise this in your papers.  There's no point to

22   it that I can tell.  And you're using this as

23   discovery.  I don't want to spend time with giving you

24   a deposition.

25             MS. ROBERTS:  Your Honor --

GONZALEZ - DIRECT                    50

1          THE COURT:  Now, ask the question and get it

2    done, please.

3    BY MS. ROBERTS:

4    Q   Were you present during the recovery of two

5    laptops from Mr. Haas's home?

6    A   I went to Mr. Haas's home.

7          THE COURT:  I think yes or no.  Were you

8    present when those were recovered?

9          THE WITNESS:  I was not the seizing agent.

10          THE COURT:  That isn't the question.  The

11    question was:  Were you present when they were seized?

12          THE WITNESS:  I have to say I was present at

13    the home.  I can't confirm that I saw the laptops

14    because there were many people conducting the search,

15    and I was focused on attempting to locate Mr. Haas.

16          THE COURT:  At the time that you filled out

17    the warrant for -- by the time you filled out the

18    warrant on September the 1st, did you know that two

19    laptops had been seized from the home even though you

20    didn't see them at the home?

21          THE WITNESS:  Probably, yes.  Yes.  I would

22    say yes.

23          THE COURT:  All right, now.  Anything else?

24          MS. ROBERTS:  Your Honor --

25    BY MS. ROBERTS:

GONZALEZ - DIRECT                    51

1  Q   And as a result of --

2          MS. ROBERTS:  Your Honor, at this time I

3  would seek to move into evidence first the search

4  warrant affidavit, I'm sorry, the search warrant

5  return from the September 1st, 2016 search of Mr.

6  Haas's home.

7          THE COURT:  Any objection?

8          MS. MANSFIELD:  Your Honor, off the top of my

9  head I don't know the date that that was returned.  I

10  don't think it has in any relevance.  I don't object

11  to it being introduced.

12          THE COURT:  It's the return of the search

13  executed on the 1st; is that right?

14          MS. ROBERTS:  Yes, Your Honor.

15          THE COURT:  Of the home.

16          MS. ROBERTS:  Of the home, yes, Your Honor.

17          THE COURT:  What's the number?  Defendant's

18  Exhibit what?

19          MS. ROBERTS:  Your Honor, we're labeling this

20  Defendant's Exhibit B.

21          THE COURT:  No, you've already got a B.

22          MS. ROBERTS:  We'll change that and make that

23  Defendant's Exhibit C, Your Honor.

24          THE COURT:  It is admitted without objection.

25          (Defendant's Exhibit C is admitted into

GONZALEZ - DIRECT                    52

1    evidence.)

2            THE COURT:  Anything else?

3            MS. ROBERTS:  Your Honor, we move to enter,

4    if it hasn't already been entered, the search and

5    seizure warrant and affidavit related to the 1995 Ford

6    tractor.

7            THE COURT:  Was that A or B?  I'm not going

8    to make any rulings in a vacuum.  Just tell me was it

9    A or B.  If it's A and B, they've already been

10   admitted.

11           MS. ROBERTS:  We'll call that B, Your Honor.

12           THE COURT:  B has or has not been admitted?

13           MS. ROBERTS:  There was a stipulation.  I

14   didn't hand it up to the Court, though.

15           THE COURT:  All right.  So what is B?

16           MS. ROBERTS:  B is the search warrant.

17           THE COURT:  Which one?

18           MS. ROBERTS:  For the tractor-trailer,

19   September 1st, 2016.

20           THE COURT:  No objection to that?

21           MS. MANSFIELD:  No, Your Honor, no objection.

22           THE COURT:  All right, it's admitted.

23           (Defendant's Exhibit B previously admitted

24   into evidence on page 5.)

25           MS. ROBERTS:  Your Honor, we would next move

GONZALEZ - DIRECT                    53

1    to admit into evidence Defendant's Exhibit D pursuant
2    to the stipulation.  This is an accurate transcript of
3    the telephone calls between Mr. Haas and CW on
4    August 14th of 2016.
5            THE COURT:  Any objection?
6            MS. MANSFIELD:  No, Your Honor, no objection.
7            THE COURT:  It's admitted.
8            (Defendant's Exhibit D is admitted into
9    evidence.)
10           MS. ROBERTS:  In addition to that, Your
11   Honor, we would move as Defendant's Exhibit E the
12   transcript of the call between Mr. Haas and CW 1 on
13   August 16th of 2016.
14           THE COURT:  CW 1?
15           MS. ROBERTS:  I'm sorry.  The exhibit says CW
16   1, but we'll just say CW.  I'm sorry.  I was reading
17   from the exhibit.
18           THE COURT:  On what date?
19           MS. ROBERTS:  On August 16th, 2016.
20           THE COURT:  All right.  Any objection?
21           MS. MANSFIELD:  No, Your Honor, no objection.
22           THE COURT:  It's admitted.
23           (Defendant's Exhibit E is admitted into
24   evidence.)
25           MS. ROBERTS:  One moment.

GONZALEZ - DIRECT                54

1           THE COURT:  How about the first search

2    warrant, Exhibit A, are you offering that?

3           MS. ROBERTS:  Your Honor, we are moving to

4    enter Exhibit A, the search warrant of the home, and

5    I'll provide the Court with a copy of that in just a

6    few moments.

7           THE COURT:  All right.  Anything else?

8    Anything else?

9           MS. ROBERTS:  One moment, Your Honor.

10           Your Honor, finally, I would enter into

11    evidence the stipulation of the parties.  And we're

12    just looking for --

13           THE COURT:  What exhibit numbers?

14           MS. ROBERTS:  This should be Defendant's

15    Exhibit F, Your Honor.

16           THE COURT:  Any objection?

17           MS. MANSFIELD:  No, Your Honor.  The

18    government entered into the stipulations.

19           THE COURT:  All right.

20           (Defendant's Exhibit F is admitted into

21    evidence.)

22           THE COURT:  Anything else?

23           MS. ROBERTS:  No, Your Honor.  No further

24    questions of the witness and no further evidence.

25           THE COURT:  As I understand it, you are not

1 challenging the search warrant of the home, Exhibit A.

2 You're challenging the search warrant of the

3 tractor-trailer, Exhibit B.

4          MS. ROBERTS:  That's correct, Your Honor.

5          THE COURT:  All right.

6

7     CROSS-EXAMINATION

8 BY MS. MANSFIELD:

9 Q   Agent Gonzalez, I just want to ask you a few

10 questions about the steps you took to corroborate the

11 statements that CW made to you.  When you initially

12 met with the CW in June of 2016, did she provide you

13 the name of Mr. Haas?

14 A   She provided the name "Todd."  That's all she knew

15 at that time.

16 Q   Did she provide you with the phone number for him

17 (804)402-6003?

18 A   That is correct.

19 Q   Did you then run a search of law enforcement

20 databases to determine that that number was linked as

21 a contact number for Mr. Haas?

22 A   Yes, we did.

23 Q   And at that time -- and did you also then once you

24 had that information show a photo of Mr. Haas to the

25 witness for her to identify?

GONZALEZ - CROSS                    56

1   A    Yes, we did.

2   Q    And did she additionally provide you with -- did

3   you additionally show her a photo of the residence

4   that you connected to Mr. Haas at 661 Green Castle

5   Road?

6   A    Yes, we did.

7   Q    And did the witness identify that as being the

8   residence that she had visited?

9   A    Yes, she did.

10  Q    And that was a residence that you determined was

11  connected to Mr. Haas through a search of law

12  enforcement databases?

13  A    It was previously owned by him.

14  Q    And then, ultimately, as outlined in your search

15  warrant, when you met with the witness again in July,

16  would she have had additional conversations with Mr.

17  Haas about the production of child pornography or she

18  stated to you that she had had additional

19  conversations with Mr. Haas about the production of

20  child pornography, correct?

21  A    She did, yes.

22  Q    So then in August did you provide her with a

23  recording device to attempt to capture those

24  conversations in order to confirm and corroborate what

25  the witness was telling you?

GONZALEZ - CROSS                        57

1   A   That is correct.

2        MS. MANSFIELD:  One moment, Your Honor.  I

3   apologize.

4   BY MS. MANSFIELD:

5   Q   Did this witness indicate to you that Mr. Haas had

6   suggested to her during their conversations that he

7   had access to children or children in the

8   neighborhood?

9   A   Yes, she did.  It was, according to the

10  information provided by the CW, Mr. Haas had access to

11  a 12-year-old.

12  Q   And then a few days after those recorded phone

13  calls in August, it looks like August 18th, did you

14  indeed receive a report from the Richmond Police

15  Department that indicated that Mr. Haas was a subject

16  in a child molestation allegation?

17  A   That is correct.

18  Q   And at that time did you understand that

19  information to be further corroboration of what CW had

20  indicated to you was the substance of CW's

21  conversations with Mr. Haas?

22  A   It was a clear indication that he was in fact

23  looking forward to producing child pornography.

24  Q   Did you also then do a telephone analysis of Mr.

25  Haas's phone and connect that phone number to the

1  Richmond Inn, which was detailed in that child

2  molestation allegation?

3  A   The Richmond Inn and also the child's mother,

4  biological mother.

5  Q   Agent Gonzalez, I just want to be clear.  The

6  steps that you took after meting with the witness in

7  June and July, this was your effort to corroborate the

8  information that that witness had told you?

9  A   Yes, of course.

10         MS. MANSFIELD:  No questions, Your Honor, for

11  this witness.

12

13      REDIRECT EXAMINATION

14  BY MS. ROBERTS:

15  Q   Agent Gonzalez, with regards to the Chesterfield

16  information regarding -- the information regarding the

17  alleged conduct in Chesterfield, the alleged victim in

18  that incident did not allege that Mr. Haas took

19  pictures, correct?

20  A   No.  When he sexually molested her, it included

21  fondling her vagina --

22  Q   So the answer is no, he did not?

23  A   No production of child pornography.

24  Q   And the alleged victim in Chesterfield did not

25  indicate the use or presence of a laptop computer or

GONZALEZ - REDIRECT                    59

1  computer at all by Mr. Haas; is that correct?

2  A    She did not disclose it.

3  Q    The alleged victim in Chesterfield did not allege

4  that the encounter with Mr. Haas involved a GPS

5  device, correct?

6  A    Can you repeat the question?

7  Q    She did not allege the use or presence by Mr. Haas

8  of a GPS device during the encounter that allegedly

9  took place?

10 A    The child?

11 Q    The child.

12 A    No.

13          THE COURT:  You keep saying the Chesterfield

14 victim.  What date is this?

15          MS. ROBERTS:  Your Honor, this is --

16          THE WITNESS:  It's -- I'm sorry, Your Honor.

17          THE COURT:  Is this 8-18-16?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  So that report came from the

20 Chesterfield Police Department?

21          THE WITNESS:  Yes, Your Honor, and it was

22 referred to Chesterfield by Richmond P.D.  We received

23 a copy of the Chesterfield and Richmond P.D. reports,

24 their investigative reports, and a forensic interview

25 that was conducted on the child.

GONZALEZ - REDIRECT                    60

1          THE COURT:  All right.

2    BY MS. ROBERTS:

3    Q   The alleged victim in the Chesterfield incident,

4    she was not able or she did not identify Mr. Haas by

5    photo or name, correct?

6    A   She provided the name "Todd."  She did not

7    identify the photo that was displayed, which to my

8    knowledge it was a very old photo of Mr. Haas.

9    Q   So she was shown a photo and she failed to

10   identify that photo as the person who allegedly

11   sexually assaulted her, correct?

12   A   I was not present, but I was told that, yes.  And

13   that is included in the affidavit.

14          MS. ROBERTS:  One moment.

15   BY MS. ROBERTS:

16   Q   With regard to the Chesterfield charges, those

17   charges were nol prossed, correct?

18   A   I believe they were nol prossed after we federally

19   indicted him.

20   Q   Those charges were nol prossed prior to execution

21   of the search warrant; is that correct?

22   A   No.

23   Q   Subsequent to the search warrant?

24   A   After.

25   Q   Yes.

GONZALEZ - BY THE COURT          61

1          MS. ROBERTS:  Your Honor, at this time I have

2     no further questions for the witness, but I would, as

3     a housekeeping matter, seek to introduce Defendant's

4     Exhibit G.  I failed to introduce that earlier, and

5     these are the text messages between the CW and Mr.

6     Haas that I questioned Agent Gonzalez and he testified

7     --

8          THE COURT:  Any objection?

9          MS. MANSFIELD:  No objection, Your Honor.

10          THE COURT:  They're admitted without

11     objection.

12          (Defendant's Exhibit G is admitted into

13     evidence.)

14          MS. ROBERTS:  No further questions.

15          THE COURT:  Do you have anything?

16          MS. MANSFIELD:  No, Your Honor.

17          THE COURT:  Is that it?

18          MS. ROBERTS:  Yes, Your Honor.

19          THE COURT:  Is there any particular reason --

20     would you have a seat, please, Agent Gonzalez.

21          Why didn't you put in the affidavit that the

22     confidential informant had reported giving false

23     information to police officers in Henrico County in

24     July of 2016?

25          THE WITNESS:  Why was it not included?

GONZALEZ - BY THE COURT                    62

1          THE COURT:  Yes, why wasn't that included in

2    the affidavit?

3          THE WITNESS:  I truly didn't think it was

4    relevant at that time.  We had corroborated all the

5    information that she had provided, and she wasn't a --

6    she wasn't an open confidential informant for the FBI;

7    just a witness.  So we -- the process for -- to handle

8    confidential informants and witnesses is very

9    different.

10          THE COURT:  How is it different?

11          THE WITNESS:  Confidential informants, we

12    open in our computer database, and we perform criminal

13    record checks.  We have to seek permission from or

14    consult to get concurrence from an AUSA's office in

15    order to engage in consensual recordings or any type

16    of otherwise illegal activities.

17          THE COURT:  Let me get this straight.  If I

18    report something to the FBI, and it obviously in the

19    view of the FBI is a crime, are you saying that as a

20    witness, you would not do a criminal background check

21    on me?

22          THE WITNESS:  If you're a witness?

23          THE COURT:  Just a witness.  I'm a guy who

24    picks up the phone and says, I saw a robbery downtown

25    here, and here's my name, and this is the date, and

GONZALEZ - BY THE COURT                    63

1   this is what I saw.  Would you do a criminal

2   background check on me?

3          THE WITNESS:  If I'm going to meet with you

4   in person for the first time and I don't know who you

5   are, yes, sir, I would run a criminal record.  We did

6   not with our CW because she was referred to us by

7   another field office, and they had previously used her

8   in their investigations.

9          THE COURT:  So CW came to you -- let me get

10  this straight.  Did CW first report to the Norfolk

11  Field Office the viewing of child pornography on the

12  defendant's computer in May of 2016?

13         THE WITNESS:  Yes, Your Honor.

14         THE COURT:  And then that was relayed to you

15  because he lived in this area and this was your area;

16  is that right?

17         THE WITNESS:  It was forwarded to one of our

18  TFOs, Holberg, because we're all part of the Child

19  Exploitation Team, and I got involved in the

20  investigation.

21         THE COURT:  Why you as opposed to the Norfolk

22  Field Office?

23         THE WITNESS:  Because it's in our territory.

24         THE COURT:  Geographic territory or subject

25  matter territory?

GONZALEZ - BY THE COURT                64

1          THE WITNESS:  The subject was in our area of

2    responsibility in Chesterfield.

3          THE COURT:  All right.  Subject meaning who?

4          THE WITNESS:  Mr. Haas.

5          THE COURT:  All right.  Anybody have any

6    questions based on what I asked?

7          MS. MANSFIELD:  No, Your Honor.

8          THE COURT:  I do have another question.

9          By the time that you issued the search

10   warrant on September 1st on the tractor-trailer, had

11   anybody viewed the computers seized in the defendant's

12   home earlier that day?

13         THE WITNESS:  I'm pretty sure that we were in

14   the process of reviewing.

15         THE COURT:  But did you know what the review

16   showed?

17         THE WITNESS:  No, no.  No, Your Honor.

18         THE COURT:  All right.  All right.  Thank

19   you.

20         Can he be excused?

21         MS. ROBERTS:  Yes, Your Honor.

22         MS. MANSFIELD:  That's fine.

23         THE COURT:  All right.  You can step down.

24         THE WITNESS:  Thank you, Your Honor.

25         (The witness was excused from the witness

1     stand.)

2               THE COURT:  Do you all have argument?

3               MS. ROBERTS:  Your Honor, I do have argument;

4     however, I would ask the Court to consider granting a

5     brief recess.  I'd like to have time to use the

6     bathroom, and also to regroup given the Court's ruling

7     on the *Franks* issue.  I just need to cut the fat from

8     my argument and go straight to the issues that are

9     before the Court today.

10              THE COURT:  We will resume this hearing at

11    three o'clock.  I'll hear everything you've got to say

12    at that time.  And if you wish to argue that the

13    *Franks* hearing should be held, I don't know what you

14    would do other than what you've already done.  You

15    said you were using this for the good faith exception

16    argued by the government.  I'll hear something on how

17    you think you've met the first test for *Franks*, but I

18    don't think you have.

19              MS. ROBERTS:  Thank you, Your Honor.

20              THE COURT:  All right.  I urge you to use

21    that time to cut out the -- what did you call it?

22    Lard, fat?  Whatever you called it.  That would be

23    good.

24              MS. ROBERTS:  Yes, Your Honor.

25              THE COURT:  All right.  And the other

1   thing -- well, I'll talk to you later.  Thank you.

2   We'll be in recess.  I'll see you at three o'clock.

3           (Recess taken from 11:35 a.m. to 3:00 p.m.)

4           THE COURT:  All right.  It's your motion.

5           MS. ROBERTS:  Yes, Your Honor.  Thank you.

6           Your Honor, first, before I get started, I

7   would like to point out with regards to Defendant's

8   Exhibit F, which is the stipulations entered in this

9   case --

10          THE COURT:  Uh-huh.

11          MS. ROBERTS:  -- we did not fill that out at

12  the conclusion of the evidence once all of the

13  exhibits had been re-ordered.  And so at this time I

14  would seek to actually insert exhibit identifiers in

15  each of the paragraphs.

16          Paragraph one said the parties stipulate and

17  agree that Defense Exhibit, and it's left blank, is a

18  true and accurate copy.

19          THE COURT:  I can do that.  I just didn't

20  understand what you were saying.

21          MS. ROBERTS:  Yes, Your Honor.  So paragraph

22  one should be, as referenced, Exhibit B.

23          THE COURT:  Uh-huh.

24          MS. ROBERTS:  Paragraph two, Exhibit A.

25          THE COURT:  Uh-huh.

1          MS. ROBERTS:  Three is Exhibit D.

2          THE COURT:  D as in dog?

3          MS. ROBERTS:  D as in dog.  Four, Exhibit E.

4          THE COURT:  All right.

5          MS. ROBERTS:  Your Honor, moving on to the

6    arguments here, we are challenging the search warrant

7    issued on September 1, 2016, for the search of the

8    1995 Ford tractor-trailer, and the seizure of a

9    Samsung Galaxy S5 phone, laptop computer, and GPS

10   device.

11         We gladly accept the Court's invitation to

12   argue how we've met our burden with regards to the

13   first prong of *Franks v. Delaware.*  Through the

14   testimony and evidence presented here today, the

15   defendant has made a prima facie showing that the

16   warrant contained --

17         THE COURT:  Sorry.  I've exhausted my papers

18   up here, whatever.  All right.

19         MS. ROBERTS:  Through testimony and evidence

20   we've demonstrated a prima facie showing that the

21   warrant contained both material omissions and

22   intentional misrepresentations by the affiant.

23         THE COURT:  What are the material omissions?

24         MS. ROBERTS:  With regards to the material

25   omissions, I've identified three for the Court.  First

1    is the omission by the affiant regarding the lack of

2    voracity and unreliability of CW.  And that was --

3            THE COURT:  That's not even a basis for

4    anything.  That's your conclusion.  What's got to be

5    left out is a fact.  If the witness -- if the affiant

6    did not believe that the woman lacked voracity, he had

7    no obligation to put that in there.

8            MS. ROBERTS:  Your Honor --

9            THE COURT:  So you have to point to some

10   objective fact that was left out.  You can't argue

11   conclusions like that.

12           MS. ROBERTS:  Yes, Your Honor.

13           THE COURT:  So that ground is nonexistent.

14           MS. ROBERTS:  So with regards to an omission

15   with regards to the voracity, no information in the

16   warrant with regards to the voracity and reliability

17   of the CW.  Through testimony today --

18           THE COURT:  Now, wait just a minute.  There's

19   all kinds of information about corroboration.  So that

20   has to do with voracity.  Why don't you say what you

21   mean?  You mean to say --

22           MS. ROBERTS:  She's a convicted felon.

23           THE COURT:  He did not put in there X.

24   That's what you mean, right?  Don't make these big,

25   broad statements.  He did not put in there what?

1          MS. ROBERTS:  Your Honor, Agent Gonzalez

2    failed to include in the affidavit that CW was a

3    felon; that CW was currently on probation; that CW had

4    pending charges; that he had knowledge that CW

5    continued to violate the law even while working with

6    him and other agents in the instant matter.

7          THE COURT:  We don't have anything like that

8    in the record.  You want to tell me what you mean?

9          MS. ROBERTS:  Yes, Your Honor.

10         THE COURT:  That's a generalized conclusion

11   and you can't say those things.  You have to be

12   specific.

13         MS. ROBERTS:  Agent Gonzalez was aware that

14   there were felony warrants issued for CW as a result

15   of the forged summons that she tendered in Henrico

16   County in July of 2016.  That is a fact that he was

17   aware of prior to his issuing or swearing out the

18   affidavit for the instant warrant.

19         He was also aware that CW had provided false

20   statements, orally provided false statements to law

21   enforcement.  That is another fact that was known to

22   him on August 31st that he failed to include in the

23   affidavit provided to the magistrate.

24         THE COURT:  Okay.  Those are the material

25   omissions; is that right?

1          MS. ROBERTS:  There are more.

2          THE COURT:  Please make sure -- have you ever

3     heard the old adage, "If you're going to touch the

4     king, kill him"?  Have you heard that?  Do you know

5     what that means?  If you're going to assert a point,

6     make sure it's got some merit to it.  Don't make a

7     laundry list of everything you can conceivably think

8     of that somebody testified to that conceivably might

9     just in another atmosphere have some purpose.

10          MS. ROBERTS:  Your Honor --

11          THE COURT:  And you are repeating the same

12    things.

13          MS. ROBERTS:  Your Honor, he was aware --

14    Agent Gonzalez was aware that CW continued to engage

15    in prostitution, and he was aware of that at the time

16    that he swore out the affidavit.

17          THE COURT:  What do you mean engage in

18    prostitution?  When?  What testimony that he gave

19    showed that between the time that she talked to him in

20    May of 2016 and August 31, 2016, that he knew she was

21    engaging in prostitution during that time?  She may

22    have, and it may very well be a reasonable inference,

23    but I don't remember any testimony where you asked

24    that or he said that.  Do you see what I'm saying?

25          MS. ROBERTS:  Your Honor, with regards to

1  that, I was referencing the two reports, but the Court

2  is correct that Your Honor did not allow the

3  introduction of the agent's report, which would have

4  contained that information.  So I'll withdraw --

5          THE COURT:  Anything else that are material

6  omissions?

7          MS. ROBERTS:  Yes, Your Honor.  The second

8  material omission --

9          THE COURT:  No, that's not the second one.

10  You have one, two, three, four, five so far.

11          MS. ROBERTS:  I'm sorry, Your Honor.  I

12  grouped them all with regards to CW's credibility and

13  reliability.

14          THE COURT:  All right.  So this has to do

15  with omissions regarding credibility?

16          MS. ROBERTS:  Yes.

17          THE COURT:  I understand what you're saying.

18  That's what this whole thing was about, this hearing

19  was about, was the reliability of CW.  And I thought

20  all these things related to --

21          MS. ROBERTS:  All of those things do relate

22  to CW's credibility.

23          THE COURT:  All right.

24          MS. ROBERTS:  In addition to omissions

25  regarding CW's credibility, if the Court -- I direct

1 the Court's attention to the August 16th phone call,

2 which has been previously marked as Defense Exhibit, I

3 believe, E.

4       THE COURT:  Is that the ones referred to in

5 the briefs?

6       MS. ROBERTS:  They are both referenced in the

7 brief, Your Honor, but Defendant's Exhibit E is the

8 one most heavily relied upon or referenced.

9       THE COURT:  This is a material omission?

10       MS. ROBERTS:  This is a material omission,

11 Your Honor.  I would direct the Court's --

12       THE COURT:  Excuse me.  It is a material

13 omission relating to what?

14       MS. ROBERTS:  The affiant, Agent Gonzalez,

15 failed to include Mr. Haas's --

16       THE COURT:  No.  Relating to what large

17 topic?  Like reliability.  Have you shifted from

18 credibility and reliability to some other topic?  You

19 told me you have three topics.  I don't know what

20 topic we're on now.

21       MS. ROBERTS:  This goes to the issue of

22 probable cause itself and the likelihood --

23       THE COURT:  But that's not a material

24 omission.

25       MS. ROBERTS:  Your Honor, if I can tell the

1    Court what the statement is that was --

2         THE COURT:  I want you to tell me where it

3    fits so I can put it where it fits and get this

4    organized.  See what happens here is, what this whole

5    thing consists of is a bunch of stuff, isolated things

6    strewn out onto the stage and leaving it to the Court

7    to try to put them somewhere so you figure out what it

8    is that in the test that you have to apply, what

9    evidence applies to what.  And I'm trying to organize

10   that now so I understand your points.

11        So you have five material omissions that you

12   say relate to CW's credibility.  You're now shifting

13   to material omissions relating to something else you

14   said.  So what does it relate to?

15        MS. ROBERTS:  The truthfulness of the

16   statements in the affidavit as presented by the agent.

17        THE COURT:  So this has to do with the -- not

18   with a material omission.  It has to do with whether

19   or not the agent's statement in the affidavit is true

20   or not, right?

21        MS. ROBERTS:  It is --

22        THE COURT:  Yes or no?

23        MS. ROBERTS:  It is not a statement that's

24   included.  It is a statement that is excluded that we

25   propose to the Court is material and has a direct

1  bearing on whether or not Mr. Haas in fact intended to

2  receive the items for himself or whether or not they

3  were for some other person.

4          THE COURT:  That's not how it works.  You are

5  attacking something here.  On the *Franks*' side, you

6  are attacking something.  What are you attacking?

7  You're saying that the agent omitted facts.  He

8  omitted facts relating to the credibility of CW.

9          Now you're shifting to something that attacks

10 the agent, right?  That is, he omitted something.

11 There is a fundamental principle at law that once you

12 start talking about something -- you have no

13 obligation to reveal certain things, for example, but

14 once you start talking, you have an obligation to say

15 all those things that make true what you're saying.

16 And so now you're saying, as I understand it, that the

17 agent failed to put in some things that were in this

18 Exhibit E that were necessary for him to have made a

19 true statement in the affidavit.  Is that what you're

20 saying?

21         MS. ROBERTS:  Yes.

22         THE COURT:  All right.  Where is the true

23 statement in the affidavit?

24         MS. ROBERTS:  Your Honor, I would direct the

25 Court's attention to page two.

```
 1              THE COURT:  Of?

 2              MS. ROBERTS:  Of Exhibit E, which is the

 3   August 16 phone call.

 4              THE COURT:  No.  Nope.  I'm sorry.  I want to

 5   know what statement in the affidavit we are measuring

 6   this statement in Exhibit E against.  That's all.

 7              MS. ROBERTS:  Your Honor, there is no

 8   statement in the affidavit, and that's why I'm

 9   referring to it as an omission to include a statement

10   in the affidavit that has a bearing on the

11   determination of probable cause in this case.

12              THE COURT:  So you're not then saying that

13   the agent made a material misrepresentation?

14              MS. ROBERTS:  Your Honor, I call these

15   omissions.

16              THE COURT:  No.  Answer the question.

17              MS. ROBERTS:  Correct.

18              THE COURT:  You're not saying he made a

19   material misrepresentation?

20              MS. ROBERTS:  Correct.

21              THE COURT:  Okay.  So he made an omission

22   that has to do with what?

23              MS. ROBERTS:  The truthfulness of the

24   statements in the affidavit.

25              THE COURT:  That's misrepresentation.  If
```

1  you're testing somebody's truthful statement, then I
2  want to know what -- you're saying this omission that
3  you're going to point to in four relates to something
4  that was said in the affidavit that you say is lacking
5  in truthfulness.  So now I want to see, so I
6  understand what you're talking about, where it is in
7  the affidavit that is the statement you want me to
8  measure against what's in Exhibit E.  Where is that
9  statement?  Or is there none?
10        MS. ROBERTS:  There is no statement.
11        THE COURT:  Okay.  Well, then go ahead and
12  say it your way.  This is not how you presented it in
13  your papers.  It's not how you presented it in your
14  argument, but let's go.  All right.
15        So the transcript -- where is the transcript?
16  I've got it.  Which line do you want?  Which statement
17  do you want me to look at?
18        MS. ROBERTS:  Your Honor --
19        THE COURT:  Where is it?
20        MS. ROBERTS:  In the phone call, page two
21  of -- and it's page two.  It is three-fourths the way
22  down the page, and it starts, "CW says, 'What's the
23  range that you like?'"
24        THE COURT:  Wait a minute.  I haven't found
25  that yet.  Okay.

1          MS. ROBERTS:  Mr. Haas's response is, "It

2     ain't so much me as it is like other, but, you know,

3     around exactly like what you were saying before.  You

4     know, give or take a little bit.  You remember what

5     you were talking about before.  That is, that is like

6     the most."

7          Your Honor, it is our position that --

8          THE COURT:  Wait a minute.  You left out the

9     rest of it.  It says, "I remember I said I had a 12

10    and an 8," talking about the age of the children.

11         MS. ROBERTS:  Your Honor, that is an

12    assumption.

13         THE COURT:  That's not an assumption.  That

14    is a logical connection between what Haas said because

15    he refers back to "You remember what you were talking

16    about before."  She then says, This is what I was

17    talking about before.  She says to articulate that, "I

18    remember.  I said I had a 12 and an 8."  That

19    statement fits together as a piece.  You can't take

20    just part of it.  And then Haas says as if to make

21    that clear, Yeah, that's the lower side of that is

22    definitely better.  The lower side of eight to 12 is

23    definitely better.  In other words, I like them at

24    eight years old or eight to 10.  That's what the fair

25    reading of that statement is about.

1       MS. ROBERTS:  Even if the Court -- if we were

2   to proceed with the Court's conclusion --

3       THE COURT:  Then he goes on to say, "I mean,

4   there's definitely -- there's definitely money in

5   other, but, you know, I mean it's not as much as the

6   other."

7       MS. ROBERTS:  Again, Your Honor, she asked --

8   and what I'm asking the Court to focus on, the Court

9   has said that this is a conversation about 12 and

10  eight-year-olds.  Even assuming that it was a

11  conversation about 12 and eight-year-olds, she says,

12  "What's the range that you like?"  And Mr. Haas stops

13  her and corrects her and says that it is not me.  It

14  is others.

15      And so, Your Honor, the fact that Mr. Haas

16  includes that statement that it is not me as it is

17  like others, it reflects --

18      THE COURT:  What are you talking about?  You

19  mean what he likes personally in order to satisfy his

20  own personal proclivities while he's engaging in sex

21  with minors?  Or do you mean it's the market I'm

22  serving, and the film I need to make has to satisfy

23  these people, and these people want 12 to

24  eight-year-olds?  That's the way that statement reads

25  to me.  But you're saying, "It ain't so much me as it

1   is like other, but, you know, around like exactly what

2   you were saying before, you know, give or take a

3   little bit."  And this is almost an unintelligible

4   statement to begin with, but viewed in terms of the

5   question, what's the range that you like, like for

6   what?  Like to pleasure himself or like to film?

7   Isn't that what this is all about?

8           MS. ROBERTS:  Your Honor, if the Court --

9           THE COURT:  Or like to read, like to look at?

10  What?

11          MS. ROBERTS:  This entire telephone call is

12  only given context if you believe the information that

13  the CW provided in the unrecorded phone conversations

14  that she allegedly had with Mr. Haas.  The Court has

15  accepted, it seems by the comments here, that this

16  was -- that these were conversations about Mr. Haas's

17  desire to obtain, one, images of child pornography

18  and, two, to obtain an actual underage female for

19  purposes of a sexual encounter.

20          THE COURT:  What is the other inference you'd

21  have me make?

22          MS. ROBERTS:  Your Honor, we don't know what

23  they're talking about.  If the Court didn't have the

24  backdrop that they say -- that the government asserts

25  was provided by CW, if you don't have CW's explanation

1  of what this conversation is a continuation of or what

2  it's purported to be the subject matter of the

3  conversation, then what you have if you read this is

4  completely unintelligible, and it does not necessarily

5  reflect Mr. Haas's intention to seek nude photos or to

6  engage in sexual conduct with an underage female or

7  individual.

8        THE COURT:  Well, if it is informed by what

9  the affidavit says occurred in the unrecorded

10  conversations, then it's reasonable to infer that

11  they're talking about making films or viewing or

12  having sex with people in the range of 12 to eight.

13        MS. ROBERTS:  But the affidavit does not

14  contain information that provides a backdrop or

15  context except for what is provided by CW.  There's no

16  other information.

17        THE COURT:  Okay.  So I believe CW.  That

18  helps me give context to this if I am the magistrate

19  judge.  I believe what he's related about CW is all

20  right.  I understand.  All right.  I understand.

21        Move to a different topic, because I believe

22  this one doesn't fly very well.

23        MS. ROBERTS:  Your Honor, the third omission

24  is the affiant, Agent Gonzalez's, failure to include

25  in the search warrant affidavit.

1          THE COURT:  Which?

2          MS. ROBERTS:  This is Exhibit B.

3          THE COURT:  Uh-huh.

4          MS. ROBERTS:  The search warrant affidavit of

5     the 1995 truck.  I'd refer the Court to page 16,

6     paragraph 25 of Exhibit B.

7          THE COURT:  Paragraph 25?

8          MS. ROBERTS:  Paragraph 25, page 16,

9     paragraph 25.

10         THE COURT:  Uh-huh.

11         MS. ROBERTS:  Your Honor, what has occurred

12    factually before this is that --

13         THE COURT:  No.  Put me in the picture first.

14    Where?

15         MS. ROBERTS:  Paragraph 25.  Based on this

16    information, it starts the beginning of the paragraph,

17    the FBI obtained a search warrant for Haas's new

18    residence from this court on August 31st.  The FBI

19    executed the search warrant early on September 1st but

20    found that Haas had already left for work.

21         THE COURT:  Okay.

22         MS. ROBERTS:  It goes on to say that during

23    the search incident that he was arrested at a

24    different location, and during the search incident to

25    arrest agents recovered a Samsung Galaxy s5 model

1    number phone from Mr. Haas's person.

2          Also during a protective sweep of the

3    tractor-trailer truck, an FBI agent observed a GPS

4    device attached to the windshield as well as a laptop

5    bag which contained a laptop computer.

6          THE COURT:  So what did he not include in

7    that paragraph that you think he should have included?

8          MS. ROBERTS:  Your Honor, we believe it was

9    material that he include the fact that agents during

10   the execution of the first search warrant had in fact

11   seized two laptop computers from the defendant's home.

12         The fact that those two laptop computers had

13   been seized and that it was specifically the target of

14   the search of his home or specifically identified as

15   material that they were seeking in the search of his

16   home, it makes it less likely that the laptop observed

17   inside of a work vehicle was the one that CW allegedly

18   saw some three months prior.

19         In furtherance of that argument, there's no

20   evidence that the CP images stored or possessed or, I

21   should say, the affidavit contains no evidence that

22   the CP images stored or possessed in Mr. Haas's work

23   truck -- I'm sorry.  There's no evidence that there

24   were CP images stored or possessed in Mr. Haas's work

25   truck.  There's no allegation of that.

1          The CW certainly didn't mention his work

2    truck, nor did the 11-year-old complainant, who was

3    also referenced in the search warrant affidavit.

4          In fact, Your Honor --

5          THE COURT:  Anything else?

6          MS. ROBERTS:  I would point the Court to

7    Exhibit G, which is the text messages.

8          THE COURT:  Anything else about the

9    omissions?

10          MS. ROBERTS:  Yes, Your Honor.  This is with

11    regards to the omissions and the statement that

12    there's no evidence that he stored or possessed CP or

13    child pornography in the work truck.  The text

14    messages exhibit that we've provided to the Court on

15    page 3 of that exhibit.

16          THE COURT:  Are they numbered?

17          MS. ROBERTS:  They are not numbered, Your

18    Honor.  This is the way that they were provided in

19    discovery.

20          THE COURT:  It starts, the message, "Damn.

21    Better drive fast"?

22          MS. ROBERTS:  Yes, Your Honor.

23          THE COURT:  So what?

24          MS. ROBERTS:  Your Honor, there Mr. Haas

25    clearly states that he's driving.  He says, "Dude,

1   there's no way I can get there this evening and then

2   get back home.  Can I see you tomorrow night or are

3   you driving down here any this week?  P.S. Don't have

4   laptop."

5            THE COURT:  So what does that mean?

6            MS. ROBERTS:  Your Honor, this is evidence --

7   some evidence that Mr. Haas does not travel with a

8   laptop.  And that's contrary to what the government or

9   the affiant would have the magistrate to have believed

10  in asserting that the laptop -- that there was

11  probable cause to believe that the laptop found in the

12  work truck was related to the offense or to any

13  information that had been provided by the CW.  There's

14  no nexus between that work truck and any alleged

15  unlawful conduct by Mr. Haas.

16           Your Honor, I would next move to intentional

17  misrepresentations that I believe we have demonstrated

18  here today.  The affidavit contains at least two

19  material misstatements that directly bear on the

20  finding of probable cause.

21           If the Court looks to Exhibit B again, which

22  is the search warrant affidavit of the truck, page 12,

23  paragraph 11.

24           THE COURT:  All right.  Where?

25           MS. ROBERTS:  Your Honor, if the Court

```
 1   proceeds down to four lines from the bottom of the
 2   page, it is mid line, and it begins, "Haas also
 3   requested nude photos of underage females in exchange
 4   of money."  This paragraph -- I'm sorry.  If I could
 5   back up.  The affiant indicates that on August 12,
 6   2016, and August 13, 2016, CW recorded two telephone
 7   calls with Haas.  And this is information that says,
 8   "During the calls, Haas advised," is the way that the
 9   paragraph starts.  So this paragraph is all about
10   information that or statements made by Mr. Haas or
11   information which was contained in the phone calls.
12   That statement that I had --
13            THE COURT:  Tell me --
14            MS. ROBERTS:  If the Court compares the
15   statement included in paragraph 11 of the affidavit
16   and compares that with the actual transcript of the
17   telephone call.
18            THE COURT:  Where is it?
19            MS. ROBERTS:  It is Exhibit E.  And, Your
20   Honor, this is not a pinpoint cite --
21            THE COURT:  Where is it?
22            MS. ROBERTS:  -- for the Court.
23            THE COURT:  Where is it?  You're saying that
24   you have to compare that statement and the affidavit.
25            MS. ROBERTS:  To the phone call.
```

1          THE COURT:  All right.  And compare it to

2     what statement in the phone call?

3          MS. ROBERTS:  The entire phone call because

4     nowhere in this phone call do you find Mr. Haas

5     requesting nude photos of underage females.

6          Even if the Court were to assume that this

7     conversation is a conversation about underage females,

8     the request for photographs is not a specific

9     request --

10         THE COURT:  Wait a minute.  There's no

11    question that part of this is about underage females.

12    It's 12 to eight.  This is the 12 to eight program.

13    Come on.

14         MS. ROBERTS:  I said excepting the Court's

15    conclusion that it is about -- that the conversation

16    is about underage females, there is still no

17    information, no evidence, no statement in this phone

18    call by Mr. Haas that he was seeking nude photos.  It

19    is true that this phone call supports the statement

20    that Mr. Haas requested photos.  However, there's no

21    statement with regards to anybody being unclothed.  As

22    a matter of fact, Your Honor, it is just as likely

23    that the request was for a face shot.  So that Mr.

24    Haas --

25         THE COURT:  What request?  I'm trying to see

1    what you're talking about to find what to compare it

2    to.

3            MS. ROBERTS:  Your Honor, that's the problem.

4            THE COURT:  No.  You just made -- you just

5    said, It's more likely that the request is for a face

6    shot.  That connotes that you're looking at something

7    in there that constitutes a request.  Where is that?

8    I don't see it.  But I haven't gone back to read the

9    whole thing all over again.  Where is it that you're

10   talking about in your sentence?

11           MS. ROBERTS:  Your Honor, in the middle of

12   page 2 of the call, Haas states, "Get me some

13   pictures, too, man, because I can like set it up to

14   where we can make some money beforehand."

15           Okay.  CW replies, "Okay.  And how does it

16   work with, um, like the way that you do it?  Is it

17   like the, um, the younger the more moolah or?"

18           Haas replies, "Yeah."

19           CW says, "Yeah?"

20           Haas, "Yeah.  Yep.  Yep."

21           CW says, "All righty then.  We'll see what I

22   can do."  And laughs.

23           That is the substance of the conversation

24   with regards to a request for photos.  And there it is

25   clear from the plain language contained in the

1   telephone call and the transcript here that there is

2   no request for a nude photo.  He requests photos.  The

3   assumption by the agent is that it is a nude photo and

4   that is a misleading statement, and a statement which

5   represents the true nature and context of the

6   information contained in the call.

7           Your Honor, those are the material -- just a

8   moment.

9           Your Honor, those are the material omissions

10  and/or intentional misrepresentations.

11          THE COURT:  I only have one intentional

12  misrepresentation.  Haas's statement appears on page

13  12 of the affidavit.  Haas also requested nude photos

14  of underage females in exchange of money, and you want

15  me to compare that to the transcript Exhibit E, page

16  2, beginning with the statement, "Get me some

17  pictures, too, man, because I can like set it up to

18  where we can make some money beforehand."  And it goes

19  all the way down to the -- looks like that

20  conversation goes all the way down to the bottom of

21  page 2 over to page 3.

22          MS. ROBERTS:  That's correct, Your Honor.

23  And I believe that the last portion of that ends with

24  CW at the top of page 3 starting, "Yeah, baby.  I'm

25  all about that moolah" or "I'm all about my moolah."

1         Your Honor, based upon the omissions that

2    I've identified and the misrepresentation that I've

3    identified, I do believe that the defendant has met

4    its burden in making a prima facie showing that the

5    warrant contained both material omissions and at least

6    one intentional misrepresentation.

7         As such, Your Honor, I would ask the Court to

8    reconsider its ruling with regards to a *Franks* hearing

9    on the matter.

10        THE COURT:  What are we going to do in a

11   *Franks* hearing that we haven't already done?

12        MS. ROBERTS:  Your Honor, reconsider a ruling

13   based upon violations -- the violations that we've

14   identified.  I do not believe that there's any

15   additional evidence at this point that we would have.

16        THE COURT:  All right.  Let me hear from the

17   government on that issue.

18        Do you agree, Ms. Mansfield, that there is no

19   mention in the affidavit that CW was a felon, that she

20   was on probation, that she was pending charges, that

21   there was a felony warrant for a Henrico arrest for

22   providing false identification and forging her

23   sister's signature?  Do you agree those were not in

24   the affidavit for the search warrant here being

25   challenged?

1          MS. MANSFIELD:  I agree that they were not in

2     the affidavit, Your Honor, and as to just No. 4 in

3     that, the felony warrant, I just want to clarify.  I

4     believe -- those, as it was testified to, if my memory

5     is accurate, the agent testified that they took her to

6     her court date, and she was arrested for felony

7     charges in Henrico.  I don't know that the evidence is

8     that there was a pending felony active warrant.  I

9     believe it was just --

10          THE COURT:  Once she told them what happened,

11     they arrested her?

12          MS. MANSFIELD:  Correct, Your Honor.  It goes

13     to the pending charges.

14          THE COURT:  That's actually four things.

15          MS. MANSFIELD:  Yes, Your Honor.

16          THE COURT:  Okay.  A felony arrest for the

17     Henrico making false statements and forging documents

18     in relation to the traffic stop.

19          MS. MANSFIELD:  To the traffic stop, yes,

20     Your Honor.

21          THE COURT:  All right.

22          MS. MANSFIELD:  And, obviously, as Your Honor

23     is aware, the defendant must first make the

24     substantial preliminary showing that a false statement

25     was knowingly and intentionally or with reckless

1   disregard for the truth included or in the instance of
2   an omission, Your Honor, that it was an omission that
3   was designed to mislead the magistrate.  And in this
4   case, Your Honor, it's the government's position the
5   defendant has not made that showing given all of the
6   other information and all of the other steps that this
7   agent took and testified that he took and is included
8   in the affidavit to corroborate the testimony -- the
9   information that was provided by that witness.  And
10  the corroboration of an informant or of a witness,
11  complainant in this case, is -- excuse me.  The degree
12  to which the report is corroborated is an important
13  consideration pursuant to *United States v. Wilhelm*, 80
14  F.3d 116, and I submit, Your Honor, that this
15  affidavit sets forth a bevy of corroboration of what
16  the witness was telling the agents that demonstrates
17  that the omissions of her felony and of the pending
18  charges were not omitted designed to mislead the
19  magistrate in this case.
20          As the agent testified, he was unaware of --
21  at the time of this affidavit what exactly the witness
22  was on probation for, although he was aware clearly,
23  very aware, of the nature of the pending charges in
24  Henrico and the false statement made to the probation
25  officer, but he did not just rely on this witness's

1 statements and omit that information. He took very

2 specific steps to corroborate what CW told him in that

3 case including taking the phone number, running that

4 through a database, confirming that it came back to

5 Mr. Haas, showing her a picture of Mr. Haas that she

6 then identified, and when she represented to the

7 agents that he was continuing to have conversations

8 with her about producing child pornography, and that

9 he drove a light-colored Jetta, they confirmed that he

10 drove a light-colored Jetta, and then they had her

11 ultimately make the recorded phone calls, Your Honor.

12          And I would submit that the recorded phone

13 calls corroborate what the witness -- the information

14 that the witness provided to the agents because

15 without the context it's just quite clear from the

16 phone calls, the government submits, that they're not

17 referring to anything except child pornography. And I

18 can address that when we get to the subtext of the

19 phone calls. But the agents took that additional step

20 to corroborate the witness. And then, as well, this

21 obviously was not an affirmative step they took, but

22 further corroboration for the magistrate to consider

23 is the complaint from the Richmond Police Department

24 or ultimately Richmond originating to Chesterfield

25 dealing with a minor alleging molestation by Mr. Haas,

1   which corroborated the witness saying that Mr. Haas

2   told her he had access to children and that they could

3   produce this child pornography.

4          So I submit, Your Honor, that although these

5   statements were omitted, they were not omissions

6   designed to mislead the magistrate.  They are not

7   material to the probable cause given all of the

8   corroboration in this affidavit in that the defense

9   has not made a prima facie showing to obtain a *Franks*

10  hearing on that matter.

11         THE COURT:  What about the material omission

12  from Exhibit B, page 16, paragraph 25, the failure to

13  include two laptop computers were seized from the

14  defendant's home, thereby making it likely, according

15  to the defense, that the laptop seen by CW in May was

16  not the one in the defendant's truck?

17         MS. MANSFIELD:  Your Honor, I would submit

18  that this is not at all material to probable cause.

19  As this court is aware, on the basis of the home

20  search warrant, the agents were authorized to seize

21  all computers to search and ultimately to determine if

22  there were records related to evidence of crimes.

23         Obviously, CW stated that it was a laptop

24  computer that she viewed child pornography on, but

25  there would be no way -- CW did not give any

1    information and without performing a search there

2    would be no way for the agents to be aware of how many

3    laptops Mr. Haas had.

4          THE COURT:  But why wasn't it relevant to

5    know that two laptops had been seized, not from the

6    standpoint of the defendant's argument, but from the

7    standpoint of the government's argument?  The seizure

8    of two laptops from the home confirms that he's a user

9    of laptops, and when they saw the laptop in the truck,

10   they had authority to seize it, and they got the

11   warrant to seize it.

12         MS. MANSFIELD:  That's correct, Your Honor.

13   I would agree with that that they had the authority to

14   seize it.

15         Additionally, in paragraph 27, subsection D

16   of the search warrant authorizing the search and

17   seizure of that laptop, it's page 17 of Defense

18   Exhibit B -- excuse me.  Page 18.  I apologize, Your

19   Honor.  There's information included in the search

20   warrant about individuals who do possess, collect, and

21   receive child pornography often maintain their

22   collections in a digital or electronic format in a

23   safe, secure, and private environment such as a

24   computer.  And it goes on to say that these

25   collections are often maintained for several years and

1   are kept close by, usually at the collector's

2   residence or inside the collector's vehicle to enable

3   the individual to view the collection, which is valued

4   highly.

5          And I would submit, Your Honor, that that

6   combined with this laptop being with Mr. Haas in his

7   work truck further supports the probable cause in that

8   it's not -- and that's why it's not -- I guess to Your

9   Honor's point, it could have definitely supported the

10  government's position that Mr. Haas was a user of

11  laptops to include it, but I would submit that it is

12  not --

13         THE COURT:  And that he kept the laptop in

14  his vehicle close by so he would be able to see them.

15  What was it?  A tractor-trailer?

16         MS. MANSFIELD:  It was more of a work truck.

17  I have -- there's a photograph, Your Honor.

18         THE COURT:  It looks like a tractor of a

19  tractor-trailer.

20         MS. MANSFIELD:  That's correct, Your Honor,

21  yes.

22         THE COURT:  Did he drive tractor-trailers?

23  Is he a trucker?

24         MS. MANSFIELD:  It's my understanding, Your

25  Honor, he had a tree service business.  I believe that

1   may have involved the driving of tractor-trailers,

2   although I'm not fully sure of what the extent of his

3   work with this tractor-trailer was.

4           THE COURT:  What about the intentional

5   misrepresentation of Exhibit B, page 12, Haas also

6   requested nude photos of underage females in exchange

7   for money?  And she compares that to the transcript on

8   Exhibit E, page 2, where it talks about getting

9   pictures but doesn't talk about getting nudes.

10          MS. MANSFIELD:  Well, I think, Your Honor,

11  again, if we look at this as being informed by the

12  background that CW has said that he's constantly

13  asking her about the production of child pornography,

14  I think that Your Honor can -- it is a logical

15  conclusion, and a logical conclusion that certainly

16  the agents made and CW made that making -- excuse me.

17  This whole production has been about CW discussing

18  with Mr. Haas producing child pornography so that they

19  can make money.

20          THE COURT:  Well, according to paragraph 12,

21  it says, "CW understood Haas to be referring to the

22  production of child pornography.  Haas also requested

23  nude photos of underage females in exchange for

24  money."

25          Isn't a fair reading of that is that he is

1    reciting what CW told him about what it is that she
2    understood at the telephone calls?
3            MS. MANSFIELD:  Yes, Your Honor.
4            THE COURT:  The whole paragraph has to do
5    with what CW --
6            MS. MANSFIELD:  Right, with what she
7    understood the context of this phone call to be.
8            THE COURT:  By that same token, the defense
9    says, well, he had a transcript of these phone calls,
10   and there isn't anything in there that would permit
11   reasonably the conclusion that the agent doing the
12   affidavit thought that CW understood that the
13   reference to pictures meant nude pictures in that one
14   sentence there.
15           MS. MANSFIELD:  But I think it is, Your
16   Honor, when you look at the answer given right to that
17   by CW.  "How does it work?  Is it like the younger,
18   the more moolah?"  And he says, "Yeah."  I think it is
19   a logical conclusion when discussing child pornography
20   that to make money or more money, the photographs are
21   very unlikely to be --
22           THE COURT:  Well, are you going to make a lot
23   of money from a child dressed in a pinafore or a prom
24   dress --
25           MS. MANSFIELD:  No, Your Honor.

1          THE COURT:  -- or a confirmation dress or

2    something like that or are you going to make more

3    money from a child without clothes on?

4          MS. MANSFIELD:  Yes, Your Honor.

5          THE COURT:  That's your point, that's the

6    inference that can we made from this?

7          MS. MANSFIELD:  Yes, Your Honor, that's my

8    point.

9          THE COURT:  Anything else on *Franks*?

10         MS. MANSFIELD:  If I may, I believe I didn't

11   address specifically what defense argued was their

12   second material admission.

13         THE COURT:  Omission.

14         MS. MANSFIELD:  Omission, yes, Your Honor.

15   From --

16         THE COURT:  You don't need to argue that.

17         MS. MANSFIELD:  Oh, okay.  Thank you, Your

18   Honor.

19         THE COURT:  Anything else on *Franks*?  I'd

20   like to go on and get that done.

21         MS. ROBERTS:  Yes, Your Honor.  Your Honor,

22   with regards to the seizure of the laptop, and the

23   government's directing the Court's attention to the

24   agent's statements in the affidavit regarding

25   characteristics of a person who possesses child

1    pornography, specifically I think the

2    government referenced --

3            THE COURT:  It's on page 18, paragraph --

4            MS. ROBERTS:  25 or 27, Your Honor.

5            THE COURT:  27D.  D at the top of page 18.

6    "Likewise, individuals who access with intent to view,

7    possess, collect, and receive child pornography often

8    maintain their collections that are in digital or

9    electronic format in a safe, secure, and private

10   environment such as a computer and surrounding area.

11   These collections are often maintained for several

12   years and are kept close by, usually at the

13   collector's residence or inside the collector's

14   vehicle to enable the individual to view the

15   collection, which is valued highly."

16           MS. ROBERTS:  Your Honor, yes, I would direct

17   the Court to paragraph 27C.  Well, first, to paragraph

18   27C, which immediately precedes the paragraph cited by

19   the government, which is on page 17.

20           THE COURT:  Okay.

21           MS. ROBERTS:  And that reads, "Individuals

22   who access with the intent to view, possess, collect

23   and receive child pornography almost always possess

24   and maintain their hard copies of child pornographic

25   material, that is their pictures, films, videotapes,

1   magazines, negatives, photographs, correspondence,

2   mailing lists, books, tape recordings, etc., in the

3   privacy and security of their home or some other

4   secure location.  Individuals who have a sexual

5   interest in children or images of children typically

6   retain pictures, films, photographs, negatives,

7   magazines, correspondence, books, tapes, recordings,

8   mailing lists, child erotica, and videotapes for many

9   years."

10          THE COURT:  That's talking about hard copy

11  material, right, not digital?

12          MS. ROBERTS:  Hard copy material is defined

13  as pornographic material including pictures, films,

14  videotapes, magazines, negatives, correspondence.  And

15  so in that, Your Honor, I don't think that it is

16  necessarily --

17          THE COURT:  This paragraph C looks to me like

18  it's talking about non-electronic formats, non-digital

19  formats.  Isn't that what paragraph C is?  Paragraph D

20  talks about digital formats.  Am I not right about

21  that?

22          MS. ROBERTS:  That is correct, Your Honor.

23          THE COURT:  All right.

24          MS. ROBERTS:  In both instances it indicates

25  that it is likely that these items are kept in a safe

 1  and secured location.  The facts of this case don't --

 2        THE COURT:  The one about the digital says

 3  including inside the vehicle.

 4        MS. ROBERTS:  I understand that, Your Honor.

 5  But even to that point, what the evidence -- well,

 6  first I will say that with regards to the agent's

 7  statements and conclusions, the agent's conclusory

 8  statements as contained in paragraphs 27 and the

 9  entire section, "Characteristics common to individuals

10  who access with the intent to view, collect, receive

11  child pornography and to seek to sexually exploit

12  children," that is exactly the type of conclusory

13  statements that the Court warns are insufficient to

14  establish probable cause.  Specifically, Your Honor,

15  in *United States v. Lull* -- I'm sorry.  One moment.

16        THE COURT:  You're talking about the validity

17  *vel non* of the affidavit.  We're talking about now

18  misrepresentation.  Why are you talking about this

19  now?

20        MS. ROBERTS:  Your Honor, only that the

21  government raised the issue to say --

22        THE COURT:  Well, let's don't worry about

23  what the government is going to do anymore unless

24  there is specifically some comment that she said.  And

25  they didn't get into testing this validity *vel non* of

213

1 the warrant in this argument.  They were addressing

2 only the comments you made.

3        MS. ROBERTS:  In that case, Your Honor --

4        THE COURT:  You're mixing these arguments

5 together, and that's not how they are to be

6 considered.

7        MS. ROBERTS:  Yes, Your Honor.

8        With regards to the intentional

9 misrepresentation regarding nude photos, the

10 government argued that Agent Gonzalez's

11 misrepresentation could not have been intentional.

12 However, we would point out that during his

13 testimony --

14        THE COURT:  Said it wasn't a

15 misrepresentation was her argument.  Her argument was

16 it wasn't a misrepresentation when you look at the

17 whole thing, particularly talking about the fact that

18 the pictures were intended to yield money, and that

19 the more money that you get -- you don't get money for

20 clothed children.  You get money for naked children.

21 That's the point she was making.  So address that.

22        MS. ROBERTS:  Your Honor, Agent Gonzalez's

23 statement in the affidavit does not say that Mr. Haas

24 requested photos in exchange for money.  They say that

25 he requested nude photos.  It specifies nude photos.

1   And that is a conclusion by --

2          THE COURT:  No, it's an inference.  It's an

3   inference based on the text of a whole two pages that

4   basically says this:  I want some pictures, 12 to

5   eight-year-olds.  And I want to make moolah from it.

6          Now, she says the officer was reasonable in

7   inferring that you make pictures from nude

8   photographs, not clothed photographs of the 12 to

9   eight-year-olds referred to in that passage.  And if

10  that's true, is that an intentional misrepresentation?

11         MS. ROBERTS:  I still believe that it is,

12  Your Honor, and it overstates the evidence.  And with

13  regards to the inference, Your Honor, it is also an

14  acceptable inference or it stands to reason, common

15  sense, that an individual or a child, in this case,

16  who a person wants to photograph or use for purposes

17  of presenting child pornography, that you want someone

18  with an attractive face.  And so, again, that may not

19  be the end, but at least the pictures that are

20  requested, it is just as likely that he is requesting

21  a picture of a head shot, and that's not ruled out

22  that he is first wanting to see a preliminary picture

23  of this individual to include perhaps a head shot.

24         THE COURT:  A head shot is not pornography.

25         MS. ROBERTS:  A head shot is not pornography,

1  nor is a clothed picture of a child where you can see

2  the child's proportions.

3       THE COURT:  Is there any other rebuttal that

4  you have?  Because I really would like to get on to

5  the merits of the case if you don't have anything

6  else.

7       MS. ROBERTS:  No, Your Honor.

8       THE COURT:  All right.  I will have an

9  opinion, but the request for a treatment of this under

10 the *Franks* analysis, it fails.  There hasn't been any

11 showing sufficient to warrant a *Franks*-type resolution

12 in this case.  So we now turn to the issue of the

13 validity of the search.

14      MS. ROBERTS:  Your Honor, our second argument

15 is that notwithstanding the Court's ruling that we've

16 not made a prima facie showing regarding the presence

17 of intentional misrepresentations and material

18 omissions in the affidavit, the warrant still fails to

19 establish probable cause under a totality of the

20 circumstances analysis.

21      THE COURT:  Do you agree -- as I understand

22 it, just so I lay the table correctly, we're not

23 considering the validity of the warrant to search the

24 home?

25      MS. ROBERTS:  That is correct, Your Honor.

 1          THE COURT:  All right.

 2          There is no attack on any part of that?

 3          MS. ROBERTS:  There was no material recovered

 4    which the government seeks to introduce at trial in

 5    this matter.  They recovered some things but none of

 6    it is of an incriminating nature.

 7          THE COURT:  You don't think the warrant in

 8    that case was bad, though, do you?

 9          MS. ROBERTS:  Well, I do have --

10          THE COURT:  You think the warrant was bad

11    here?

12          MS. ROBERTS:  I think the warrant was bad

13    there for a lot of the same reasons that the warrant

14    was bad here in that -- and the reasons that I'm going

15    to articulate with regards to the face of the warrant.

16          THE COURT:  The bottom line here is that

17    there is an amplitude of evidence showing that this

18    fellow was interested in child pornography from a

19    confidential witness or informant, however you want to

20    call it, that establishes firsthand knowledge that it

21    was on a computer and that he has had a longstanding

22    interest in children and child pornography.  And I

23    don't see that there's anything wrong with the warrant

24    for the house.

25          MS. ROBERTS:  Your Honor --

1          THE COURT:  You didn't attack it.

2          MS. ROBERTS:  The warrant for the house and

3     the warrant for the 1995 tractor-trailer truck are

4     identical in every respect except for the inclusion by

5     the affiant in paragraph 25 of the September 1st

6     affidavit for search warrant.  They read verbatim, the

7     exact same information, except the September 1st

8     updates the magistrate judge and advises that a search

9     of the home pursuant to the August 31st, 2016 warrant

10    had been executed.  And then it advises the magistrate

11    judge that Mr. Haas was taken into custody at a

12    different location and that he was arrested on the

13    charges which we've been referring to as the charges

14    out of Chesterfield County involving the 11-year-old.

15    It advises the magistrate judge that a laptop computer

16    was located on the seat in that work truck and that a

17    GPS device was located --

18         THE COURT:  Before you go any further, I have

19    up here two things marked Defense Exhibit B.  One is a

20    search and seizure warrant with an execution demand of

21    9-14-2016, and an execution demand on the other one

22    for 9-15-2016.  And one of them is signed by the

23    magistrate judge on August 31 at looks like 10:30 a.m.

24    and the other one is signed on September the 1st,

25    2016, at 11:05 a.m.  Which is the right B?

1          MS. ROBERTS:  Your Honor, the correct B is
2     signed September 1st, at 11:05 a.m.
3          THE COURT:  What is this thing that I have
4     here on Exhibit B?  I mean on the other one.
5          MS. ROBERTS:  That is Exhibit C.
6          THE COURT:  So I have one that looks like
7     Exhibit C.  So I'm returning this B to you, the second
8     B to you.  The one I'm returning actually is Exhibit
9     C.  Somebody has written over here.  Okay.
10          Was the magistrate judge ever told that they
11     seized two computers at the defendant's house?
12          MS. ROBERTS:  He was not, Your Honor.
13          THE COURT:  Does that make a difference that
14     they did?
15          MS. ROBERTS:  Your Honor, I believe it does
16     make a difference.
17          THE COURT:  Is there any evidence that the
18     affiant knew that two computers had been seized at the
19     house?
20          MS. ROBERTS:  Yes, Your Honor.  Through his
21     testimony here in court today I specifically asked him
22     whether or not he was present when the two laptops
23     were recovered.
24          THE COURT:  He said he was present, but he
25     said he didn't know that they had been seized.

219

1          MS. ROBERTS:  No, Your Honor, that is not my

2     recollection of his testimony.  It was that he was

3     present, that he did not specifically retrieve them or

4     seize them, but that yes, he knew -- I think he said,

5     I probably knew at the time of the swearing out of

6     that second search warrant.  He specifically affirmed

7     the statement that he had knowledge of the two laptop

8     computers.

9          THE COURT:  Well, I don't recall that being

10    his testimony, but you all will have a chance to deal

11    with it.  All right.  Go ahead.

12         MS. ROBERTS:  Your Honor --

13         THE COURT:  What more does the government

14    have to show here to get a warrant, to have a valid

15    warrant?  There's not any real doubt.  They have

16    probably cause to believe that he has child

17    pornography on his computer.  He talks about it all

18    the time.  The warrant authorizes the search, the

19    seizure of the computers at home, and they found

20    another one in his truck, so it authorizes the one at

21    the truck.  What is your objection to all this?

22         MS. ROBERTS:  Your Honor --

23         THE COURT:  Other than the reliability,

24    credibility of the CW?

25         MS. ROBERTS:  Well, Your Honor, when an

1  officer has reason to know that the information

2  provided by a source is perhaps questionable --

3           THE COURT:  I'm not helping you here.  I'm

4  sorry.  Let me start again.  Let's assume that I found

5  that there isn't any problem with what he did with

6  respect to the credibility of CW, that that is

7  sufficient unto the day.  Given that there's no basis

8  for an attack on that theory at all, in other words,

9  he didn't mislead anybody, what he put in there was

10 fine, what he left out doesn't make a difference.

11          Now, with all the evidence that CW provided

12 and the evidence that they corroborated, and the

13 evidence of the telephone calls, why isn't that enough

14 to authorize the warrant both in the house and at the

15 truck once they found the computer in the truck?

16          MS. ROBERTS:  If the Court were -- assuming

17 that the Court credits CW, that would thereby lend the

18 information in the affidavit as being reliable, and if

19 the Court were to view the affidavit or the

20 information provided by CW as being reliable

21 information, then I think that we would have a problem

22 asserting that the warrant is not valid on its face.

23          THE COURT:  Right.  So the real rub here is

24 CW's reliability and credibility; is that right?

25          MS. ROBERTS:  That is, Your Honor.

1          THE COURT:  That's the gravamen of what

2    you're attack is; is that correct?

3          MS. ROBERTS:  That's correct.

4          THE COURT:  Well, let's argue that then.

5    I'll be glad to hear you on that.  I'm just trying to

6    define issues.  Now that I know that the issue here is

7    the credibility/reliability of CW and whatever the

8    evidence is that was given or was not given is

9    dispositive of whether the warrant is valid or not,

10   I'll hear your argument on the whole credibility

11   issue, if you don't mind.  And I recognize there's

12   some overlap between what you argued about omissions

13   in the *Franks* context and this topic, but I'm willing

14   to hear -- I understand that it has different thrusts

15   and different contexts.  So I'll be glad to hear you

16   argue that even if you repeat yourself on this point

17   now that I know what the dispositive issue really is.

18         MS. ROBERTS:  Yes, Your Honor.

19         Your Honor, on the face of the warrant, the

20   four corners of the warrant provides certain

21   assertions that go to the issue of probable cause.

22   The assertion by CW that she actually observed child

23   pornography on the computer in May of 2016.  Second,

24   there is the assertion in the affidavit and search

25   warrant by CW that she engaged in multiple

1    conversations with Mr. Haas in which Mr. Haas

2    continuously requested nude photos of children and

3    requested CW -- that CW obtain a juvenile female for

4    purposes of engaging in sexual conduct with Mr. Haas.

5              THE COURT:  Mr. Haas or with her?  I thought

6    that part of it was that he was -- it was to engage

7    with her so that he could film it.  Isn't that what

8    the agent said?

9              MS. ROBERTS:  I don't recall that it was

10   exclusive to her.

11             THE COURT:  No --

12             MS. ROBERTS:  As --

13             THE COURT:  No, he wanted to have sex with

14   some people himself, but he wanted it -- as far as

15   child pornography is concerned, he wanted CW to engage

16   in sex with the child so that he could film it.  Isn't

17   that what we've been told?

18             MS. ROBERTS:  Your Honor, I don't believe

19   that it is, that it was specified that an underage

20   female would have sex with CW as opposed to the

21   underage female having sex with Mr. Haas or some other

22   person or persons.  That is not to say that -- I guess

23   there are all kinds of inferences that have been made,

24   so there's nothing to rule out the possibility that

25   the sexual interaction was supposed to be between

 1  Haas, CW, and an underage individual, but I just don't
 2  think that the evidence is clear on that one way or
 3  the other.
 4          THE COURT:  All right.  Excuse me.
 5          MS. ROBERTS:  Your Honor, in addition, the
 6  other piece of evidence found in the affidavit which
 7  goes to probable cause would be the phone calls that
 8  occurred between CW and Mr. Haas.  Those phone calls
 9  when viewed and reviewed --
10          THE COURT:  Are you talking about the ones
11  that are recorded and we have transcripts for?
12          MS. ROBERTS:  Right, it is the recorded phone
13  calls that have been entered into evidence today that
14  are referenced in the search warrant.  The search
15  warrant also, however, references at least two other
16  phone conversations, and one in person conversation
17  that allegedly occurred between CW and Haas prior to
18  agents setting up the recorded phone call.  Those two
19  calls, the earlier calls and the earlier in person
20  conversation, were not recorded in any way, and so the
21  substance of that is based strictly on CW's account of
22  that.
23          THE COURT:  The substance of what?
24          MS. ROBERTS:  The substance of those earlier
25  conversations as reflected in the affidavit, and the

224

1  substance of the earlier phone calls as reflected in

2  the affidavit.

3        THE COURT:  Excuse me.  I thought you were

4  starting to talk about the phone calls in Exhibits E

5  and F.  You started off and then you drifted off and

6  you talked about the fact that there were other phone

7  calls.  Let's confine ourselves first to the recorded

8  phone calls.  And you say that they are probative of

9  no probable cause.  How is that so?

10        MS. ROBERTS:  Your Honor, it's our position

11  that they are not probative at all when viewed without

12  some other explanation or background story to give

13  them context.

14        THE COURT:  The background story being --

15        MS. ROBERTS:  CW's allegation that there were

16  two previous phone conversations that were not

17  recorded and for which agents were not privy to, and

18  an in person meeting with Haas during which they

19  engage in conversations about child pornography.

20        THE COURT:  What about all this?

21        MS. ROBERTS:  Well, Your Honor --

22        THE COURT:  He swore to the fact that CW told

23  him about the original meeting in May, about her

24  meeting him four years before, approximately in 2012,

25  and what she said the contents were of the two earlier

1  conversations.

2       MS. ROBERTS:  Your Honor, but none of that

3  information was corroborated.  Although the agent took

4  time to corroborate just basic general information

5  such as CW's name, her address, her phone number, he

6  didn't conduct any or obtain any information that

7  provided any corroboration for the meaningful

8  allegations that she lodged against Mr. Haas.

9       The fact that he verified her name, date of

10 birth, and address does not bear on whether or not she

11 is a credible source.  What bears on whether or not

12 she's a credible source are all the things that this

13 court has heard today with regards to her prior felony

14 convictions, to her pending charges, to her lying to

15 Henrico police in July of 2016 about 45 days before he

16 swore out the affidavit.

17      All of those are red flags to this officer,

18 to this agent, that even if he hadn't originally done

19 a due diligence check to find out the record and the

20 voracity of the person that he was dealing with, that

21 when these things occurred and they kept on popping

22 up, that he had then -- that it was unreasonable for

23 him to not conduct a criminal records check.

24      She told him that she had been convicted of

25 offenses in Chesapeake previously.  So it wasn't that

1   he was assuming she didn't have a record because she

2   told him she had a record.  She also told him that she

3   was on probation.  He says that she didn't tell him

4   why -- that CW didn't tell him why she was on

5   probation, but the fact that she told him that she was

6   on probation, the fact that he knew she had a prior

7   criminal record would prompt any reasonable officer

8   relying on a person's statement to look into their

9   criminal history and their record for truthfulness.

10  He didn't do that.  He intentionally disregarded that

11  information, and I think we can assume that it was

12  not -- that it was for the purpose of not wanting to

13  know that information and not having to include it.

14          Even if you find that it wasn't an

15  intentional misrepresentation on his part, under the

16  good faith exception to the exclusionary rule, prong

17  one says, "The magistrate or judge issuing a warrant,

18  the good faith exception will not apply if the

19  magistrate or judge issuing a warrant was misled by

20  information in an affidavit that the affiant knew was

21  false or would have known was false except for his

22  reckless disregard for the truth."  And that is what

23  we have here.  There were --

24          THE COURT:  Well, you don't allege it was

25  false.

1          MS. ROBERTS:  At this prong, Your Honor, at

2     this point I think that the Court has already made a

3     ruling on that.  And so I stand now --

4          THE COURT:  You don't contend it was false

5     anyway.  False means you intended to say something

6     misleading.

7          MS. ROBERTS:  They were --

8          THE COURT:  The only intentional

9     misrepresentation --

10          MS. ROBERTS:  Is with regards to the nude --

11          THE COURT:  Yeah.

12          MS. ROBERTS:  Right.  This is a material

13     omission that was made in reckless disregard for the

14     truth.  And if the Court so finds, then the good faith

15     exception fails in this case.

16          So that is why CW's credibility or her

17     history of voracity as known to Agent Gonzalez at the

18     time that he swore out the affidavit is so incredibly

19     important.  The information contained in the

20     affidavit, save the information with regards to the

21     Chesterfield offense, is wholly provided and based

22     upon the acceptance of the source as being a reliable

23     source.

24          And so, Your Honor, in addition to that, on

25     the face of the warrant, in the four corners of the

228

1    warrant there's not even an allegation in the

2    affidavit that CW was reliable.  And in United States

3    v. *Lull*, 824 F.3d 109, which was a Fourth Circuit case

4    from 2016, it stands for the proposition that the

5    affiant's omission of the informant's problematic

6    reliability in the affidavit prevented a neutral

7    magistrate from being able to accurately assess the

8    reliability and voracity of the informant's

9    statements.

10           So in this case, as applied to these facts,

11   Agent Gonzalez's failure to even allege the

12   reliability of the CW in the instant affidavit and

13   warrant is exactly the same as the situation in *Lull*

14   in which the Court found that that was problematic and

15   that that prevented the magistrate from performing his

16   duties.

17           In addition to that, any affidavit that omits

18   all of the informant's credibility undermines the

19   issuing magistrate's ability to perform his role as a

20   neutral arbiter of probable cause.

21           THE COURT:  Is that *Lull*?

22           MS. ROBERTS:  That is *Lull*, Your Honor, yes.

23           Your Honor, our second argument is that the

24   affidavit -- on the face of the affidavit, the face of

25   the warrant, that the affidavit fails to establish a

1   sufficient nexus between the criminal conduct, the
2   place to be searched, and the items to be seized.
3   First, the evidence of child sexual assault alone does
4   not support probable cause to search for child
5   pornography.
6          THE COURT:  So wait a minute.  There's a
7   nexus between what?
8          MS. ROBERTS:  The nexus between the criminal
9   conduct alleged, and the place to be searched, and the
10   items to be seized.
11          Again, if the Court ultimately rules that CW
12   is credible, then there would be -- the Court would be
13   making a finding that the information provided by her
14   in the warrant was properly considered.  However, if
15   the Court decides that CW is not reliable and that
16   that is an issue that is fatal to the government's
17   case, then what that leaves us with is only evidence
18   of the child's sexual assault as it relates to the
19   Chesterfield offense.  But there the 11-year-old never
20   asserted the presence or use of a laptop, never
21   asserted the presence or use of a camera or other
22   device used or associated with child pornography.
23   There was no mention that Haas took pictures, that he
24   displayed images to her or anything of that nature.
25   And finally, there was no GPS device, no evidence that

1   there was a GPS device present.

2        THE COURT:  What's the GPS device have to do

3   with this case?  Are they offering it into evidence?

4   To show what?

5        MS. ROBERTS:  Your Honor, we have reviewed --

6        THE COURT:  Are you offering it into evidence

7   to show what, Ms. Mansfield?  There's really no

8   discussion in the papers about the GPS at all.

9        MS. MANSFIELD:  That's correct, Your Honor.

10  We will state on the record we're not offering the GPS

11  device into evidence.

12       THE COURT:  Okay.  So that's irrelevant.

13       MS. ROBERTS:  Your Honor, finally, there's no

14  indication that the laptop observed by law enforcement

15  in the tractor-trailer on September 1st is the same

16  laptop allegedly viewed by CW in May of 2016.

17       What you heard here today -- I'm sorry.  What

18  is contained in the affidavit is a statement that CW

19  observed a laptop.  There's no description provided in

20  the affidavit that would allow law enforcement

21  officers to be able to identify with particularity or

22  specificity the item that they are searching for in

23  the home.  Certainly, the record is absent of any

24  description whatsoever.

25       It is convenient today that Agent Gonzalez on

1  the stand, when asked on the stand said that CW told

2  him that it was a black laptop.  That is information

3  that would have been relevant and material and that

4  should have been --

5        THE COURT:  What was seized from the truck?

6        MS. ROBERTS:  Your Honor, there was a black

7  laptop seized from the truck.  That statement that it

8  was a -- that she said "black laptop" does not appear

9  in the affidavit and had we been able to explore the

10  substance of the report as part of our case-in-chief

11  for *Franks*, then we would have been able to present

12  evidence to the Court that it did not appear in either

13  of his reports.  Specifically, the report that

14  detailed the statements CW made.

15        Now, that report's not into evidence.  The

16  Court did not allow that, but right now the government

17  has the report, and I'm not sure if they're willing to

18  stipulate that the report does not indicate that there

19  is a description.

20        THE COURT:  It's either in there or it's not.

21        MS. ROBERTS:  Right.  But the report itself

22  is not included in the material that the Court has.

23  The government objected to our moving it into

24  admission.  The absence of this information in the

25  report and the absence of the information in the

1   affidavit --

2        THE COURT:  You didn't offer it into evidence

3   to show the color of the laptop.  You offered it to

4   impeach him about something else.  I never was called

5   upon to rule on such an issue as that that I recall.

6        MS. ROBERTS:  No, Your Honor, at the

7   conclusion --

8        THE COURT:  Yeah, you had it out.  You

9   offered it.  Yes, I kept it out.  But you had used it

10  only to impeach him about something that didn't have

11  to do with the color of the laptop, and he admitted

12  what it was that you wanted him to answer, and she

13  objected on that basis, and I held that the statement

14  was not admissible to impeach him, that there was no

15  impeachment and therefore no need to admit the report

16  that you're talking about.

17       You never raised the issue of the color of

18  the laptop and whether that report was pertinent to

19  that or not.  He testified about the color of the

20  laptop, but you didn't raise that issue.

21       MS. ROBERTS:  Your Honor, if I can have a

22  moment.

23       Your Honor, the government has advised that

24  it is willing to stipulate that the agent's report

25  only references a laptop and that there's no

1    description contained.

2         MS. MANSFIELD:  Yes, it showed pictures on a

3    laptop, Your Honor.

4         THE COURT:  All right.

5         MS. ROBERTS:  Your Honor, if you strip away

6    the statements that are attributed to CW and her

7    credibility, what you're left with is the allegation

8    regarding a touch offense in Chesterfield.  And that

9    alone does not establish probable cause to believe

10   that Mr. Haas is likely to collect or possess child

11   pornography.

12        For that I would refer -- for that

13   proposition I would refer the Court to *Virgin Islands*

14   *v. John*, 654 F.3d 412 at 418 and 419.  That's a Third

15   Circuit case from 2011.  And of course the Court is

16   familiar with the decision in this circuit in *United*

17   *States v. Doyle*.

18        The affidavit failed to provide the

19   magistrate with a substantial basis for determining

20   the existence of probable cause, and, therefore, it

21   fails on its face.

22        Your Honor, finally, the good faith exception

23   does not save what is otherwise a faulty, in our

24   position, of a faulty and invalid warrant where the

25   affidavit -- because in this case, a reasonable

1  officer executing the warrant, given the four corners

2  of the warrant, should have known that the warrant did

3  not contain sufficiently reliable information so as to

4  establish probable cause.

5       The warrant was facially deficient in that

6  the affidavit failed to allege the reliability of the

7  confidential source.

8       So for those reasons, Your Honor, not

9  withstanding the Court's denial of the *Franks* hearing,

10  I believe that on the face of the warrant and when

11  examining the four corners of the warrant, the Court

12  still must conclude that the warrant fails to

13  establish probable cause, and that it fails to contain

14  essential elements such as a statement with regards to

15  the reliability of the source, and that no reasonable

16  officer executing the warrant would have been able to

17  conclude that the warrant was valid given those

18  deficiencies.

19       One moment.  Nothing further, Your Honor.

20       THE COURT:  All right.  Okay.  You have a

21  whole group of things that are omissions, that you

22  acknowledge were omissions.  Why taken together would

23  those omissions not have been important to put before

24  the magistrate judge so he could make a decision about

25  whether CW's statements were sufficiently reliable to

1  constitute probable cause given that CW was the

2  principal, if not exclusive, predicate for the

3  allegations of child pornography on a computer?

4          MS. MANSFIELD:  Well, I think because, Your

5  Honor, there was much other evidence provided to the

6  magistrate in this case that corroborated and

7  demonstrated CW's reliability and the reliability of

8  her statements in this context.

9          THE COURT:  What is that?

10          MS. MANSFIELD:  Again, Your Honor, as Your

11  Honor has recognized, some of this will be repetitive,

12  but the information included in the affidavit that

13  corroborates the information that CW was giving to the

14  agents, first of all, when CW gave the agents a phone

15  number, the agents ran those records, corroborated

16  that that went back to Richard Haas and pulled those

17  phone records for that phone, which is included in the

18  affidavit that they confirmed that that phone number

19  is registered to Richard T. Haas, the account number,

20  P.O. Box 35085, North Chesterfield, Virginia.

21          The agents then ran a CLEAR report confirming

22  that that P.O. box does belong to Haas as well and

23  that Mr. Haas's DMV records also would include that

24  P.O. box.

25          THE COURT:  That all goes to show that Haas

1  was who she said he was, right?

2         MS. MANSFIELD:  Well, that's correct, Your

3  Honor.

4         THE COURT:  What does that have to do with

5  corroborating any of the material allegations except

6  that she was dealing with Haas?

7         MS. MANSFIELD:  Well, I guess that's the

8  beginning of it, Your Honor, and then ultimately the

9  agents did perform the two recorded phone calls with

10  CW, had CW do, record her interactions with Mr. Haas

11  in order to corroborate that she was discussing with

12  him the production of child pornography.

13         THE COURT:  All right.  Now, tell me what --

14  that's Exhibits E and F from the defense, right?

15         MS. MANSFIELD:  That's correct, Your Honor.

16         THE COURT:  What part of -- let's take E.  Is

17  it D and E?  It's D and E.  What part of D and E

18  corroborates that?

19         MS. MANSFIELD:  Well, Your Honor, I think

20  looking more so to E, the transcript of the phone

21  call --

22         THE COURT:  You don't think D does?

23         MS. MANSFIELD:  I think that D does, Your

24  Honor, in that it is clear that the two of them -- it

25  is clear from this that the two of them have been in

1   contact with each other, that they know each other as

2   well.  One moment.  He references at the very

3   beginning of that call about one, two, three, four

4   lines into the first page of D.  Haas references two

5   lines into that statement, Anyway, just getting back,

6   and I got to take some shit out to the country right

7   now.  Long story.  Like long story on that shit like

8   we talked about before.

9           So he's referencing clearly things that

10   they've talked about before.  I don't think D

11   corroborates as much as E does, Your Honor, but I do

12   think --

13           THE COURT:  It doesn't corroborate anything

14   that I can see.  What does it corroborate other than

15   they are already in communication with each other and

16   have had previous communication of some sort?  I don't

17   see it.  If it's there, tell me, but I don't see it.

18           MS. MANSFIELD:  She also -- CW, Your Honor,

19   also references about halfway down that first page

20   about picking up one of her girlfriends from

21   Baltimore, which was part of this child pornography

22   scheme that she has discussed with Mr. Haas.  And so,

23   Your Honor --

24           THE COURT:  Where does that appear?  There's

25   no other evidence that I know of about that, about

238

1  that sentence.  Yeah, one of my girlfriends from down

2  where I'm from.  I'm going to pick her up.  She's

3  going to come up here with me for a while, and then we

4  might go to Baltimore or whatever.  What does it

5  corroborate specifically?

6       MS. MANSFIELD:  Well, I think, Your Honor,

7  it's corroborating that they have been -- that the two

8  of them have discussed certain things prior to this

9  phone call.

10      THE COURT:  Yeah, about a girlfriend coming

11 from Baltimore but not about pornography or anything

12 like that.

13      MS. MANSFIELD:  Well, then I think, Your

14 Honor, to Your Honor's point I'll move on to Defense

15 Exhibit E.

16      THE COURT:  We're going to close the door on

17 D.

18      MS. MANSFIELD:  That's fine, Your Honor.  And

19 move on to E.  This conversation, Your Honor, when

20 read in the -- when the whole conversation is read, I

21 think it is clear that they are talking about -- it's

22 corroborating CW's statements that they have been in

23 touch and continued discussing child pornography.

24      CW begins to discuss this at the top of page

25 2.  Okay.  Cool.  And if I do make that trip to

128

1  Baltimore, like I've told you before, you can't

2  bullshit because, you know, she can't be riding, you

3  know, the girl around and stuff like that, just

4  everywhere going.  Nobody get pulled over or nothing

5  like that whenever she's on her way down.  And you

6  know how that goes.

7          And Haas says, "Now, if you -- I'm serious.

8  You tell me when that shit's hooked up, man, because

9  that will definitely make you -- make you some, too,

10 man, and I mean a lot actually.  So depending on how

11 it -- I can't say a lot because it just depends on how

12 it works out, but --"

13         CW says, "Yeah."

14         Haas says, "But, dude, definitely hook that

15 up, man.  I'm serious.  Get me --"

16         CW:  How do you -- huh?

17         And then Haas goes into the discussion.

18         THE COURT:  What does that show so far?  I

19 don't that shows anything.

20         MS. MANSFIELD:  Well, I think, Your Honor,

21 then as we get done, and he says that's --

22         THE COURT:  What does it show so far?

23         MS. MANSFIELD:  It shows, Your Honor, that --

24 it's clear that -- I think it's clear from the way

25 this conversation starts that they have discussed CW

1   knows someone who can get a young girl and can bring a
2   young girl to Mr. Haas.
3          THE COURT:  The girl.  It doesn't say the age
4   of the girl.
5          MS. MANSFIELD:  Then if you go down, Your
6   Honor, when he says, Get me some first, too, man,
7   because I can like set it up to where we can make some
8   money beforehand.  CW says, "Okay.  And how does it
9   work with, um, like the way you do it?  Is it like
10  the, um, the younger the more moolah?"
11         THE COURT:  That's one thing.  That part of
12  the conversation doesn't necessarily refer back to the
13  girl in the first paragraph on page 2, does it?
14         MS. MANSFIELD:  I think that it can be read
15  that way, Your Honor.  I think it can read that they
16  are discussing possibly -- they're discussing hooking
17  that up and getting a young girl.  Then they move on
18  to get me some pictures.  We can make some money
19  beforehand.  And then as you move down the
20  conversation, CW says, "Remember, I said an 8 and a
21  12?"  And Haas says, "Yeah, the lower side of that is
22  definitely better."
23         I'm sorry, Your Honor, to skip around.
24  Earlier when CW answers the questions about the
25  pictures, she says, "The younger, the more moolah."  I

 1   think this conversation in context in corroborating

 2   and informing to the reliability of CW, I can't think

 3   of what else they would be discussing, the younger,

 4   the more moolah in the context of getting pictures,

 5   and "I said I had a 12 and an 8.  The lower side is

 6   definitely better."

 7        THE COURT:  Well, this corroborates -- I

 8   mean, I think it's reasonable to say, to interpret

 9   this conversation as saying that he's interested in

10   producing child pornography because he's sufficiently

11   described the taking of pictures, the getting of

12   pictures, and the making of money out of young girls.

13   And I mean that tends to corroborate what she says

14   that he had talked to her about before.  But what does

15   that have to do with the probable cause to believe

16   that there's on the computer in the truck child

17   pornography?

18        MS. MANSFIELD:  Well, I think, Your Honor,

19   the corroboration is an important part of that because

20   the agent's -- the search warrant -- that's how the

21   agents are ultimately able to seize the computer and

22   view the child pornography.  Outside of -- all they

23   could do at this point was corroborate information

24   surrounding the statements that CW had given them.

25        Obviously, based on her statements, Mr. Haas

1   has child pornography on a computer.  The agents can

2   corroborate many details of what Mr. Haas has told CW,

3   like his residence, and they can make the recorded

4   phone calls, but they cannot view that computer to

5   corroborate that information.  So they were taking all

6   the reasonable steps necessary to corroborate as much

7   as they could to inform the magistrate as to the

8   truthfulness of what CW had told.

9        Obviously, the crux of the child pornography

10  on the computer is CW's statement, and it's simply not

11  possible or not logical, reasonable, for the agents to

12  confirm that piece of information because that's what

13  they're seeking to do through search warrant, but --

14       THE COURT:  I mean, what time issue was there

15  here?  It looks to me like they could have had further

16  conversations in which she talked more specifically

17  about it.  This takes a lot of -- it's almost like

18  having a divining rod trying to find where the water

19  is in listening to this conversation.  And you're

20  reading it with a bias.

21       Your bias is, Well, she said that there was

22  child pornography.  And she saw it in May.  From that

23  then you look at this statement in E, and the

24  statements in E, I think it's reasonable to interpret

25  the second page that he's asking her to make some

1  arrangement to be able to make money out of 12 and

2  eight-year-old girls that involves pictures.  And the

3  fact that it involves money and 12 to eight-year-old

4  girls, given his propensity and demonstrated interest

5  that she testified to in the past several months, his

6  interest in child pornography, it's reasonable to

7  believe that that's what's being asked in this E, in

8  this F, but that's a different issue.

9       Yes, it proves that he's interested in child

10  pornography.  I don't think there's any question about

11  that and that he wants to make child pornography

12  pictures, but how does it then go on to inform that

13  there is likely to be on the computer in the truck

14  child pornography?  How does that work?  I don't see

15  what the nexus is here.

16       MS. MANSFIELD:  Well, I think -- well, Your

17  Honor, it works out because CW -- it is corroborating

18  the truthfulness of the statements that CW has made,

19  and, therefore, the truthfulness of the statement that

20  CW made that she saw images of child pornography on

21  Mr. Haas's laptop.

22       THE COURT:  Right.  We agree with that.  I

23  agree with that.  It certainly does show that because

24  you have a history of having seen the pictures, having

25  said other conversations, and he's always talking

1   about it, and now they have a recording of him talking

2   about how to do it.  All right.  But how do we know

3   that that computer is in that truck?  How do I -- what

4   do I make a finding on on that aspect of this case

5   because that's what this is all about?

6           MS. MANSFIELD:  Okay.  Now I understand.

7           THE COURT:  She provides no testimony or

8   evidence, nothing anybody has testified to provides

9   any evidence that the stuff she saw on the computer in

10  May was on a computer that was like the computer in

11  the truck or that would allow someone to determine,

12  well, that's the computer that we ought to be seizing.

13          MS. MANSFIELD:  Well, okay.  Going directly

14  to that question, Your Honor, as the search warrant

15  lays out in a later portion entitled, "Computers,

16  electronic storage, and forensic analysis" on page 22.

17          THE COURT:  Wait a minute.  I have to get it.

18          MS. MANSFIELD:  Yes, Your Honor.

19          THE COURT:  Page 22, paragraph 36.  All

20  right.

21          MS. MANSFIELD:  I may have gone slightly far

22  ahead, but I guess I can start here, Your Honor.

23          THE COURT:  That's his discussion of probable

24  cause.

25          MS. MANSFIELD:  Well, and it submits, Your

1   Honor, that if a computer or storage medium is found

2   on the subject property, which we're talking about

3   specifically the truck here, Your Honor, which we

4   already know at this time that there's a computer

5   there, that there is probable cause to believe that

6   the records will be stored on that computer, and it

7   goes --

8           THE COURT:   I've lost you.   Where are you?

9           MS. MANSFIELD:   I'm sorry.   That sentence

10  following it, "I submit that if a computer or storage

11  medium is found in the subject property --

12          THE COURT:   Subject property is defined as

13  the truck.

14          MS. MANSFIELD:   That's correct, Your Honor.

15  There's probable cause to believe those records will

16  be stored on that computer or storage medium for the

17  following reasons.   And this specific paragraph, Your

18  Honor, discusses essentially how long electronic files

19  can be stored, and that deleted files can be recovered

20  via forensic evidence, and I think if we even go then

21  back, Your Honor, a page -- excuse me.

22          THE COURT:   So I take from this that you're

23  saying that paragraph 36A says that if there's a

24  computer in the truck, there will be -- according to

25  his knowledge, training, and experience, the files or

1   remnants of files can be recovered.

2          MS. MANSFIELD:  That's correct, Your Honor.

3          THE COURT:  Yeah, can be recovered for months

4   after they have been downloaded.

5          MS. MANSFIELD:  And backing up slightly, Your

6   Honor, I got slightly ahead.

7          THE COURT:  I don't see how that tells us

8   anything.  I mean, it seems to me as if the officer

9   had -- the woman had said, and the affidavit

10  contained, that there was a black computer.  And let's

11  say it was a Dell.  Let's just say that.  And then you

12  find a black Dell computer in the truck.  That's one

13  thing.  And that would link what she viewed in May

14  with what was found in the truck.  The question then

15  would be staleness.  But the affidavit doesn't say

16  that.  There's nothing in here that says that the

17  computer that she saw these images on was black, nor

18  does it say the computer that was seized was black.

19  It just says the computer was seized.

20         So, you know, computers come in all shapes,

21  sizes, configurations.  Don't you need more than that

22  under *Lull* and some of these cases to provide the

23  linkage to seize that particular computer?  And if so,

24  where is it because paragraph 36A doesn't do it?  It

25  just says you can recover old images.

1          MS. MANSFIELD:  Sorry, Your Honor.  I'm

2    looking through now the paragraphs, as well the

3    background of repeaters and child pornography

4    beginning at paragraph 28, page 19 of the search

5    warrant affidavit, and discusses essentially how

6    computers have changed the production and sharing of

7    child pornography, Your Honor, and essentially the way

8    photos are taken, the way photos are shared, and the

9    way that these images can be reproduced.

10          And I believe, Your Honor, that this does go

11   to the probable cause to search essentially any

12   laptop, that there would be probable cause to search

13   any laptop found in Mr. Haas's possession.

14          THE COURT:  Once it is shown that he views

15   pornography on laptops; is that what you're saying?

16          MS. MANSFIELD:  Yes, Your Honor.  Because of

17   this information as well as going to the point I was

18   just making but probably not as clear as I could the

19   first time.

20          THE COURT:  You didn't do the brief in this

21   case, did you?

22          MS. MANSFIELD:  No, Your Honor, I did not.

23          THE COURT:  Well, the brief in this case

24   doesn't have anything in it about what you're talking

25   about.  Your argument is depending upon the particular

1   paragraphs in an affidavit which looks like a form

2   affidavit.  So you have two issues.  One is there's no

3   discussion in the government's response about the

4   issue.  And, two, what's the law on considering what

5   looked like form affidavits?

6           And Church deals with both of those.

7           MS. MANSFIELD:  Yes, Your Honor.

8           THE COURT:  Here's my take on all this:  I

9   don't know what's going on but somebody wrote a brief

10  about opposing a search warrant that wasn't -- I mean

11  defending a search on the basis of something that

12  wasn't being attacked because the government's whole

13  brief deals with the search warrant on the residence.

14          MS. MANSFIELD:  The initial brief, the

15  initial response, yes, Your Honor, that's correct.

16          THE COURT:  And then a supplemental response

17  tries to correct that, but it doesn't do what you're

18  doing.  It doesn't point back to what's in the

19  affidavit.  I just don't think that the briefing in

20  here even remotely tracks what the facts are and that

21  the issues that are being discussed are kind of being

22  discussed on the fly here.  So I think I'm going to

23  require some further briefing using the transcript.

24          MS. MANSFIELD:  Yes, Your Honor.  I would

25  appreciate that opportunity.

1            THE COURT:  I don't know what else to do.

2    Seems to me like using the transcript we need to have

3    briefing, and we'll let the defendant, whose motion it

4    is, go first.

5            I want it organized and presented in a

6    logical way.  To begin, we need to talk about what it

7    is that CW said that provides probable cause to search

8    for computers anywhere.  What it is that CW said that

9    provides probable cause to search for computers in the

10   truck.  What is the effect of the acknowledged

11   omissions respecting -- you don't have to do it in

12   this order because it's not necessarily the best way

13   to do it, but these are just topics that come to mind.

14   Then I'll defer what I was starting to talk about for

15   a minute about the effect of the omissions and say if

16   you all agree that the search warrants were identical

17   except for some add ons, let's just get a couple of

18   add ons that were made in the September 1 document.

19   You need to deal with what else provides evidence that

20   it was all right -- it was probable cause to search

21   for computers in the truck.

22           The government has pointed out a certain

23   provision.  I think it was paragraph 27E.  I'm not

24   sure.  But that's not discussed in the papers either.

25           And then you had the whole issue of whether

1   or not the magistrate judge or whether or not what was

2   not told about this woman's credibility, CW's

3   credibility, how does that affect anything in the

4   case?  The way it's being argued, sometimes you're

5   arguing it as only a component of a *Leon* good faith

6   analysis.  Sometimes you're arguing it as deficiency

7   in the warrant.

8           The defendant cites *Lull*, but is *Lull* really

9   a case that applies to the probable cause analysis or

10  is it a good faith case?  And it seems to me there's a

11  lot here that needs to be sorted out and briefed.

12          So I'd like to see some new papers, fresh new

13  papers, and don't incorporate by reference.  These

14  papers basically, as they're structured, are not of

15  great utility.

16          So when are you going to file yours, Ms.

17  Roberts?

18          MS. ROBERTS:  Your Honor, we would ask for 25

19  days.  That will allow the request of the

20  transcription of the hearing.

21          THE COURT:  Are you ordering the transcript?

22  Is that what you're saying?

23          MS. ROBERTS:  Yes, Your Honor.

24          THE COURT:  Do you want it expedited?

25          MS. ROBERTS:  No, Your Honor.

140

1          THE COURT:  You don't?  You think you're
2    going to get this in 25 days?
3          Ms. Daffron happens to be standing in, and
4    she has Judge Lauck she usually has to work with.  I
5    don't know what's on the agenda down there.  I don't
6    know.
7          Can it be done?  When is the soonest you can
8    get in it without expediting it I would think would be
9    one of the questions, Ms. Daffron, mindful of your
10   prior obligations to Judge Lauck?
11         THE COURT REPORTER:  Two weeks, Your Honor.
12         THE COURT:  Two weeks without expediting it?
13         THE COURT REPORTER:  Yes, sir.
14         THE COURT:  Now, what is the soonest you can
15   get it if it is expedited?
16         THE COURT REPORTER:  One week.
17         THE COURT:  One week.  Okay.
18         So now you know the parameters.  What do you
19   want to do?
20         MS. ROBERTS:  Your Honor, we will request it
21   expedited and --
22         THE COURT:  Now, have you got your calendar
23   out so you can see what you want after that?
24         MS. ROBERTS:  Your Honor, we would ask for
25   Friday, March 10th.

1          THE COURT:  Friday what?

2          MS. ROBERTS:  March 10th.

3          THE COURT:  All right.  Friday, March 10.

4          When do you want to file your response?

5   Today is what day?  This is February 8.  Okay.  So

6   then you get -- you basically are asking for 30 days?

7   Is that what you're asking for, Ms. Roberts?

8          MS. ROBERTS:  Yes, Your Honor.

9          THE COURT:  March 10th.  So what do you want

10  to do, Ms. Mansfield?

11         MS. MANSFIELD:  Your Honor, I was going to

12  ask the Court for two weeks, but I'm mindful of the

13  fact that I have a Fourth Circuit argument on the

14  23rd.  So if I could have until Monday, March 27.

15         THE COURT:  Sure, March 27.  3-10, 3-27.

16  Reply 3-31?

17         MS. ROBERTS:  Your Honor, would the Court

18  allow five days, which would actually make it April

19  3rd, which is our originally scheduled trial date?

20         THE COURT:  You mean to tell me that you say

21  that you don't work on the weekends?

22         MS. ROBERTS:  I absolutely work on the

23  weekends, Your Honor.

24         THE COURT:  Well, you didn't count the days

25  right then from the 27th.  Five days would be

1    Saturday.  Not only that, you want --

2            MS. ROBERTS:  I'd like until Monday, Your

3    Honor.

4            THE COURT:  The 3rd?

5            MS. ROBERTS:  Yes, Your Honor.

6            THE COURT:  All right.  That will be done.

7    And I'll set up argument if I need it.  I'll look at

8    your papers and I'll see.  All right?

9            MS. ROBERTS:  Yes, Your Honor.

10           THE COURT:  Are you going to persist in your

11   *Franks* argument again?  Is there any reason to do

12   that?  There's nothing new you have to say on that, is

13   it?

14           MS. ROBERTS:  Your Honor, I'd like an

15   opportunity to just review the transcript and digest

16   everything.

17           THE COURT:  Don't run that dog out the kennel

18   anymore if you don't have any basis for doing it, will

19   you?

20           MS. ROBERTS:  Yes, Your Honor.

21           THE COURT:  All right.

22           MS. MANSFIELD:  Your Honor, just for planning

23   purposes for subpoenaing of witnesses on the

24   government's end, the defense subpoenaed for

25   April 3rd --

1            THE COURT:  I think that prudence would

2     dictate that in order to allow further briefing of the

3     defendant's motion, the trial will be continued

4     generally, and we will reset the trial date after we

5     know the result.

6            MS. MANSFIELD:  Thank you, Your Honor.

7            THE COURT:  But in regards to that, can you

8     go forward on the case if this motion to suppress is

9     granted?

10           MS. MANSFIELD:  Your Honor, he is

11    currently -- Mr. Haas is currently charged in Count

12    One with sex trafficking of children related to

13    information provided, but I would have to assess,

14    given that I'm fairly new to the case, there's a

15    possibility that we may still be able to go forward on

16    additional counts even if the motion is granted.

17           THE COURT:  So you're new to this.  You

18    inherited this, right?

19           MS. MANSFIELD:  That's correct, Your Honor.

20    But I'm certainly getting up to speed, but I do have

21    the knowledge of that count, and I believe that it's

22    not necessarily dependent on the evidence recovered

23    from the computer.

24           THE COURT:  Well, you want it all resolved at

25    one trial, do you, Ms. Roberts?

1        MS. ROBERTS:  Yes, Your Honor.

2        THE COURT:  All right.  We'll consider when

3   to set the whole case for a new trial date after we

4   look at this whole issue again.

5        It may be that in the coming days I may issue

6   an order further refining a little bit of what I want.

7   That doesn't mean it restricts you in what you want,

8   but it does mean that if I want something, I'd like

9   for you to address it.

10        All right?  Does that take care of everything

11  for now?

12        MS. MANSFIELD:  Yes, sir.

13        THE COURT:  Thank you very much.  We'll be in

14  adjournment.

15        (The proceedings were adjourned at 5:04 p.m.)

16

17    I, Diane J. Daffron, certify that the foregoing is

18   a correct transcript from the record of proceedings

19   in the above-entitled matter.

20                      /s/

21   _____        _____

22   DIANE J. DAFFRON, RPR, CCR           DATE

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No.  3:16CR139 |
| | ) | Hon. Robert E. Payne |
| RICHARD TODD HAAS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEFING ON MOTION TO SUPPRESS**

Defendant, Richard Todd Haas, by counsel, pursuant to this Court's Order of February 10, 2017 (ECF No. 24), submits supplemental briefing to address the issues raised by the Court in its Order and to provide further authority and analysis to the Court in support of his motion to suppress the laptop computer[1] seized from Mr. Haas's business truck.

In short, as evidenced by the testimony elicited at the February 8, 2017, hearing, and other evidence submitted to the Court,  (1) there was not probable cause under the search warrant for the government to seize Mr. Haas's laptop computer from his business truck, despite the issue of CW's reliability; (2) there was a fatal failure to establish probable cause in the affidavit due to the omission of the CW's criminal history and other evidence impacting her credibility, separate and apart from the *Franks* hearing issue; (3) the good faith exception cannot save the fatally flawed affidavit because of knowing and reckless falsity and omissions in the affidavit; and (4) despite the factual differences between *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016)

_____

[1] Defendant is no longer arguing for the suppression of the GPS device because the government stated that it will not be offering the GPS device into evidence if the case proceeds to trial.  At the hearing on February 8, 2017, the government stated, "We will state on the record we're not offering the GPS device into evidence."  Transcript of February 8, 2017, Hearing (hereinafter "Tran.") at 119.

and this case, the legal analysis and findings in *Lull* compel this Court to find that the unreliability of the informants in both cases produce the same result.

## Case History

Mr. Haas has been charged in a five-count indictment with sex trafficking of a child, in violation of 18 U.S.C. § 1591(a)(1); receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  Mr. Haas was arraigned by Magistrate Judge Novak on November 9, 2016, and a jury trial had been scheduled to commence on January 11, 2017.   On December 16, 2016, a Joint Motion to Continue the Jury Trial was filed, which was granted on December 20, 2016. (ECF Nos. 12, 13)

A motion to suppress was filed by Mr. Haas on January 3, 2017 (ECF No. 14), and after briefing, the court heard evidence and argument on February 8, 2017.  Upon completion of the arguments, the Court ordered further briefing as outlined in the February 10, 2017, Order (ECF No. 24).

## Argument

**1.      Absence of Probable Cause to Search**

Notwithstanding the fact that the affidavit contained no information about the CW's significant credibility problems, the warrant still lacked the requisite evidence necessary for a finding of probable cause that the computer found in Mr. Haas's business truck contained evidence of criminal activity.  The warrant failed to establish a sufficient nexus between the alleged criminal activity and the laptop computer in Mr. Haas's business vehicle; the warrant also failed to establish such a nexus between the place to be searched - his business vehicle - and the item to be seized, the laptop computer.  Nothing in the search warrant that the CW said

justified a search of the defendant's business truck for a laptop computer.  Therefore, the government failed to demonstrate probable cause for the search.

The chronology of events in this case involved the FBI collecting information, investigating the case, and then preparing and executing the first search warrant at Mr. Haas's residence.  *See* Ex. A.  During the search, two laptop computers were found at Mr. Haas's residence.  Tran. at 50.  When Mr. Haas was not found at the residence, authorities went looking for him at his workplace.  Ex. B at ¶ 25.  They found him in his business vehicle and also found a laptop in a computer bag in the business vehicle.  Nothing in the investigation, reports, affidavit or evidence from the hearing suggested that his business vehicle was ever connected with any alleged unlawful activity.  Additionally, there was no evidence that Mr. Haas had more than one laptop.  The CW never mentioned anything about a business vehicle.  And the search warrant failed to provide any description of the laptop.   Because the affidavit provided no justification for the seizure of the laptop from the business truck, and no nexus between the laptop in the business truck and unlawful activity, the suppression motion must be granted.

The affidavit references the CW's alleged viewing of child pornography on Mr. Haas's laptop computer at his home in May of 2016.  *See* Ex. B ¶ 8. At the hearing, the agent testified that it was a black laptop, a description that was absent from the affidavit or any other discovery.  *See* Tran. at 45.  No information was provided in the search warrant regarding the size of the laptop, the make of the laptop, or the model.

"In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *See United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir. 1993).  The affidavit supporting the search

warrant must demonstrate a nexus between the evidence sought and the place to be searched. *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016). That connection between the place to be searched and the evidence of criminal activity "must be specific and concrete, not 'vague' or 'generalized.'" *Id.* The Fourth Circuit has consistently held that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson,* 851 F.2d 727, 729 (4th Cir. 1988), *as cited in United States v. Doyle*, 650 F.3d 460, 471 (4th Cir. 2011). If the affidavit and search warrant do not present facts sufficient to demonstrate why law enforcement expects to find evidence in one place rather than in some other place, a judge may not find probable cause to issue a search warrant. *Brown*, 828 F.3d at 382. The question of whether an affidavit establishes a proper nexus is one guided by the facts under a totality of the circumstances inquiry. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In this case, the only evidence submitted in the search warrant and affidavit regarding illegal activity and a laptop computer involved CW allegedly seeing child pornography images on a single laptop computer in Mr. Haas's home in May of 2016; the search of Mr. Haas's business truck was on September 1, 2016. *See* Ex. B ¶ 8. No specific descriptive information was provided by CW regarding Mr. Haas's laptop - no information about color, size, make, model or features - or if it was a personal laptop as opposed to a business laptop.[2] The government simply failed to demonstrate any nexus between the criminal activity described in the affidavit and the search of Mr. Haas's business truck and seizure of the lap top inside. As this Court pointed out during the February 8, 2017, hearing, how does the affidavit "inform that

---

[2] Defendant could find no authority to support an inference that a laptop computer with child pornography is likely to be found in a business vehicle. Therefore, this Court should reject any argument raised by the government that endorses such an inference.

there is likely to be on the computer in the truck child pornography?"  Tran. at 132.  Therefore, absent the requisite connection between the illegal activity described in the search warrant and the place that was searched, Mr. Haas's business truck, the motion to suppress must be granted.

**2.      Omission of Damaging Information Rendered Warrant Invalid**

There was a fatal failure by the United States to justify its search through the search warrant at issue due to the omission of the CW's criminal history from the warrant and other evidence impacting on her credibility.  This evidence includes her status as an offender on probation, violations of that probation status, her deception of law enforcement, requests to law enforcement to assist with her legal problems, and efforts by law enforcement to assist her in fixing those legal problems.  *See* Tran. at 17-35 and Ex. F.  As presented by Agent Gonzalez at the hearing, CW's criminal history included an offense that resulted in her being placed on "felony" probation.  Tran. at 23.  She further had an outstanding charge in Henrico County for a driving offense, but lied to the arresting law enforcement officers by providing a false name and signing official legal papers in Henrico County using the false name.  Tran. at 30-31, 61-62.

These lies to law enforcement resulted in additional felony charges against CW which were pending at the time of the application for the search warrant, and apparently constituted violations of her supervisory status.  *See* Ex. F.  Additionally, she specifically requested the assistance of Agent Gonzalez with her legal predicament in Henrico County (and also, evidently, with her violation of probation) by asking how her situation could be "fixed."  Tran. at 35.  Agent Gonzalez then helped CW with "fixing" her legal problems in Henrico County.  Tran. at 32-33 (Gonzalez contacted a Henrico County police officer, took CW to court, and received assurances from Henrico police that the Henrico County Commonwealth's Attorney would be advised of her assistance to the FBI).  Apparently, the FBI also permitted CW to continue to

5

drive on a suspended license.  This would constitute the FBI allowing CW to act in direct

conflict with a court order.  All of this was intentionally left out of the affidavit.

Agent Gonzalez was aware that CW was on probation at the time of her conversations

with the FBI, and was aware that she was a prostitute (which he never included in the affidavit),

but testified that he was not aware of whether she was a convicted felon.  Evidently, neither he

nor anyone else at the FBI ran a criminal record check on this confidential witness with whom

they were working and relying upon.  This constitutes either gross negligence on the part of law

enforcement for failing to properly vet this cooperating witness, or willful blindness to the

credibility problems posed by this witness.  Agent Gonzalez, when asked by the Court whether

and to what extent he looked into the criminal history of the CW, he responded, "I didn't give

importance to it . . . .  I didn't think it was important at the time, so I didn't look into it."  Tran. at

28-29.  Yet the agent responded affirmatively to the Court's questioning about whether he would

run the criminal record if some unknown person called with information and the agent wanted to

meet with that person.  Tran. at 62-63.  This was one of the critical flaws in the application for

the search warrant - the agent's complete disregard for the crucial determination of the credibility

of his witness.

Where the primary basis for a probable cause determination is information provided by a

confidential informant, the affidavit must provide some information from which a magistrate can

credit the informant's credibility.  *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013).

"Cases that test the sufficiency of affidavits for warrants obtained based on informants are highly

fact-specific, but information about the informant's credibility or potential bias is crucial."

*United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014).  "To the extent that police have a

limited privilege to withhold some information to protect an informant's identity, *see United*

*States v. Weaver,* 99 F.3d 1372, 1378 (6th Cir. 1996); *United States v. Bourbon,* 819 F.2d 856,

859 (8th Cir. 1987), that privilege does not extend to wholesale omission of damaging credibility

information." *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014). "In this case,

however, the affidavit did not provide the magistrate with even a minimum of information on

credibility that might have triggered further inquiry. We cannot defer to the under-informed

finding of probable cause." *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014).

The *Glover* court found that the complete omission of such information regarding the

informant's credibility was sufficient to raise an inference that the officer acted in reckless

disregard for the truth, warranting a *Franks* hearing. *Id.* at 817–18, 820.

    In *United States v. Musgraves*, 831 F.3d 454, 460 (7th Cir. 2016), the Seventh Circuit

found that when law enforcement omit relevant and damaging credibility information regarding a

source, and "particularly his criminal record, prior deception of law enforcement, and

expectation of payment, the problem is serious." The *Musgraves* court stated that without this

information, the court cannot properly "assess the reliability of the informant relied upon to

authorize a highly intrusive search." *Id*.

    Jury instructions that are used in trials before this Court bear out the simple fact that

felony convictions and cooperation with law enforcement authorities present tangible credibility

problems that a fact finder should consider. When a witness testifies in a trial, the jury is warned

that a felony conviction is a factor that they may consider in weighing the felon's credibility.

When a witness provides cooperation to law enforcement in return for something of value, such

as reduced charges or assistance by law enforcement, jurors are warned as a matter of law of

receiving such evidence with caution and great care. *See* Sand *et al., Modern Federal Jury*

*Instructions*, Instruction 1.14 (5th Cir)(2001 Ed.).

In this case, Agent Gonzalez failed to run a simple criminal record check of this informant, even though he knew she had likely been convicted of a felony offense, that she had violated conditions of her supervision, that she had lied to law enforcement during her most recent arrest, and that she sought the assistance of the FBI in fixing the many legal problems she faced.  Such assistance is the equivalent of payment or compensation for cooperation.  All of this information significantly impacts CW's credibility; all of this information should have been provided in the search warrant and affidavit.  Had this information been provided, CW would have been shown to be unreliable, and the warrant would unquestionably lack in probable cause to allow the search of Mr. Haas's laptop computer found in his business truck.  *See United States v. Hall*, 113 F.3d 157, 159 (9th Cir.1997) (state trooper's failure to disclose convictions that bore on informant's testimony rendered informant's already weak testimony insufficient to support issuance of warrant to search defendant's trailer).

If the government claims that evidence of CW's statements were corroborated by the recorded telephone calls, thereby enhancing her reliability, nothing in the telephone calls advanced the notion that evidence of criminal activity would be found on Mr. Haas's laptop computer in his business vehicle.  As the Court pointed out during the hearing on February 8, 2017, the agents could have instructed CW to have "further conversations [with Mr. Haas] in which she talked more specifically" about child pornography and nude pictures.  *See* Tran. at 131.  The conversations did not involve nearly the specificity required to corroborate the otherwise unreliable CW.  Consequently, any alleged "corroboration" of the untrustworthy CW did not rise to the level required to resurrect CW's reliability problems in the search warrant and affidavit.

8

264

### 3.    Knowing or Reckless Falsity Precludes Reliance on Good Faith Exception

The good faith exception under *United States v. Leon*, 468 U.S. 897 (1984) cannot resurrect the fatally flawed affidavit in this case because the case agent submitted a search warrant and affidavit with knowing and reckless falsities and because the agent intentionally and recklessly omitted material facts from the affidavit.  As described above, Agent Gonzalez failed to include in the search warrant and affidavit all of the known evidence that negatively impacted the credibility of his source, to include CW's criminal history, her status as an offender on probation, violations of that probation status, her deception of law enforcement, requests to law enforcement to assist with her legal problems, and efforts by law enforcement to assist her in fixing those legal problems.  All of those facts were material and should have been submitted to the magistrate.  The failure to provide this information in the search warrant precludes the government from relying on the good faith exception to the warrant requirement.

The search warrant and affidavit also include a material misstatement.  The affidavit stated that in the phone calls between Mr. Haas and CW, "Haas has also requested nude photos of underage females in exchange for money."  Ex. B ¶ 11.  Transcripts of the phone calls make no reference to a request for nude photos. [3]

Additionally, there are significant indicia that Agent Gonzalez, at a minimum, demonstrated a reckless disregard for the truth by including the uncorroborated statements of a person whom he knew to be unreliable.  The first sentence of the affidavit states that the CW provided information that indicated that Mr. Haas was "actively producing child pornography." Ex. B ¶ 7.  The evidence adduced during the hearing clearly demonstrated that Agent Gonzalez made no effort to corroborate the information.  The CW reported that, four years prior, Mr. Haas

---

[3] One phone call included a request for photos, but not nude photos.  *See* Ex. E at 2.

told her that "he had a neighbor who was approximately 12 years old that would come over and perform oral sex on him." Ex. B ¶ 7. Again, the evidence advanced at the hearing clearly demonstrated that Agent Gonzalez took no measures to corroborate this information. The CW allegedly stated that the child pornography Mr. Haas supposedly showed her on the May 2016 date at his residence depicted images of girls that he knew "because they lived in his neighborhood." *Id*. at ¶ 8. Once again, Agent Gonzalez made no attempt to corroborate this information though he knew that CW was not reliable. Finally, the affidavit references how Mr. Haas "constantly discussed the production of child pornography with CW and requested CW to find an underage female in order to produce child pornography." Ex. B ¶ 10. The alleged conversation(s) - which CW reported during a July 21, 2016, meeting with Agent Gonzalez - were not recorded and were uncorroborated. Nonetheless, Agent Gonzalez included the information provided him knowing the source to be unreliable.

The good faith exception to the exclusionary rule was set forth in *Leon*. The Supreme Court in *Leon* held that the exclusionary rule was established to deter police misconduct. *See Leon*, 468 U.S. at 918; *United States v. Calandra*, 414 U.S. 338, 347 (1974). The theory behind *Leon's* good faith exception was that if the police acted in good faith and objectively and reasonably relied upon a subsequently invalidated search warrant, then the exclusion of evidence obtained in this manner could not be justified. *Leon*, 468 U.S. at 922. Such exclusion would not serve as a viable deterrent to police misconduct. *See United States v. DeQuasie*, 373 F.3d 509, 519 (4th Cir. 2004).

There are four circumstances, however, in which the *Leon* good faith exception will not apply:

> first, when the warrant is based on an affidavit containing 'knowing or reckless falsity'; second, when the magistrate has simply acted as a 'rubber stamp' for the

10

266

> police; third, when the affidavit does not 'provide the magistrate with a
> substantial basis for determining the existence of probable cause'; and finally,
> when the warrant is so 'facially deficient' that an officer could not reasonably rely
> on it.

*United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996); *see also United States v. DeQuasie,*
373 F.3d 509, 519–20 (4th Cir. 2004). A knowing and intentional material omission, as well as
material misstatements, in the search warrant would satisfy the first circumstance. *See United
States v. Jones*, 200 Fed.Appx. 229, 230 (4th Cir. 2006) (unpublished) ("With regard to this
circumstance, courts have found that the error **or omission** in the material presented to a
magistrate must be significant to the finding of probable cause in order for the good faith
exception not to apply") (emphasis added), citing to *United States v. Hammond,* 351 F.3d 765,
774 (6th Cir. 2003); *United States v. Capozzi,* 347 F.3d 327, 332 (1st Cir. 2003); and *United
States v. Tuter,* 240 F.3d 1292, 1299 (10th Cir. 2001). And it is the first circumstance upon
which Mr. Haas relies to demonstrate that the good faith exception should not apply in this case.

The affidavit in this case failed to include any reference to the credibility or reliability of
the CW. The affidavit also failed to provide any information about CW's criminal history. By
themselves, these factors may or may not have been sufficient to constitute a reckless and
intentional material omission, but that is not the only question for the Court in this case. This
Court must also confront omissions regarding: (1) CW's status as an offender on probation; (2)
CW's violations of probation; (3) CW's deception of law enforcement; (4) CW's requests to law
enforcement to assist with her legal problems; (5) efforts by Agent Gonzalez and other law
enforcement officer to assist CW with her legal problems; and (6) the misstatements in the
affidavit referenced above. *See United States v. Glover*, 755 F.3d 811, 817-18, 820 (7th Cir.
2014) (the Seventh Circuit in *Glover* found that the omission of negative credibility information
in the search warrant raised an inference that the officer acted in reckless disregard for the truth).

11

267

The authorities were also aware of additional information which would inform the magistrate that it was unlikely that any evidence of criminal activity would be found on a laptop computer in Mr. Haas's business vehicle.  Law enforcement had Mr. Haas's text messages to CW, one of which specifically stated, "there's no way I can get there this evening and then get back home can I see you tomorrow night or are you driving down here any this week?  P.S. don't have laptop." Tran. at 84. *See* Ex. G, p. 3.  Additionally, in the recorded phone calls, CW tried to elicit from the defendant a statement regarding the age of the person who he wants her to bring for a meeting.  *See* Ex. E at 2.  The CW states, "what's the range that you like?"  Rather than answering the question posed, the defendant states, "it ain't so much **me** as it is like **other** . . . ." *Id*. (emphasis added).  It is clear from the recording that the defendant is stating that whatever it is they are talking about, or whoever it is that the defendant is talking about with the CW, this person or juvenile is not intended for **him**, but for **some other person or persons**.

All of these omissions were known to law enforcement at the time of the warrant application.  Failure to provide this critical information to the magistrate judge in applying for a search warrant demonstrates intentional and reckless material omissions.  This is especially true when considering that CW's statement about seeing child pornography images on Mr. Haas's home laptop computer was the only evidence in the search warrant and affidavit that connected Mr. Haas's computer with any unlawful activity.  Consequently, the deficiencies in the warrant cannot be remedied through the good faith exception.

### 4.   *Lull* is Applicable to this Case

Despite any factual differences between *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016) and this case, the legal analysis and findings in *Lull* compel this Court to find that the

12

268

unreliability of the informants in both cases should produce the same result. *See also United States v. Tate*, 524 F.3d 449, 451 (4th Cir. 2008).

In *Lull*, the Fourth Circuit held that when a law enforcement officer recklessly omits from his affidavit material facts which undermine the reliability of a confidential informant, reversal is required. *Lull*, 824 F.3d at 118-20. *See also United States v.Wharton*, 840 F.3d 163, 169 (4th Cir. 2016). The facts omitted in *Lull* involved a search warrant executed on Lull's residence. In the application for the search warrant, the officer provided information from an informant which described the recent sale of controlled substances from the residence. *Lull*, 824 F.3d at 113. What the officer did not include in the affidavit was that the informant had tried to steal some of the money - $20.00 - he received from the police to make the buy. *Id*. at 112-13. The Fourth Circuit invalidated the search warrant, finding that the omission undermined the reliability of the informant. *Id*. at 111.

The court explained that the informant provided the factual basis for the affidavit. The court then withdrew from the affidavit the informant's statements because the informant was found to be inherently unreliable. *Id*. at 118. The remaining evidence in the affidavit was insufficient to connect the defendant to the drug transaction, so the court vacated the conviction and sentence. *Id*. at 119-20.

Mr. Haas asks this Court to do in his case what the Fourth Circuit did in *Lull*. The omissions from the affidavit by Agent Gonzalez were intentional and reckless, and were material to a finding of the CW's reliability. The only factual basis to support a finding that evidence of unlawful activity would be found on Mr. Haas's laptop computer came from CW. If this Court is to excise from the affidavit the statements of CW, as the court did in *Lull*, the remaining

13

269

information fails to establish probable cause that any evidence of unlawful activity would be found on Mr. Haas's computer.

A distinction can be drawn between the omissions in *Lull* and the omissions in this case. *Lull* involved the unlawful acts of the informant while conducting an undercover purchase of drugs that was not reported in the affidavit. While the unlawful activities in this case did not involve the theft of police funds, the CW in this case was engaging in unlawful activities during her observations of Mr. Haas and his laptop that were not reported in the affidavit. The CW was acting as a prostitute during her interactions with Mr. Haas on the date in question. This unlawful activity was not reported to the magistrate; the affidavit merely stated that she was acting as an escort. The CW apparently drove to Mr. Haas's residence; she was violating a court order when she drove there on her suspended license. These illegal activities were all conducted in violation of CW's supervised probation, a fact that also failed to be reported to the magistrate judge. Along with the cooperation assistance provided by law enforcement to CW and the fact that CW had a criminal record, the reliability issues in this case rise to at least the level of those in *Lull*. Consequently, as in *Lull*, the illegally obtained laptop computer and evidence subsequently obtained from the forensic analysis of the laptop, must be suppressed.

## Conclusion

Mr. Haas respectfully requests that the Court suppress all digital evidence obtained pursuant to the unlawful search and seizure of his laptop computer from his business vehicle on September 1, 2016.

Respectfully Submitted,
RICHARD TODD HAAS


By: _____/s/_____
            Counsel

14

270

Robert J. Wagner, Esq.
VSB# 27493
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0808 (phone)
(804) 648-5033 (fax)
robert_wagner@fd.org

Carolyn V. Grady, Esq.
VSB#30445
Office of the Public Defender
701 E. Broad Street, Suite 3600
Richmond VA 23219
(804) 565-0855 (phone)
(804) 648-5033 (fax)
carolyn_grady@fd.org

Valencia Roberts, Esq.
VSB #44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0885 (phone)
(804) 648-5033 (fax)
valencia_roberts@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to Heather Mansfield, Assistant United States Attorney, United States Attorney's Office, 919 East Main Street, Suite 1900, Richmond, Virginia, 23219.

_____/s/_____
Counsel

Valencia Roberts, Esq.
VSB #44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0885 (phone)
(804) 648-5033 (fax)
valencia_roberts@fd.org

15

271

U.S. v RICHARD TODD HAAS                              3:16CR139

## EXHIBIT LIST TO DEFENDANT'S SUPPLEMENTAL
## BRIEFING ON MOTION TO SUPPRESS

A.  Search Warrant for Monath Road and Volkswagen Jetta

B.  Search Warrant for Tractor Trailer Truck and Samsung Galaxy S5

C.  Search Warrant Return for Monath Road

D.  Transcript of August 14, 2016 Telephone Call

E.  Transcript of August 16, 2016 Telephone Call

F.  Stipulations

G.  Text Messages

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia ▾

AUG 3 1 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

236 Monath Rd, North Chesterfield, VA 23236 and
a 2015 White VW Jetta, license plate VEU2010,
VIN 3VW2K7AJ4FM357543

)
)
)
)
)
)

Case No. 3:16ms370

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A and B, fully incorporated by reference herein;

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment C, fully incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(2)(a) | Possession, Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2251 | Production of child pornography |

The application is based on these facts:

See attached Affidavit, fully incorporated by reference herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

_____ Gonzalez, FBI Special Agent
*Printed name and title*

BY _____

DEPUTY CLERK

Sworn to before me and signed in my presence.

/s/

Roderick C. Young
United States Magistrate Judge
*Judge's signature*

Date: _____ 08/31/2016 _____

City and state: Richmond, Virginia _____

Hon. Roderick C. Young, United States Magistrate Judge
*Printed name and title*

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division



F I L E D
AUG 3 1 2016
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| IN THE MATTER OF THE SEARCH OF: | Case No. 3:16ms370 |
| 236 Monath Rd, North Chesterfield, Virginia 23236, and a 2015 White VW Jetta, license plate VEU2010, VIN: 3VW2K7AJ4FM357543 | FILED UNDER SEAL |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Melvin Gonzalez, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent of the Federal Bureau of Investigation (FBI), United States

Department of Justice, and have been so employed by the FBI for over ten years.  I am currently

assigned to the Richmond Field Office, Richmond, VA.  I am assigned to the Child Exploitation

Task Force which conducts investigations pertaining to child sex trafficking, child pornography,

and child abductions.  I have received training from the FBI in the areas of child exploitation.  I

was previously assigned for three years to the San Juan Field Office, where I investigated violent

crimes, gangs, and drug trafficking.  During my career in law enforcement, I have received

extensive training in the conduct of a variety of investigations, including drug investigations,

organized crime, violent crime, white collar crime, and others.  In my experience, I have

participated in a wide range of investigations.  That experience has included receiving and

analyzing information, conducting interviews, collecting and processing physical evidence, and

preparing evidence for trial.

2.     In the course of my employment as a sworn law-enforcement officer, I have participated

1

274

in the execution of numerous search warrants resulting in the seizure of computers, magnetic

storage media for computers, other electronic media, and other items evidencing violations of

state and federal laws, including various sections of Title 18, United States Code §§ 1591, 2251,

2252, and 2252A, involving child exploitation and child pornography offenses.

3.   I have probable cause to believe that **236 Monath Rd, North Chesterfield, Virginia**

**23236 and a 2015 white VW Jetta License plate VEU2010, VIN 3VW2K7AJ4FM357543**

("SUBJECT PREMISES") contain contraband and evidence of a crime, fruits of a crime, and

instrumentalities of violations of:  18 U.S.C. § 2251 (production of child pornography); 18

U.S.C. § 2251A (Selling or Buying of Children); 18 U.S.C. § 2252 (possession of, knowing

access or attempted access with intent to view, child pornography); 18 U.S.C. § 2422 (enticement

or coercion of a minor to engage in illegal sexual activity); and 18 U.S.C. § 1591( sex trafficking

of children).  I submit this application and affidavit in support of a search warrant authorizing a

search of the SUBJECT PREMISES, as further described in Attachment A and B, incorporated

herein by reference, which is located in the Eastern District of Virginia.  Located within the

SUBJECT PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of

the foregoing criminal violations.  I request authority to search the entire SUBJECT PREMISES,

including the residential dwelling and any computer, communication devices, and electronic

media located therein where the items specified in Attachment C may be found, and to seize all

items listed in Attachment C as contraband and instrumentalities, fruits, and evidence of crime.

4.   The statements contained in this affidavit are based in part on:  information provided by

FBI Special Agents, FBI Task Force Agents, and other law-enforcement officers; written reports

about this and other investigations that I have received, directly or indirectly, from other law-

2

enforcement agents; information gathered from the service of administrative subpoenas; the

results of physical and electronic surveillance conducted by law-enforcement agents;

independent investigation and analysis by FBI agents/analysts and computer forensic

professionals; and my experience, training, and background as a Special Agent with the FBI.

Because this affidavit is being submitted for the limited purpose of securing authorization for the

requested search warrant, I have not included each and every fact known to me concerning this

investigation. Instead, I have set forth only the facts that I believe are necessary to establish the

necessary foundation for the requested warrant.

## DEFINITIONS

5.  The following definitions apply to this Affidavit and attachments hereto:

   a.  "Erotica," as used herein, means materials or items that are sexually arousing to

       persons having a sexual interest in minors but that are not, in and of themselves,

       legally obscene or that do not necessarily depict minors in sexually explicit

       conduct.

   b.  **"Child Pornography,"** as used herein, is defined in 18 U.S.C. § 2256(8) as any

       visual depiction of sexually explicit conduct where (a) the production of the visual

       depiction involved the use of a minor engaged in sexually explicit conduct, (b) the

       visual depiction is a digital image, computer image, or computer-generated image

       that is, or is indistinguishable from, that of a minor engaged in sexually explicit

       conduct, or (c) the visual depiction has been created, adapted, or modified to

       appear that an identifiable minor is engaged in sexually explicit conduct.

   c.  **Visual depictions** include undeveloped film and videotape, and data stored on

3

computer disk or by electronic means, which are capable of conversion into a visual image, and data which are capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. See 18 U.S.C. § 2256(5).

d. **Minor** means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e. **Sexually explicit conduct** means actual or simulated: (i) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

## TECHNICAL TERMS

6. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. **"Computer,"** as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

b. **"Computer Server"** or **"Server,"** as used herein is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server

4

receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

c.   **"Computer hardware,"** as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d.   **"Computer software,"** as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and

5

278

utilities.

e. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

f. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

6

279

drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

g. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

h. **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

7

280

a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

i.   **PDA**: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

j.   **Tablet**: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen.   Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.   Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those

8

functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

k. The "**Internet**" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l. "**Internet Service Providers**" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

9

m. "**Internet Protocol address**" or "IP address" refers to a unique number used by a computer to access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

n. "The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o. "**Website**" consists of textual pages of information and associated graphic

10

283

images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## "BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7. On June 16, 2016, members of the FBI Richmond Child Exploitation Task Force, received information regarding a suspect, Richard Todd Haas, which indicated that Haas was both interested in and actively producing child pornography. The information was provided by a confidential witness (CW), who has known Haas for approximately four years. During that time, CW provided escort services to Haas. Haas advised CW during one of their encounters that he had an interest in what he described as younger females. Haas advised CW that he had a neighbor who was approximately 12 years old that would come over and perform oral sex on him. CW and Haas parted ways shortly after that conversation four years ago.

8. According to CW, in May 2016, CW and Haas reconnected, and the two arranged to meet at his residence located in Chesterfield County, Virginia. CW was dropped at a house she identified as being the residence at which she met Haas four years ago. During this visit, Haas again brought up his interest in juvenile females. Haas displayed his laptop to CW, which contained images of juvenile females. CW described the images as depicting juvenile females between the ages of 5 and 12 in various stages of undress and engaged in sexually explicit acts. CW advised that she was shown between 50 and 100 images of these girls. Haas advised CW that he knew the victims because they lived in his neighborhood. While Haas displayed the images to the CW, he masturbated to the photos. Haas told CW that he would like for CW to be involved in the production of images and videos of child pornography with juvenile females and

11

inquired as to whether CW would be able to help provide these females for such production. CW advised that, while she was disgusted with what Haas was suggesting, CW played along in order to get more information for what crimes Haas may be committing.

9. Agents displayed a photo to CW, which CW identified as Haas. CW also provided FBI agents with a phone number for Haas—804-402-6003. FBI agents cross searched 804-402-6003 with law-enforcement databases and were able to determine that it has been used as a contact number for Haas in law-enforcement investigations.

10. On July 21, 2016, FBI agents met with CW again. CW advised that she had multiple telephone conversations with Haas and had met Haas in person one additional time in the vicinity of Henrico County, Virginia. CW advised that Haas was driving a light-colored Jetta. Haas constantly discussed the production of child pornography with CW and requested CW to find an underage female in order to produce child pornography. Haas also requested CW to obtain nude images of an underage female in exchange for money.

11. On August 12, 2016, and August 13, 2016, CW recorded two telephone calls with Haas at 804-402-6003. During the calls, Haas advised CW that he was previously trying to contact CW because he was with someone and wanted to meet with CW. CW understood that Haas was referring to an underage female. Haas also advised CW that he was out of town in New Jersey taking care of a job and later advised that he was in the country. CW understood Haas to be referring to the production of child pornography. Haas also requested nude photos of underage females in exchange of money. Haas requested CW to coordinate a meeting between him and an underage female not older than 12 years old. Haas advised CW that the younger the better inasmuch as the others prefer younger females. Haas advised CW that she could make a lot of

12

money from it. Before the call terminated, Haas requested that CW refer to underage females as shoes and to specify their age using shoe sizes.

12. Based on these recordings, FBI agents believe that Haas may be involved with others in the production and distribution of child pornography. FBI agents also believe that Haas could be traveling outside of Virginia in order to engage in criminal activity.

13. CW identified a photo of the residence located at 661 Greencastle Road, North Chesterfield, Virginia 23236 as the residence at which she visited Haas and where he displayed the child pornography images. According to CLEAR records, Haas was the owner of the 661 Greencastle Rd. residence until July 2016 when he sold the residence.

14. On August 18, 2016, FBI agents received a complaint from the Richmond Police Department, indicating that Haas had sexually molested an 11-year-old female ("CV1") on occasions. According to the police report, since September 2015, CV1 was sent by her mother to Haas's residence to provide cleaning services. Haas picked up the child and transported her to his residence.

15. CV1 was forensically interviewed and provided the following information. CV1 was living at the Richmond Inn located at 6346 Midlothian Turnpike, Richmond, Virginia 23225 before February 2016 with her biological mother and her biological father. CV1 states that she and her father would go "beg for money" close to the Richmond Inn. The first time CV1 remembers meeting Haas, who she refers to as Todd, she was panhandling with her father. CV1 states that Todd came by where they sat one day and gave her father five dollars. A short time later, Todd came back, gave her father sixty dollars, and asked him if CV1 could come to his house to babysit. The father declined to let CV1 babysit initially, but, when Todd asked if she

13

could come clean his house instead, the father agreed. Todd picked CV1 up at the hotel later that day and brought her to his house in Chesterfield County.

16.   During the initial visit to Todd's house, CV1 cleaned the kitchen by doing the dishes and vacuuming. At some point, Todd asked CV1 to come to the living room where he was sitting on the floor in front of the couch. Todd asked CV1 to lie down on the couch, which she did. CV1 said that Todd pulled her pants down and pushed her shirt up. CV1 sat up and pulled her pants up and attempted to exit the room. Todd stopped her and told her to lie back down on the couch. Todd again pulled down her pants and rubbed her on the outside of her vagina skin to skin. CV1 asked to go home, and Todd drove her back to the Richmond Inn, gave her $200, and told her to give it to her parents. Todd told CV1 that she could not tell anyone what he had done or he would be arrested and sent to jail. CV1 advised that this happened on at least 5 occasions with each time being the same as the first, although the amount of money he gave her would change each time.

17.   On August 26, 2016, CV1's guardian was interviewed. CV1's guardian advised that CV1 told her that Haas had given her from $200 to $600 every time she had an encounter with him. CV1's guardian stated that she has had custody of CV1 since April 2016 and that she was not aware that CV1's mother had access to CV1 when CV1 was visiting other family members. CV1's guardian said the last time Haas had access to CV1 he picked her up at her brother's residence and sexually abused CV1 in his vehicle. CV1's guardian said that CV1's mother coordinated the meeting. CV1's guardian believes this meeting took place sometime in June 2016.

14

287

18. CV1 advised her guardian that Haas told her that CV1's mother was in the process of giving him custody of CV1 so she didn't have to beg for money again. CV1 also advised her guardian that Haas told her not to worry because he also sexually abused one of his kids.

19. While CV1 was unable to identify a photo of Haas, CV1's guardian confronted CV1's mother and obtained a telephone number for Haas, which was 804-402-6003. CV1's guardian called Haas to corroborate his identity. CV1's guardian told law-enforcement that the man who answered her call identified himself as Richard Todd Haas. CV1's mother advised CV1's guardian that Haas has a tree service business.

20. FBI agents served Verizon Wireless with a Subpoena and obtained Subscriber information for 804-402-6003. According to the records obtained, 804-402-6003 is registered to Richard T Haas, Account 552599036-1, PO Box 35085, North Chesterfield, Virginia.

21. According to CLEAR reports, PO Box 35085, North Chesterfield, Virginia belongs to Haas. Haas's Virginia DMV records also display the address of PO Box 35085, North Chesterfield, Virginia. Virginia DMV records also indicate a new dwelling address for Haas at the SUBJECT PREMISES, which was added on July 14, 2016.

22. FBI agents conducted a telephone analysis and discovered that Haas's cellular telephone number had contacted the Richmond Inn at 804-276-8500 five times in April 2016. FBI agents also identified more than 60 text messages and 100 telephone calls between Haas's cellular telephone number and CV1's mother's phone number from May 2016 to July 2016.

23. The FBI has conducted surveillance at the SUBJECT PREMISES for several days. On numerous occasions, including August 29, 2016, the surveillance team observed Haas depart the SUBJECT PREMISES in a 2015 white VW Jetta, License plate VEU2010. Haas has been

15

288

observed driving to his work location at TMS Services LLC, 270 Labrook Concourse, Richmond, Virginia 23234.

24.  According to CLEAR Records, Haas is the principle executive for TMS Services LLC, an equipment and leasing business, which was incorporated in 2001 with a registered address of 661 Greencastle Road, North Chesterfield, Virginia 23236.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, COLLECT, RECEIVE CHILD PORNOGRAPHY AND SEEK TO SEXUALLY EXPLOIT CHILDREN

25.  Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize web-based sites to seek children to sexually exploit them by having sexual encounters or obtaining images of child pornography:

    a.    Individuals who access with intent to view, possess, collect, receive and distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

    b.    Individuals who access with intent to view, possess, collect and receive child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and

16

gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who access with intent to view, possess, collect and receive child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who access with intent to view, possess, collect and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.      Individuals who access with intent to view, possess, collect and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of

17

individuals with whom they have been in contact and who share the same interests in child pornography.

f.     Individuals involved in sexually exploiting children and who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest.  Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images and children victims of sexual exploitation.  Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.     Individuals who access with intent to view, possess, collect and receive child pornography prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.     Individuals involved in sexually exploiting children sometimes have double lives and concealed forms of communication with these victims.  These individuals also create fictitious profiles pertaining to web base accounts such as emails, chatting and forum sites. These individuals with double lives can be involved in children related activities in order to have direct access to new victims. It is common for these individuals to use mobile devices connected to public Wi-Fi internet to communicate with victims and schedule dates for sexual encounters.

i.     Individuals who are child predators and sexually exploit children search for

18

291

children who are vulnerable and easily manipulated. These individuals seek for children with low self-esteem and who are experiencing problems at home.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

26.   Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. It has also revolutionized the methods that individuals will use to interact with and sexually exploit children. Computers serve four functions in connection with child pornography: production, communication, distribution, and storage.

27.   **Production.** Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

28.   **Distribution and Communication.** A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability

19

292

to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

29. **Storage.** The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

30. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

31. Individuals also use online resources to retrieve and store child pornography, including

services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

32. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33. As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

21

294

34. *Probable cause.* I submit that if a computer or storage medium is found in the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Depending on a variety of factors, a particular computer could easily not overwrite deleted files with new data for many months, and in certain cases, conceivably ever.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

22

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the

23

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

24

297

accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to engage in a child pornography offense (whether it be to produce, distribute, transport, receive or possess child pornography), the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: 1) data that is evidence of how the computer was used; 2) data that was sent or received; 3) notes as to how the criminal conduct was achieved; 4) records

25

298

of Internet discussions about the crime; and 5) other records that indicate the
nature of the offense.

36. *Necessity of seizing or copying entire computers or storage media.* In most cases, a
thorough search of a premises for information that might be stored on storage media often
requires the seizure of the physical storage media and later off-site review consistent with the
warrant. In lieu of removing storage media from the SUBJECT PREMISES, it is sometimes
possible to make an image copy of storage media. Generally speaking, imaging is the taking of a
complete electronic picture of the computer's data, including all hidden sectors and deleted files.
Either seizure or imaging is often necessary to ensure the accuracy and completeness of data
recorded on the storage media, and to prevent the loss of the data either from accidental or
intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the
       form of documents and files that can be easily viewed on site. Analyzing
       evidence of how a computer has been used, what it has been used for, and who
       has used it requires considerable time, and taking that much time in the SUBJECT
       PREMISES could be unreasonable. As explained above, because the warrant calls
       for forensic electronic evidence, it is exceedingly likely that it will be necessary to
       thoroughly examine storage media to obtain evidence. Storage media can store a
       large volume of information. Reviewing that information for things described in
       the warrant can take weeks or months, depending on the volume of data stored,
       and would be impractical and invasive to attempt on-site.

26

299

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the SUBJECT PREMISES.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

38.  Because multiple people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and

27

300

perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that

that it is possible that the things described in this warrant could be found on any of those

computers or storage media, the warrant applied for would permit the seizure and review of those

items as well.

## SPECIFICITY OF SEARCH WARRANT RETURN

39.   Consistent with the Court's current policy, the search warrant return will list the

model(s) and serial number(s) of any and all computers seized at the SUBJECT PREMISES and

include a general description of any and all associated peripheral equipment that has been seized.

Additionally, the search warrant return will include the total numbers of each type of digital

media that has been seized (*e.g.,* "ten (10) 3.5" diskettes; twenty (20) CDs; twenty (20) DVDs;

three (3) USB drives; one (1) 256 MB flash memory card," etc.)

## NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

40.   Moreover, the Government will file a written pleading in this case within 120

days after the execution of the search warrant notifying the court that the imaging process of

digital evidence seized from the target location is complete, and the forensic analysis of

computers and media has begun. Such notice will include confirmation that written notice has

been provided to the defendant or his counsel informing the defendant that the forensic

examination of evidence seized from him has actually begun. Such notice to the defendant and

the Court is not intended to mean, and should not be construed to mean, that the forensic analysis

is complete, or that a written report detailing the results of the examination to date will be filed

with the Court or provided to the defendant or his counsel. This notice does not create, and is

not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of

28

this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

## CONCLUSION

41.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment C of this Affidavit, are located at the SUBJECT PREMISES, described in Attachments A and B.  I respectfully request that this Court issue a search warrants for the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment C.

Melvin Gonzalez
Special Agent
Federal Bureau of Investigation


Seen and approved by:

Thomas K. Johnstone IV
Special Assistant United States Attorney


Sworn to me this 31st day of August 2016


/s/
Roderick C. Young
United States Magistrate Judge


29

302

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 236 Monath Road, North Chesterfield, Virginia 23236, and a 2015 White VW Jetta, license plate VEU2010, VIN: 3VW2K7AJ4FM357543 | Case No. 3:16ms370 **Filed Under Seal** |

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 236 Monath Rd, North Chesterfield, Virginia 23236, is identified as follows: a single-level house with white siding and black shutters. The house is located in Chesterfield County and has a brick foundation. In the front of the house, there are several brick steps that lead to the front entrance door, which is brown. The driveway is to the right of the house.

The premises to be searched includes any appurtenances to the real property located at 236 Monath Rd, North Chesterfield, Virginia 23226, and any storage units, outbuildings, and vehicles parked at the residence.

30



31

304

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
236 Monath Rd, North Chesterfield, Virginia
23236 and a 2015 White VW Jetta, license plate
VEU2010, VIN:  3VW2K7AJ4FM357543

Case No. 3:16ms370

**Filed Under Seal**

**ATTACHMENT B**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The location known as 2015 White VW Jetta, license plate VEU2010, VIN:

3VW2K7AJ4FM357543, is identified as follows:



32

305

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>236 Monath Rd, North Chesterfield, Virginia<br>23236 and a 2015 White VW Jetta, license plate<br>VEU2010, VIN: 3VW2K7AJ4FM357543 | Case No. 3:16mS370<br><br>**Filed Under Seal** |

## ATTACHMENT C

### EVIDENCE TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal

offense, contraband, the fruits of crime, or property designed or intended for use or which is or

has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §

2251(production of child pornography); 18 U.S.C. § 2251A(Selling or Buying of Children); 18

U.S.C. § 2252 (possession of, knowing access or attempted access with intent to view, child

pornography); 18 U.S.C. § 2422(enticement or coercion of a minor to engage in illegal sexual

activity); and 18 U.S.C. § 1591( sex trafficking of children).

1. Computers or storage media used as a means to commit the violations described above.

2. GPS devices

3. Any computer or storage medium whose seizure is otherwise authorized by this

   warrant, and any computer or storage medium that contains or in which is stored records

   or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the

      things described in this warrant were created, edited, or deleted, such as logs,

      registry entries, configuration files, saved usernames and passwords, documents,

33

306

browsing history, user profiles, email, email contacts, "chat," instant messaging

logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious

software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

34

307

    k.  records of or information about Internet Protocol addresses used by the

        COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including

        firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

        web pages, search terms that the user entered into any Internet search engine, and

        records of user-typed web addresses; and

    m.  contextual information necessary to understand the evidence described in this

        attachment.

4.  Routers, modems, and network equipment used to connect computers to the Internet.

5.  Child pornography and child erotica.

6.  Any cameras capable of producing paper or digital photographs and/or audio-visual

   recordings

7.  Records, information, and items relating to violations of the statutes described above

   including

    a.  Records, information, and items relating to the occupancy or ownership of the

        SUBJECT PREMISES, including utility and telephone bills, mail envelopes, or

        addressed correspondence; Records, information, and  items relating to the

        ownership or use of computer equipment found in the above residence, including

        sales receipts, bills for Internet access, and handwritten notes and ownership of

        vehicles at the SUBJECT PREMISES;

    b.  Records and information relating to the identity or location of the persons

        suspected of violating the statutes described above; and

35

308

c. Records and information relating to sexual exploitation of children.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

36

309

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 3:16MS371 |
| 1995 Ford Tractor-Trailer Truck, license plate 26-392, | ) |
| VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, | ) |
| model SM-G900V, 990004913336164 | ) |

## SEARCH AND SEIZURE WARRANT

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____Virginia_____
*(identify the person or describe the property to be searched and give its location):*

See Attachments A and B, fully incorporated by reference herein

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the
property to be seized):*

See Attachment C, fully incorporated by reference herein

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before ____9/15/2016____
                                                                    *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.       ☐ at any time in the day or night as I find reasonable cause has been
                                                                 established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Roderick C. Young                                                       .
                         *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30).*
                                                                       ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  9/1/2016 @ 11:05am                    _____
                                                                                     *Judge's signature*

City and state:   Richmond, VA                              Roderick C. Young
                                                                        United States Magistrate Judge
                                                                               *Printed name and title*

**EXHIBIT B**

310

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
1995 Ford Tractor-Trailer Truck, license plate 26-
392, VIN: 1FTYY90V6SVA73472, and a
Samsung Galaxy S5, model SM-G900V,
990004913336164

Case No. 3:16mS371

**Filed Under Seal**

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The vehicle known as a 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN:

1FTYY90V6SVA73472, a picture of which is below.

30





31

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>1995 Ford Tractor-Trailer Truck, license plate 26-<br>392, VIN: 1FTYY90V6SVA73472, and a<br>Samsung Galaxy S5, model SM-G900V,<br>990004913336164 | Case No. _____<br><br>**Filed Under Seal** |

## ATTACHMENT B

## DESCRIPTION OF LOCATION TO BE SEARCHED

The cellular phone known as a Samsung Galaxy S5, model SM-G900V,

990004913336164, a picture of which is below.

32

314



33

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

F I L E D

SEP - 1 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN RE:  SEARCH WARRANT FOR
**1995 Ford Tractor-Trailer Truck, license plate
26-392, VIN: 1FTYY90V6SVA73472, and a
Samsung Galaxy S5, model SM-G900V,
990004913336164**

No. 3:16MS371

**Filed Under Seal**

## ORDER
(Sealing Order)

The United States has submitted a Motion to Seal pursuant to Local Rule 49(B),

requesting the Court to issue an Order sealing the Motion to Seal, this Order, and the search

warrant with the same case number as captioned above (hereafter referred to as "the search

warrant") until further order of the Court.

Upon due consideration, the Court determines that there is reason to believe that

notification of the existence of the search warrant will seriously jeopardize the investigation,

including by giving targets an opportunity to flee or continue flight from prosecution, destroy or

tamper with evidence, change patterns of behavior, or notify confederates.

316

IT IS THEREFORE ORDERED that the government's Motion to Seal, this Order, and the search warrant, including its supporting application and affidavit, are sealed until otherwise ordered by the Court.

IT IS SO ORDERED

/s/

Roderick C. Young
United States Magistrate Judge

Date 9/1/2016
Richmond, Virginia

2

317

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



SEP - 1 2016

CLERK, US DISTRICT COURT
RICHMOND, VA

IN RE:  SEARCH WARRANT **FOR**

**1995 Ford Tractor-Trailer Truck, license
plate 26-392, VIN: 1FTYY90V6SVA73472,
and a Samsung Galaxy S5, model SM-
G900V, 990004913336164**

No. 3 16mS371

**Filed Under Seal**

## MOTION TO SEAL SEARCH WARRANT
## UNDER LOCAL RULE 49(B)

The United States requests, under Local Rule 49(B), that the Court seal this motion, any

resulting order, and the search warrant, including its supporting application and affidavit, until

further order of the Court.

It is generally recognized that the public has a common law right of access, but not a First

Amendment right of access, to judicial documents, including documents associated with *ex parte*

proceedings such as search warrant affidavits.  *Media General Operations, Inc. v. Buchanan*, 417

F.3d 424, 429 (4th Cir. 2005); *In re Washington Post Company v. Hughes,* 923 F.2d 324, 326

(4th Cir. 1991).  But the right of access is qualified, and a judicial officer may deny access to

search warrant documents if sealing is "essential to preserve higher values" and "narrowly

tailored to serve that interest."  *Media General Operations*, 417 F.3d at 429 (internal citations

omitted); *see also In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) ("The trial court has

supervisory power over its own records and may, in its discretion, seal documents if the public's

right of access is outweighed by competing interests").  Sealing search warrants, their

accompanying affidavits and application, and any related pleadings is within the discretionary

powers of a judicial officer where, among other things, an affidavit contain[s] sensitive details of

1

318

an ongoing investigation and "it is clear and apparent from the affidavits that any disclosure of the information there would hamper th[e] ongoing investigation." *Media General Operations*, 417 F.3d at 430 (internal citations omitted); *see also In re Search Warrant for Matter of Eye Care Physicians of America*, 100 F.3d 514, 518 (7th Cir. 1996).

Before a district court generally may seal judicial records or documents, it must (a) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (b) consider less drastic alternatives to sealing the documents, and (c) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000).

However, regarding the notice requirement in the specific context of a search warrant, the Fourth Circuit has cautioned that "the opportunity to object does not arise prior to the entry of a sealing order when a search warrant has not been executed." *Media General Operations*, 417 F.3d at 429. "A rule to the contrary would endanger the lives of officers and agents and allow the subjects of the investigation to destroy or remove evidence before the execution of the search warrant." *Id.*; *see also Franks v. Delaware*, 438 U.S. 154, 169 (1978). Accordingly, in the context of search warrants, "the notice requirement is fulfilled by docketing 'the order sealing the documents,' which gives interested parties the opportunity to object after the execution of the search warrants." *Media General Operations*, 417 F.3d at 430 (quoting *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 65 (4th Cir. 1989)); *see also* Local Rule 49(B) ("Until an executed search warrant is returned, search warrants and related papers are not filed with the Clerk.").

As to the requirement of a court's consideration of alternatives, the Fourth Circuit counsels that, "[i]f a judicial officer determines that full public access is not appropriate, she 'must consider alternatives to sealing the documents,' which may include giving the public

2

319

access to some of the documents or releasing a redacted version of the documents that are the subject to the government's motion to seal." *Media General Operations*, 417 F.3d at 429 (quoting *Goetz*, 886 F.2d at 66).

Finally, regarding the requirement of specific findings, the Fourth Circuit's precedents state that, "in entering a sealing order, a 'judicial officer may explicitly adopt the facts that the government presents to justify sealing when the evidence appears creditable,'" *Media General Operations*, 417 F.3d at 430 (quoting *Goetz*, 886 F.2d at 65), so long as the ultimate decision to seal the papers is made by the judicial officer. *Goetz*, 886 F.2d at 65. "'Moreover, if appropriate, the government's submission and the [judicial] officer's reason for sealing the documents can be filed under seal.'" *Media General Operations*, 417 F.3d at 430 (quoting *Goetz*, 886 F.2d at 65); *see also In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986) ("[I]f the court concludes that a denial of public access is warranted, the court may file its statement of the reasons for its decision under seal").

Sealing is appropriate in this case because premature disclosure of the specific details of this ongoing investigation to the public would jeopardize this continuing criminal investigation in several ways. It would potentially alert possible targets of the investigation of its existence, thus giving them an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. Allowing potential targets to engage in this type of behavior would hinder the ability of the United States to identify, locate, and arrest the individuals involved in the suspected production and trafficking of child pornography and human trafficking referenced in the search warrant affidavit.

WHEREFORE, the United States requests that the Court order that this motion, any resulting order, and the search warrant, including its supporting application and affidavit, be

3

sealed until further order of the Court.  As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Thomas K. Johnstone IV
Special Assistant United States Attorney

4

321

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia ▾

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )       Case No. 3:16MS371
1995 Ford Tractor-Trailer Truck, license plate 26-392, )
VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, )
model SM-G900V, 990004913336164 )

SEP - 1 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A and B, fully incorporated by reference herein;

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment C, fully incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(2)(a) | Possession, Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2251 | Production of child pornography |

The application is based on these facts:

See attached Affidavit, fully incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Melvin Gonzalez, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____09/01/2016_____

Roderick C. Young   /s/
United States Magistrate Judge
*Judge's signature*

City and state:  Richmond, Virginia

Hon. Roderick C. Young,  United States Magistrate Judge
*Printed name and title*

322

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 990004913336164 | Case No. *2:16m5371*<br><br>FILED UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Melvin Gonzalez, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI), United States

Department of Justice, and have been so employed by the FBI for over ten years.  I am currently

assigned to the Richmond Field Office, Richmond, VA.  I am assigned to the Child Exploitation

Task Force which conducts investigations pertaining to child sex trafficking, child pornography,

and child abductions.  I have received training from the FBI in the areas of child exploitation.  I

was previously assigned for three years to the San Juan Field Office, where I investigated violent

crimes, gangs, and drug trafficking.  During my career in law enforcement, I have received

extensive training in the conduct of a variety of investigations, including drug investigations,

organized crime, violent crime, white collar crime, and others.  In my experience, I have

participated in a wide range of investigations.  That experience has included receiving and

analyzing information, conducting interviews, collecting and processing physical evidence, and

preparing evidence for trial.

1



323

2. In the course of my employment as a sworn law-enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of computers, magnetic storage media for computers, other electronic media, and other items evidencing violations of state and federal laws, including various sections of Title 18, United States Code §§ 1591, 2251, 2252, and 2252A, involving child exploitation and child pornography offenses.

3. I have probable cause to believe that a 1995 Ford Tractor Trailer, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, IMEI 990004913336164 ("SUBJECT PROPERTY") contains contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of: 18 U.S.C. § 2251 (production of child pornography); 18 U.S.C. § 2251A (Selling or Buying of Children); 18 U.S.C. § 2252 (possession of, knowing access or attempted access with intent to view, child pornography); 18 U.S.C. § 2422 (enticement or coercion of a minor to engage in illegal sexual activity); and 18 U.S.C. § 1591( sex trafficking of children). I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT PROPERTY, as further described in Attachments A and B, incorporated herein by reference, which is located in the Eastern District of Virginia. Located within the SUBJECT PROPERTY to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire SUBJECT PROPERTY, including any computer, communication devices, and electronic media located therein where the items specified in Attachment C may be found, and to seize all items listed in Attachment C as contraband and instrumentalities, fruits, and evidence of crime.

4. The statements contained in this affidavit are based in part on: information provided by FBI Special Agents, FBI Task Force Agents, and other law-enforcement officers; written reports

2

324

about this and other investigations that I have received, directly or indirectly, from other law-enforcement agents; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law-enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training, and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## DEFINITIONS

5.   The following definitions apply to this Affidavit and attachments hereto:

   a.   "Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

   b.   "**Child Pornography**," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

3

325

c. **Visual depictions** include undeveloped film and videotape, and data stored on computer disk or by electronic means, which are capable of conversion into a visual image, and data which are capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. See 18 U.S.C. § 2256(5).

d. **Minor** means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e. **Sexually explicit conduct** means actual or simulated: (i) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

## TECHNICAL TERMS

6.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a. **"Computer,"** as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

b. **"Computer Server"** or **"Server,"** as used herein is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a

4

326

computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

c.  **"Computer hardware,"** as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d.  **"Computer software,"** as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.

5

327

It commonly includes programs to run operating systems, applications, and utilities.

e. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

f. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable

6

328

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

g. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

h. **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that

7

329

are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

i.  **PDA**: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

j.  **Tablet**: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those

8

functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

k. The "**Internet**" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l. "**Internet Service Providers**" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

9

331

m. **"Internet Protocol address"** or "IP address" refers to a unique number used by a computer to access the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

n. "The terms **"records**," **"documents**," and **"materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o. **"Website"** consists of textual pages of information and associated graphic

10

332

images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

7. On June 16, 2016, members of the FBI Richmond Child Exploitation Task Force, received information regarding a suspect, Richard Todd Haas, which indicated that Haas was both interested in and actively producing child pornography. The information was provided by a confidential witness (CW), who has known Haas for approximately four years. During that time, CW provided escort services to Haas. Haas advised CW during one of their encounters that he had an interest in what he described as younger females. Haas advised CW that he had a neighbor who was approximately 12 years old that would come over and perform oral sex on him. CW and Haas parted ways shortly after that conversation four years ago.

8. According to CW, in May 2016, CW and Haas reconnected, and the two arranged to meet at his residence located in Chesterfield County, Virginia. CW was dropped at a house she identified as being the residence at which she met Haas four years ago. During this visit, Haas again brought up his interest in juvenile females. Haas displayed his laptop to CW, which contained images of juvenile females. CW described the images as depicting juvenile females between the ages of 5 and 12 in various stages of undress and engaged in sexually explicit acts. CW advised that she was shown between 50 and 100 images of these girls. Haas advised CW that he knew the victims because they lived in his neighborhood. While Haas displayed the images to the CW, he masturbated to the photos. Haas told CW that he would like for CW to be involved in the production of images and videos of child pornography with juvenile females and

11

333

inquired as to whether CW would be able to help provide these females for such production. CW advised that, while she was disgusted with what Haas was suggesting, CW played along in order to get more information for what crimes Haas may be committing.

9. Agents displayed a photo to CW, which CW identified as Haas. CW also provided FBI agents with a phone number for Haas—804-402-6003. FBI agents cross searched 804-402-6003 with law-enforcement databases and were able to determine that it has been used as a contact number for Haas in law-enforcement investigations.

10. On July 21, 2016, FBI agents met with CW again. CW advised that she had multiple telephone conversations with Haas and had met Haas in person one additional time in the vicinity of Henrico County, Virginia. CW advised that Haas was driving a light-colored Jetta. Haas constantly discussed the production of child pornography with CW and requested CW to find an underage female in order to produce child pornography. Haas also requested CW to obtain nude images of an underage female in exchange for money.

11. On August 12, 2016, and August 13, 2016, CW recorded two telephone calls with Haas at 804-402-6003. During the calls, Haas advised CW that he was previously trying to contact CW because he was with someone and wanted to meet with CW. CW understood that Haas was referring to an underage female. Haas also advised CW that he was out of town in New Jersey taking care of a job and later advised that he was in the country. CW understood Haas to be referring to the production of child pornography. Haas also requested nude photos of underage females in exchange of money. Haas requested CW to coordinate a meeting between him and an underage female not older than 12 years old. Haas advised CW that the younger the better inasmuch as the others prefer younger females. Haas advised CW that she could make a lot of

12

money from it.  Before the call terminated, Haas requested that CW refer to underage females as shoes and to specify their age using shoe sizes.

12.  Based on these recordings, FBI agents believe that Haas may be involved with others in the production and distribution of child pornography.  FBI agents also believe that Haas could be traveling outside of Virginia in order to engage in criminal activity.

13.  CW identified a photo of the residence located at 661 Greencastle Road, North Chesterfield, Virginia 23236 as the residence at which she visited Haas and where he displayed the child pornography images.  According to CLEAR records, Haas was the owner of the 661 Greencastle Rd. residence until July 2016 when he sold the residence.

14.  On August 18, 2016, FBI agents received a complaint from the Richmond Police Department, indicating that Haas had sexually molested an 11-year-old female ("CV1") on occasions.  According to the police report, since September 2015, CV1 was sent by her mother to Haas's residence to provide cleaning services.  Haas picked up the child and transported her to his residence.

15.  CV1 was forensically interviewed and provided the following information.  CV1 was living at the Richmond Inn located at 6346 Midlothian Turnpike, Richmond, Virginia 23225 before February 2016 with her biological mother and her biological father. CV1 states that she and her father would go "beg for money" close to the Richmond Inn.  The first time CV1 remembers meeting Haas, who she refers to as Todd, she was panhandling with her father.  CV1 states that Todd came by where they sat one day and gave her father five dollars.  A short time later, Todd came back, gave her father sixty dollars, and asked him if CV1 could come to his house to babysit.  The father declined to let CV1 babysit initially, but, when Todd asked if she

13

could come clean his house instead, the father agreed.  Todd picked CV1 up at the hotel later that day and brought her to his house in Chesterfield County.

16.  During the initial visit to Todd's house, CV1 cleaned the kitchen by doing the dishes and vacuuming.  At some point, Todd asked CV1 to come to the living room where he was sitting on the floor in front of the couch.  Todd asked CV1 to lie down on the couch, which she did.  CV1 said that Todd pulled her pants down and pushed her shirt up.  CV1 sat up and pulled her pants up and attempted to exit the room.  Todd stopped her and told her to lie back down on the couch. Todd again pulled down her pants and rubbed her on the outside of her vagina skin to skin.  CV1 asked to go home, and Todd drove her back to the Richmond Inn, gave her $200, and told her to give it to her parents.  Todd told CV1 that she could not tell anyone what he had done or he would be arrested and sent to jail.  CV1 advised that this happened on at least 5 occasions with each time being the same as the first, although the amount of money he gave her would change each time.

17.  On August 26, 2016, CV1's guardian was interviewed.  CV1's guardian advised that CV1 told her that Haas had given her from $200 to $600 every time she had an encounter with him.  CV1's guardian stated that she has had custody of CV1 since April 2016 and that she was not aware that CV1's mother had access to CV1 when CV1 was visiting other family members.  CV1's guardian said the last time Haas had access to CV1 he picked her up at her brother's residence and sexually abused CV1 in his vehicle.  CV1's guardian said that CV1's mother coordinated the meeting.  CV1's guardian believes this meeting took place sometime in June 2016.

14

336

18. CV1 advised her guardian that Haas told her that CV1's mother was in the process of giving him custody of CV1 so she didn't have to beg for money again. CV1 also advised her guardian that Haas told her not to worry because he also sexually abused one of his kids.

19. While CV1 was unable to identify a photo of Haas, CV1's guardian confronted CV1's mother and obtained a telephone number for Haas, which was 804-402-6003. CV1's guardian called Haas to corroborate his identity. CV1's guardian told law-enforcement that the man who answered her call identified himself as Richard Todd Haas. CV1's mother advised CV1's guardian that Haas has a tree service business.

20. FBI agents served Verizon Wireless with a Subpoena and obtained Subscriber information for 804-402-6003. According to the records obtained, 804-402-6003 is registered to Richard T Haas, Account 552599036-1, PO Box 35085, North Chesterfield, Virginia.

21. According to CLEAR reports, PO Box 35085, North Chesterfield, Virginia belongs to Haas. Haas's Virginia DMV records also display the address of PO Box 35085, North Chesterfield, Virginia. Virginia DMV records also indicate a new dwelling address for Haas in Chesterfield County, Virginia, which was added on July 14, 2016.

22. FBI agents conducted a telephone analysis and discovered that Haas's cellular telephone number had contacted the Richmond Inn at 804-276-8500 five times in April 2016. FBI agents also identified more than 60 text messages and 100 telephone calls between Haas's cellular telephone number and CV1's mother's phone number from May 2016 to July 2016.

23. The FBI conducted surveillance at the Haas's new residence for several days. On numerous occasions, including August 29, 2016, the surveillance team observed Haas depart the

15

337

residence in a 2015 white VW Jetta, License plate VEU2010.  Haas has been observed driving to

his work location at TMS Services LLC, 270 Labrook Concourse, Richmond, Virginia 23234.

24.  According to CLEAR Records, Haas is the principle executive for TMS Services LLC,

an equipment and leasing business, which was incorporated in 2001 with a registered address of

661 Greencastle Road, North Chesterfield, Virginia 23236.

25.  Based on this information, the FBI obtained a search warrant for Haas's new residence

from this Court on August 31, 2016.  The FBI executed the search warrant early on September 1,

2016, but found that Haas had already left for work.  FBI agents proceeded to Haas's work

location at 270 Labrook Concourse, Richmond, Virginia 23234, where they encountered Haas

sitting in the driver's seat of his work vehicle, a 1995 Ford tractor-trailer truck, license plate

number 26-392.   Haas was arrested pursuant to a Virginia arrest warrant charging him with

aggravated sexual battery of a minor.  During the search incident to arrest, agents recovered a

Samsung Galaxy S5, model SM-G900V, IMEI 990004913336164, from Haas's person.  Also,

during a protective sweep of the tractor-trailer truck, an FBI agent observed a GPS device

attached to the windshield, as well as a laptop bag, which contained a laptop computer.  After

seeing the laptop bag, the agent ceased his protective sweep and exited the vehicle.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, COLLECT, RECEIVE CHILD PORNOGRAPHY AND SEEK TO SEXUALLY EXPLOIT CHILDREN

27.  Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I

have had discussions, I know there are certain characteristics common to individuals who utilize

web-based sites to seek children to sexually exploit them by having sexual encounters or

16

338

obtaining images of child pornography:

a.    Individuals who access with intent to view, possess, collect, receive and distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Individuals who access with intent to view, possess, collect and receive child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Individuals who access with intent to view, possess, collect and receive child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

17

d.     Likewise, individuals who access with intent to view, possess, collect and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.     Individuals who access with intent to view, possess, collect and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.     Individuals involved in sexually exploiting children and who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images and children victims of sexual exploitation. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.     Individuals who access with intent to view, possess, collect and receive child

18

340

pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. Individuals involved in sexually exploiting children sometimes have double lives and concealed forms of communication with these victims. These individuals also create fictitious profiles pertaining to web base accounts such as emails, chatting and forum sites. These individuals with double lives can be involved in children related activities in order to have direct access to new victims. It is common for these individuals to use mobile devices connected to public Wi-Fi internet to communicate with victims and schedule dates for sexual encounters.

i. Individuals who are child predators and sexually exploit children search for children who are vulnerable and easily manipulated. These individuals seek for children with low self-esteem and who are experiencing problems at home.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

28. Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. It has also revolutionized the methods that individuals will use to interact with and sexually exploit children. Computers serve four functions in connection with child pornography: production, communication, distribution, and storage.

29. **Production.** Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred

19

to a computer by simply connecting the camera to the computer.  In the last ten years, the

resolution of pictures taken by digital cameras has increased dramatically, meaning the photos

taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera

are stored on a removable memory card in the camera.  These memory cards often store up to 32

gigabytes of data, which provides enough space to store thousands of high-resolution

photographs.  Video camcorders, which once recorded video onto tapes or mini-CDs, now can

save video footage in a digital format directly to a hard drive in the camera.  The video files can

be easily transferred from the camcorder to a computer.

30.  **Distribution and Communication.**  A device known as a modem allows any computer

to connect to another computer through the use of telephone, cable, or wireless connection.

Electronic contact can be made to literally millions of computers around the world.  The ability

to produce child pornography easily, reproduce it inexpensively, and market it anonymously

(through electronic communications) has drastically changed the method of distribution and

receipt of child pornography.  Child pornography can be transferred via electronic mail or

through file transfer protocols (FTPs) to anyone with access to a computer and modem.  Because

of the proliferation of commercial services that provide electronic mail service, chat services

(i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of

distribution and receipt of child pornographic materials.

31.  **Storage.**  The computer's ability to store images in digital form makes the computer

itself an ideal repository for child pornography.  The size of the electronic storage media

(commonly referred to as the hard drive) used in home computers has grown tremendously

within the last several years.  These drives can store thousands of images at very high resolution.

20

342

In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

32.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

33.   Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

34.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically

21

stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.  As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PROPERTY in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.  *Probable cause.*  I submit that if a computer or storage medium is found in the SUBJECT PROPERTY, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, I know that computer files or
       remnants of such files can be recovered months or even years after they have been
       downloaded onto a storage medium, deleted, or viewed via the Internet.
       Electronic files downloaded to a storage medium can be stored for years at little
       or no cost.  Even when files have been deleted, they can be recovered months or
       years later using forensic tools.  This is so because when a person "deletes" a file
       on a computer, the data contained in the file does not actually disappear; rather,
       that data remains on the storage medium until it is overwritten by new data.

22

344

Depending on a variety of factors, a particular computer could easily not overwrite deleted files with new data for many months, and in certain cases, conceivably ever.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

23

345

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PROPERTY because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

24

346

photographs, the presence or absence of malware, and correspondence (and the

data associated with the foregoing, such as file creation and last-accessed dates)

may be evidence of who used or controlled the computer or storage medium at a

relevant time.

c.   A person with appropriate familiarity with how a computer works can, after

examining this forensic evidence in its proper context, draw conclusions about

how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other

forms of forensic evidence on a storage medium that are necessary to draw an

accurate conclusion is a dynamic process.  While it is possible to specify in

advance the records to be sought, computer evidence is not always data that can

be merely reviewed by a review team and passed along to investigators.  Whether

data stored on a computer is evidence may depend on other information stored on

the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also

falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use,

who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a storage medium.  For example, the presence or absence

of counter-forensic programs or anti-virus programs (and associated data) may be

relevant to establishing the user's intent.

25

    f.   I know that when an individual uses a computer to engage in a child pornography offense (whether it be to produce, distribute, transport, receive or possess child pornography), the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: 1) data that is evidence of how the computer was used; 2) data that was sent or received; 3) notes as to how the criminal conduct was achieved; 4) records of Internet discussions about the crime; and 5) other records that indicate the nature of the offense.

38.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the SUBJECT PROPERTY, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

26

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time in the SUBJECT PROPERTY could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the SUBJECT PROPERTY.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

27

349

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIFICITY OF SEARCH WARRANT RETURN

40. Consistent with the Court's current policy, the search warrant return will list the model(s) and serial number(s) of any and all computers seized in the SUBJECT PROPERTY and include a general description of any and all associated peripheral equipment that has been seized. Additionally, the search warrant return will include the total numbers of each type of digital media that has been seized (*e.g.,* "ten (10) 3.5" diskettes; twenty (20) CDs; twenty (20) DVDs; three (3) USB drives; one (1) 256 MB flash memory card," etc.)

## NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

41. Moreover, the Government will file a written pleading in this case within 120 days after the execution of the search warrant notifying the court that the imaging process of digital evidence seized from the target location is complete, and the forensic analysis of computers and media has begun. Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun. Such notice to the defendant and the Court is not intended to mean, and should not be construed to mean, that the forensic analysis

28

350

is complete, or that a written report detailing the results of the examination to date will be filed

with the Court or provided to the defendant or his counsel. This notice does not create, and is

not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of

this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic

search of that property has actually begun.

## CONCLUSION

42.     Based on the foregoing, there is probable cause to believe that the federal

criminal statutes cited herein have been violated, and that the contraband, property, evidence,

fruits and instrumentalities of these offenses, more fully described in Attachment C of this

Affidavit, are located in the SUBJECT PROPERTY, described in Attachments A and B. I

respectfully request that this Court issue a search warrants for the SUBJECT PROPERTY,

authorizing the seizure and search of the items described in Attachment C.

Melvin Gonzalez
Special Agent
Federal Bureau of Investigation


Seen and approved by:

Thomas K. Johnstone IV
Special Assistant United States Attorney


Sworn to me this 1st day of September 2016

/s/

Roderick C. Young
United States Magistrate Judge                29


351

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:
1995 Ford Tractor-Trailer Truck, license plate 26-
392, VIN: 1FTYY90V6SVA73472, and a
Samsung Galaxy S5, model SM-G900V,
990004913336164

Case No. 3:16MS34

**Filed Under Seal**

RECEIVED
SEP - 1 2016
CLERK U S DISTRICT COURT
RICHMOND VA

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The vehicle known as a 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN:

1FTYY90V6SVA73472, a picture of which is below.

30

352



31

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| IN THE MATTER OF THE SEARCH OF: 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 990004913336164 | Case No. 3:16mS371 |
|---|---|
| | **Filed Under Seal** |

### ATTACHMENT B

### DESCRIPTION OF LOCATION TO BE SEARCHED

The cellular phone known as a Samsung Galaxy S5, model SM-G900V,

990004913336164, a picture of which is below.

32

354



33

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 1995 Ford Tractor-Trailer Truck, license plate 26-392, VIN: 1FTYY90V6SVA73472, and a Samsung Galaxy S5, model SM-G900V, 990004913336164 | Case No. 3:16mS37 1 <br><br> **Filed Under Seal** |

SEP - 1 2016

## ATTACHMENT C

### EVIDENCE TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal

offense, contraband, the fruits of crime, or property designed or intended for use or which is or

has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §

2251(production of child pornography); 18 U.S.C. § 2251A(Selling or Buying of Children); 18

U.S.C. § 2252 (possession of, knowing access or attempted access with intent to view, child

pornography); 18 U.S.C. § 2422(enticement or coercion of a minor to engage in illegal sexual

activity); and 18 U.S.C. § 1591( sex trafficking of children).

1. Computers or storage media used as a means to commit the violations described above.

2. GPS devices

3. Any computer or storage medium whose seizure is otherwise authorized by this

    warrant, and any computer or storage medium that contains or in which is stored records

    or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the

        things described in this warrant were created, edited, or deleted, such as logs,

        registry entries, configuration files, saved usernames and passwords, documents,

34

356

browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

35

    k.  records of or information about Internet Protocol addresses used by the

        COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including

        firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

        web pages, search terms that the user entered into any Internet search engine, and

        records of user-typed web addresses; and

    m.  contextual information necessary to understand the evidence described in this

        attachment.

4.  Routers, modems, and network equipment used to connect computers to the Internet.

5.  Child pornography and child erotica.

6.  Any cameras capable of producing paper or digital photographs and/or audio-visual

    recordings

7.  Records, information, and items relating to violations of the statutes described above

    including

    a.  Records, information, and items relating to the occupancy or ownership of the

        SUBJECT PROPERTY, including utility and telephone bills, mail envelopes, or

        addressed correspondence; Records, information, and  items relating to the

        ownership or use of computer equipment found in the SUBJECT PROPERTY,

        including sales receipts, bills for Internet access, and handwritten notes and

        ownership of vehicles in the SUBJECT PROPERTY;

    b.  Records and information relating to the identity or location of the persons

        suspected of violating the statutes described above; and

36

358

c.  Records and information relating to sexual exploitation of children.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

37

359